# EXHIBIT E

DEBT INSTRUMENT AGREEMENT

dated as of February 15, 2007

as amended and restated on June 2, 2008

among

CEVA INVESTMENTS LTD (formerly Louis Topco Limited),

THE HOLDERS OF DEBT INSTRUMENTS PARTY HERETO,

and

CREDIT SUISSE
as Administrative Agent,

_____

CREDIT SUISSE

as Bookrunner,

CREDIT SUISSE

and

DEUTSCHE BANK AG, LONDON BRANCH

as Joint Lead Arrangers

**Exhibits and Schedules**

Exhibit A          Form of Assignment and Acceptance
Exhibit B          Form of Solvency Certificate
Exhibit C          Form of Initial Notice

Schedule 1.01(a)   Immaterial Subsidiaries
Schedule 1.01(h)   Unrestricted Subsidiaries
Schedule 2.01      Commitments
Schedule 3.01      Organization and Good Standing
Schedule 3.04      Governmental Approvals
Schedule 3.07(a)   Owned Properties
Schedule 3.07(b)   Leased Properties
Schedule 3.07(c)   Intellectual Property
Schedule 3.08(a)   Subsidiaries
Schedule 3.08(b)   Subscriptions
Schedule 3.09(a)   Litigation
Schedule 3.09(b)   Litigation
Schedule 3.13      Taxes
Schedule 3.16      Environmental Matters
Schedule 3.20      Labor Matters
Schedule 3.21      Insurance
Schedule 4.02(d)   Local Counsel
Schedule 10.01     Notice Information

**Error! Unknown document property name.**

DEBT INSTRUMENT AGREEMENT dated as of February 15, 2007, and amended and restated as of June 2, 2008 (this "Agreement"), among CEVA INVESTMENTS LTD (formerly Louis Topco Limited), a limited liability company organized under the laws of the Cayman Islands with tax residence in the United Kingdom (together with its successors, the "Company"), the HOLDERS OF DEBT INSTRUMENTS party hereto from time to time, and CREDIT SUISSE, as administrative agent (the "Administrative Agent") for the Holders of Debt Instruments.

WHEREAS, affiliates of Apollo Management VI, L.P. (the "Fund") and other Permitted Holders (as defined below) own the Equity Interests (as defined below) of the Company, the direct parent of CEVA Group PLC (formerly Louis No. 1 PLC) ("CEVA");

WHEREAS, in connection with payment of dividends to the Company's equity holders, the Company requested that the Holders of Debt Instruments extend credit to the Company by purchasing pay-in-kind term debt instruments on the Closing Date, in an initial aggregate principal amount of €275,000,000; and

WHEREAS, on the Closing Date, the Company incurred an initial aggregate principal amount of Debt Instruments of €275,000,000;

NOW, THEREFORE, the Holders of Debt Instruments extended such credit to the Company on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

ARTICLE I

Definitions

Section 1.01.  Defined Terms.  As used in this Agreement, the following terms shall have the meanings specified below:

"Acquired Indebtedness" shall mean, with respect to any specified Person:

(1)      Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person; and

(2)      Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"Acquisition Agreement" means that certain Agreement for the Sale and Purchase of All the Issued and Outstanding Shares in the Capital of TNT Logistics

Error! Unknown document property name.

Holdings B.V. and the SNCF Business, dated August 23, 2006, by and between TNT N.V. and CEVA Limited (formerly known as Louis No. 3 Limited).

"<u>Acquisition Documents</u>" means the Acquisition Agreement and any other document entered into in connection therewith, in each case as amended, supplemented or modified from time to time prior to the Closing Date or thereafter (so long as any amendment, supplement or modification after the Closing Date, together with all other amendments, supplements and modifications after the Closing Date, taken as a whole, is not more disadvantageous to the Holders of Debt Instruments in any material respect than the Acquisition Documents as in effect on the Closing Date).

"<u>Additional Amounts</u>" shall have the meaning assigned to such term in Section 2.17(a).

"<u>Additional Bank Agreement</u>" shall mean that certain Additional Bank Agreement dated as of January 30, 2007 by and among the Company and Deutsche Bank AG, London Branch, consented to by Credit Suisse, whereby Deutsche Bank AG, London Branch was appointed as a joint Lead Arranger in respect of the Debt Instruments.

"<u>Administrative Agent</u>" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Administrative Agent Fees</u>" shall have the meaning assigned to such term in Section 2.12(b).

"<u>Administrative Questionnaire</u>" shall mean an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"<u>Agreement</u>" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Applicable Margin</u>" shall mean for any day 7.75% per annum in the case of any Debt Instrument.

"<u>Applicable Premium</u>" shall mean, with respect to any Debt Instrument on any early redemption date, the excess of: (1) the present value at such early redemption date of (i) the early redemption price of 103% of the principal amount of such Debt Instrument at the six month anniversary of the Closing Date, plus (ii) all required interest

**Error! Unknown document property name.**

payments due on such Debt Instrument (assuming that the EURIBO Rate prevailing at the time of the notice of early redemption applies throughout such period) to and including the six month anniversary of the Closing Date (excluding accrued but unpaid interest not treated as part of principal amount), computed upon the early redemption date using a discount rate equal to the Bund Rate at such early redemption date plus 75 basis points; over (2) the outstanding principal amount of such Debt Instrument.

"Applicable Rate" shall have the meaning assigned to such term in Section 2.13.

"Approved Fund" shall have the meaning assigned to such term in Section 10.04(b).

"Arranger" shall mean each of Credit Suisse and Deutsche Bank AG, London Branch.

"Asset Sale" shall mean:

(1)     the sale, conveyance, transfer or other disposition (whether in a single transaction or a series of related transactions) of property or assets (including by way of a Sale/Leaseback Transaction) outside the ordinary course of business of the Company or any Restricted Subsidiary of the Company (each referred to in this definition as a "disposition") or

(2)     the issuance or sale of Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Company or another Restricted Subsidiary of the Company) (whether in a single transaction or a series of related transactions),

in each case other than:

(a) a disposition of Cash Equivalents or Investment Grade Loans or obsolete, surplus or worn-out property or equipment in the ordinary course of business;

(b) transactions permitted pursuant to Section 3.01 of Annex A or any disposition that constitutes a Change of Control;

(c) any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 2.04 of Annex A;

(d) any disposition of assets or issuance or sale of Equity Interests of any Restricted Subsidiary, which assets or Equity Interests so disposed or issued have an aggregate Fair Market Value of less than €7.5 million;

(e) any disposition of property or assets, or the issuance of securities, by a Restricted Subsidiary of the Company to the Company or

Error! Unknown document property name.

by the Company or a Restricted Subsidiary of the Company to a Restricted Subsidiary of the Company;

(f) any exchange of assets (including a combination of assets and Cash Equivalents) for assets related to a Similar Business of comparable or greater market value or usefulness to the business of the Company and its Restricted Subsidiaries as a whole, as determined in good faith by the Company;

(g) foreclosure or any similar action with respect to any property or any other asset of the Company or any of its Restricted Subsidiaries;

(h) any sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(i) the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(j) any sale of inventory, trading stock or other assets in the ordinary course of business;

(k) any grant in the ordinary course of business of any license of patents, trademarks, know-how or any other intellectual property;

(l) an issuance of Capital Stock pursuant to an equity incentive or compensation plan approved by the Board of Directors;

(m) dispositions consisting of the granting of Permitted Liens;

(n) dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(o) any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Company or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(p) any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

Error! Unknown document property name.

(q) a transfer of accounts receivable and related assets of the type specified in the definition of "Receivables Financing" (or a fractional undivided interest therein) by a Receivables Subsidiary or any Restricted Subsidiary (x) in a Qualified Receivables Financing or (y) pursuant to any other factoring on arm's length terms or (z) in the ordinary course of business;

(r) the sale of any property in a Sale/Leaseback Transaction within six months of the acquisition of such property; and

(s) in the ordinary course of business, any swap of assets, or any lease, assignment or sublease of any real or personal property, in exchange for services (including in connection with any outsourcing arrangements) of comparable or greater value or usefulness to the business of the Company and the Restricted Subsidiaries taken as a whole, as determined in good faith by the Company; provided, that any cash or Cash Equivalents received must be applied in accordance with Section 2.06 of Annex A.

"Assignee" shall have the meaning assigned to such term in Section 10.04(b).

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Holder of Debt Instruments and an Assignee, and accepted by the Administrative Agent and the Company (if required by Section 10.04), in the form of Exhibit A or such other form as shall be approved by the Administrative Agent and reasonably satisfactory to the Company.

"Bank Indebtedness" shall mean any and all amounts payable under or in respect of the CEVA Credit Agreement and the other CEVA Credit Agreement Documents as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time (including after termination of the CEVA Credit Agreement), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to CEVA whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"Board of Directors" means, as to any Person, the board of directors or managers, as applicable, of such Person (or, if such Person is a partnership, the board of directors or other governing body of the general partner of such Person) or any duly authorized committee thereof.

"Bund Rate" means, with respect to any relevant date, the rate per annum equal to the equivalent yield to maturity as of such date of the Comparable German Bund

Error! Unknown document property name.

Issue, assuming a price for the Comparable German Bund Issue (expressed as a percentage of its principal amount) equal to the Comparable German Bund Price for such relevant date, where:

(1) "Comparable German Bund Issue" means the German Bundesanleihe security selected by any Reference German Bund Dealer as having a fixed maturity of one year and that would be utilized at the time of selection and in accordance with customary financial practice, in pricing new issues of euro-denominated corporate debt securities in a principal amount approximately equal to the then outstanding principal amount of the Debt Instruments.

(2) "Comparable German Bund Price" means, with respect to any relevant date, the average of all Reference German Bund Dealer Quotations for such date (which, in any event, must include at least two such quotations), after excluding the highest and lowest such Reference German Bund Dealer Quotations, or if the Company obtains fewer than four such Reference German Bund Dealer Quotations, the average of all such quotations;

(3) "Reference German Bund Dealer" means any dealer of German Bundesanleihe securities appointed by the Company in consultation with the Administrative Agent; and

(4) "Reference German Bund Dealer Quotations" means, with respect to each Reference German Bund Dealer and any relevant date, the average as determined by the Company of the bid and offered prices for the Comparable German Bund Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by such Reference German Bund Dealer at 3.30 p.m. Frankfurt, Germany, time on the third Business Day preceding the relevant date.

"Business Day" means a day other than a Saturday, Sunday or other day on which banking institutions are authorized or required by law to close in New York City and London.

"Capitalized Lease Obligation" shall mean, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"Capital Stock" shall mean:

(1) in the case of a corporation, corporate stock or shares;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

Error! Unknown document property name.

(3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Cash Equivalents" shall mean:

(1)     U.S. dollars, pounds sterling, euro, the national currency of any member state in the European Union or, in the case of any Restricted Subsidiary that is not organized or existing under the laws of the United States, any member state of the European Union or any state or territory thereof, such local currencies held by it from time to time in the ordinary course of business;

(2)     securities issued or directly and fully guaranteed or insured by the U.S., Canadian, Swiss or Japanese government or any country that is a member of the European Union or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3)     certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank whose long-term debt is rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency);

(4)     repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)     commercial paper issued by a corporation (other than an Affiliate of the Company) rated at least "A-2" or the equivalent thereof by S&P or "P-2" or the equivalent thereof by Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6)     readily marketable direct obligations issued by any state of the United States of America, any province of Canada, any member of the European Monetary Union, Switzerland or Norway or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(7)     Indebtedness issued by Persons (other than the Sponsors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from

Moody's in each case with maturities not exceeding two years from the date of acquisition;

(8)     for the purpose of paragraph (a) of the definition of "Asset Sale," any marketable securities of third parties owned by the Company and/or its Restricted Subsidiaries on the Closing Date; and

(9)     interest in investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (7) above.

"CEVA" shall have the meaning assigned to such term in the preamble hereto.

"CEVA Credit Agreement" shall mean (i) the Credit Agreement dated as of November 4, 2006, as amended and restated as of January 4, 2007, among CEVA, Louis U.S. Holdco, Inc., TNT Canada ULC, CEVA Logistics Holdings B.V., Louis Australia Holdco Pty Limited, the lenders party thereto from time to time, Credit Suisse as administrative agent and collateral agent, and ABN AMRO Bank N.V., as syndication agent, as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, increased as permitted under Section 2.03(a) of Annex A, repaid, refunded, refinanced or otherwise modified from time to time, including any agreement or indenture extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof, among the Company, the guarantors named therein, the financial institutions named therein, and Credit Suisse, as Administrative Agent, and (ii) whether or not the credit agreement referred to in clause (i) remains outstanding, if designated by the Company to be included in the definition of "CEVA Credit Agreement," one or more (A) debt facilities or commercial paper facilities, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to lenders or to special purpose entities formed to borrow from lenders against such receivables) or letters of credit, (B) debt securities, indentures or other forms of debt financing (including convertible or exchangeable debt instruments or bank guarantees or bankers' acceptances) or (C) instruments or agreements evidencing any other Indebtedness, in each case, with the same or different borrowers or issuers and, in each case, as amended, supplemented, modified, extended, restructured, renewed, refinanced, restated, replaced or refunded in whole or in part from time to time.

"CEVA Note Issuance Date" shall mean December 6, 2006.

"CEVA Notes" shall mean the Senior Notes and the Senior Subordinated Notes.

"Change of Control" shall mean the occurrence of any of the following events:

Error! Unknown document property name.

(i) the sale, lease or transfer, in one or a series of related transactions, of all or substantially all the assets of the Company and its Subsidiaries, taken as a whole, to a Person other than any of the Permitted Holders;

(ii) the Company becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) of the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), other than any of the Permitted Holders, in a single transaction or in a related series of transactions, by way of merger, consolidation or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), of more than 50% of the total voting power of the Voting Stock of the Company or any direct or indirect parent of the Company; or

(iii) the Company shall fail to own directly or indirectly 100% of the issued and outstanding Equity Interests of CEVA.

Notwithstanding the foregoing, a transaction will not be deemed to be or to result in a Change of Control if such transaction is permitted by Article III of Annex A.

"Change of Control Offer" shall have the meaning assigned to such term in Section 2.11(b).

"Change of Control Payment" shall have the meaning assigned to such term in Section 2.11(b)(i).

"Change of Control Redemption Date" shall have the meaning assigned to such term in Section 2.11(b)(iii).

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Holder of Debt Instruments (or, for purposes of Section 2.15, by any lending office of such Holder of Debt Instruments) or by the holding company, if any, of such Holder of Debt Instruments with any written request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date.

"Charges" shall have the meaning assigned to such term in Section 10.09.

"Closing Date" shall mean February 21, 2007.

"Code" shall mean the United States Internal Revenue Code of 1986, as amended from time to time and the regulations promulgated and rulings issued thereunder.

**Error! Unknown document property name.**

"Commitments" shall mean with respect to any Holder of Debt Instruments, the commitment of such Holder of Debt Instruments to subscribe Debt Instruments hereunder as set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Holder of Debt Instruments assumed its commitment, as applicable, as the same may be reduced or increased from time to time pursuant to assignments by or to such Holder of Debt Instruments pursuant to Section 10.04.

"Company" shall have the meaning assigned to such term in the preamble hereto.

"Company Materials" shall have the meaning assigned to such term in Section 10.17.

"Consolidated Interest Expense" shall mean, with respect to any Person for any period, the sum, without duplication, of:

(1) consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted in computing Consolidated Net Profit (including amortization of original issue discount, the interest component of Capitalized Lease Obligations, and net payments and receipts (if any) pursuant to interest rate Hedging Obligations and excluding amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses and expensing of any bridge commitment or other financing fees); plus

(2) consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued (but excluding any capitalizing interest on Subordinated Shareholder Funding); plus

(3) commissions, discounts, yield and other fees and charges Incurred in connection with any Receivables Financing which are payable to Persons other than the Company and its Restricted Subsidiaries; minus

(4) interest income for such period.

"Consolidated Leverage Ratio" shall mean, with respect to any Person at any date, the ratio of (a) the aggregate amount of all Indebtedness of such Person and its Restricted Subsidiaries less cash and cash equivalents (excluding restricted cash), in each case, determined on a consolidated basis in accordance with GAAP as of such date to (b) the EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date. In the event that the Company or any of its Restricted Subsidiaries Incurs or redeems any Indebtedness subsequent to the commencement of the period for which the Consolidated Leverage Ratio is being calculated and on or prior to the date on which the event for which the calculation of the Consolidated Leverage Ratio is made, then the Consolidated Leverage Ratio shall be calculated giving pro forma effect to such Incurrence or redemption of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period. The provisions applicable to pro forma transactions and Indebtedness set forth in the

Error! Unknown document property name.

2

Subsidiary of its Net Profit is not at the date of determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restrictions with respect to the payment of dividends or similar distributions have been legally waived and other than as may be permitted by Section 2.05 of Annex A; provided that the Consolidated Net Profit of such Person shall be increased by the amount of dividends or other distributions or other payments actually paid in cash (or converted into cash) by any such Restricted Subsidiary to such Person, to the extent not already included therein;

(9)     an amount equal to the amount of Tax Distributions actually made to any parent of such Person in respect of such period in accordance with Section 2.04(b)(12) of Annex A shall be included as though such amounts had been paid as income taxes directly by such Person for such period;

(10)    any non-cash impairment charges or asset write-offs, and the amortization of intangibles arising in each case pursuant to GAAP or the pronouncements of the IASB shall be excluded;

(11)    any non-cash expense realized or resulting from stock option plans, employee benefit plans or post-employment benefit plans, grants and sales of stock, stock appreciation or similar rights, stock options or other rights to officers, directors and employees shall be excluded;

(12)    any (a) severance or relocation costs or expenses, (b) one-time non-cash compensation charges, (c) the costs and expenses after the CEVA Note Issuance Date related to employment of terminated employees, (d) costs or expenses realized in connection with, resulting from or in anticipation of the Initial Transactions or (e) costs or expenses realized in connection with or resulting from stock appreciation or similar rights, stock options or other rights existing on the Closing Date of officers, directors and employees, in each case of such Person or any of its Restricted Subsidiaries, shall be excluded;

(13)    accruals and reserves that are established or adjusted as a result of the Initial Transactions (including as a result of the adoption or modification of accounting policies in connection with the Initial Transactions) within 12 months after the CEVA Note Issuance Date, and that are so required to be established in accordance with GAAP shall be excluded;

(14)    solely for purposes of calculating EBITDA, (a) the Net Profit of any Person and its Restricted Subsidiaries shall be calculated without deducting the income attributable to, or adding the losses attributable to, the minority equity interests of third parties in any non-wholly owned Restricted Subsidiary except to the extent of dividends declared or paid in respect of such period or any prior period on the shares of Capital Stock of such Restricted Subsidiary held by such

Error! Unknown document property name.

third parties and (b) any ordinary course dividend, distribution or other payment paid in cash and received from any Person in excess of amounts included in clause (7) above shall be included;

(15)     (a) (i) the non-cash portion of "straight-line" rent expense shall be excluded and (ii) the cash portion of "straight-line" rent expense that exceeds the amount expensed in respect of such rent expense shall be included and (b) non-cash gains, losses, income and expenses resulting from fair value accounting required by the applicable standard under GAAP shall be excluded;

(16)     unrealized gains and losses relating to hedging transactions and mark-to-market of Indebtedness denominated in foreign currencies resulting from the applications of the applicable standard under GAAP shall be excluded;

(17)     any expenses incurred in the 18 months following the CEVA Note Issuance Date that constitute transition expenses attributable to the Company becoming an independent operating company in connection with the Initial Transactions (including without limitation re-branding costs) shall be excluded;

(18)     solely for the purpose of calculating Restricted Payments, the difference, if positive, of the Consolidated Taxes of the Company calculated in accordance with GAAP and the actual Consolidated Taxes paid in cash by the Company during any Reference Period shall be included; and

(19)     solely for the purpose of determining the amount available for Restricted Payments under clause (1) of the definition of Cumulative Credit, amortization of original issue discount and the payment of non-cash interest relating to the Debt Instruments shall be excluded.

Notwithstanding the foregoing, for the purpose of Article III of Annex A only, there shall be excluded from Consolidated Net Profit any dividends, repayments of loans or advances or other transfers of assets from Unrestricted Subsidiaries of the Company or a Restricted Subsidiary of the Company to the extent such dividends, repayments or transfers increase the amount of Restricted Payments permitted under Article III of Annex A pursuant to clauses (4) and (5) of the definition of "Cumulative Credit" contained therein.

"Consolidated Non-cash Charges" shall mean, with respect to any Person for any period, the aggregate depreciation, amortization and other non-cash expenses of such Person and its Restricted Subsidiaries reducing Consolidated Net Profit of such Person for such period on a consolidated basis and otherwise determined in accordance with GAAP, but excluding any such charge which consists of or requires an accrual of, or cash reserve for, anticipated cash charges for any future period.

"Consolidated Taxes" shall mean provision for taxes based on income, profits or capital, including, without limitation, state, franchise and similar taxes and any Tax Distributions taken into account in calculating Consolidated Net Profit.

Error! Unknown document property name.

"Consolidated Total Assets" shall mean, as of any date, the total assets of the Company and the consolidated Subsidiaries, determined in accordance with GAAP, as set forth on the consolidated balance sheet of the Company as of such date.

"Contingent Obligations" shall mean, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1)     to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(2)     to advance or supply funds:

(a)     for the purchase or payment of any such primary obligation; or

(b)     to maintain working capital or equity capital of the primary obligor     or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Cumulative Credit" means the sum of (without duplication):

(1)     50% of the Consolidated Net Profit of the Company for the period (taken as one accounting period, the "Reference Period") beginning on the first day after the end of the Company's second full fiscal quarter ending after the CEVA Note Issuance Date to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, in the case such Consolidated Net Profit for such period is a deficit, minus 100% of such deficit); plus

(2)     100% of the aggregate net proceeds, including cash and the Fair Market Value (as determined in good faith by the Company) of property other than cash received by the Company after the CEVA Note Issuance Date (other than net proceeds to the extent such net proceeds have been used to Incur Indebtedness, Disqualified Stock, or Preferred Stock pursuant to clause (xxii) of Section 2.03(b) of Annex A) from the issue or sale of Equity Interests of the

Error! Unknown document property name.

Company or Subordinated Shareholder Funding to the Company (excluding Refunding Capital Stock, Designated Preferred Stock, Excluded Contributions, and Disqualified Stock), including Equity Interests issued upon exercise of warrants or options (other than an issuance or sale to a Restricted Subsidiary of the Company); plus

(3)     100% of the aggregate amount of contributions to the capital of the Company received in cash and the Fair Market Value (as determined in good faith by the Company) of property other than cash after the CEVA Note Issuance Date (other than Excluded Contributions, Refunding Capital Stock, Designated Preferred Stock, and Disqualified Stock and other than contributions to the extent such contributions have been used to Incur Indebtedness, Disqualified Stock, or Preferred Stock pursuant to clause (xxii) of Section 2.03(b) of Annex A); plus

(4)     the principal amount of any Indebtedness, or the liquidation preference or maximum fixed repurchase price, as the case may be, of any Disqualified Stock of the Company or any Restricted Subsidiary thereof issued after the CEVA Note Issuance Date (other than Indebtedness or Disqualified Stock issued to a Restricted Subsidiary) which has been converted into or exchanged for Equity Interests in or Subordinated Shareholder Funding of the Company (other than Disqualified Stock) or any direct or indirect parent of the Company (provided in the case of any parent, such Indebtedness or Disqualified Stock is retired or extinguished); plus

(5)     100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value (as determined in good faith by the Company) of property other than cash received by the Company or any Restricted Subsidiary from:

(A)     the sale or other disposition (other than to the Company or a Restricted Subsidiary of the Company) of Restricted Investments made by the Company and its Restricted Subsidiaries and from repurchases and redemptions of such Restricted Investments from the Company and its Restricted Subsidiaries by any Person (other than the Company or any of its Restricted Subsidiaries) and from repayments of loans or advances and releases of guarantees, which constituted Restricted Investments (other than in each case to the extent that the Restricted Investment was made pursuant to clause (7) or (10) of Section 2.04(b)),

(B)     the sale (other than to the Company or a Restricted Subsidiary of the Company) of the Capital Stock of an Unrestricted Subsidiary, or

(C)     a distribution or dividend from an Unrestricted Subsidiary; plus

Error! Unknown document property name.

(6)      in the event any Unrestricted Subsidiary of the Company has been redesignated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Company or a Restricted Subsidiary after the CEVA Note Issuance Date, the Fair Market Value (as determined in good faith by the Company or, if such Fair Market Value may exceed €20.0 million, in writing by an Independent Financial Advisor) of the Investment of the Company in such Unrestricted Subsidiary at the time of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable), after taking into account any Indebtedness associated with the Unrestricted Subsidiary so designated or combined or any Indebtedness associated with the assets so transferred or conveyed (other than in each case to the extent that the designation of such Subsidiary as an Unrestricted Subsidiary was made pursuant to clause (7) or (10) of Section 2.04(b) or constituted a Permitted Investment).

"Currency Agreement" shall mean, in respect of a Person, any foreign exchange contract, currency swap agreement, currency futures contract, currency option contract, currency derivative or other similar agreement to which such Person is a party or beneficiary.

"Debt Instrument" shall mean the Debt Instruments subscribed by the Holders of Debt Instruments pursuant to this Agreement.

"Debt Instrument Documents" shall mean this Agreement, including all Schedules, Exhibits and Annexes, and solely for the purposes of Section 4.01 of Annex A, the Fee Letter, and any other document designated as such and agreed between the Administrative Agent and the Company.

"Debt Instrument Listing" shall have the meaning assigned to such term in Section 2.15.

"Default" shall mean any event which is, or after notice or passage of time or both would be, an Event of Default.

"Defaulting Holder of Debt Instruments" shall mean any Holder of Debt Instruments with respect to which a Holder of Debt Instruments Default is in effect.

"Designated Non-cash Consideration" shall mean the Fair Market Value of non-cash consideration received by the Company or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officers' Certificate, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"Designated Preferred Stock" shall mean Preferred Stock of a Person (other than Disqualified Stock), that is issued for cash (other than to the Company or any of its Subsidiaries or an employee stock ownership plan or trust established by the

Error! Unknown document property name.

Company or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officers' Certificate, on the issuance date thereof.

"Disqualified Holder of Debt Instruments" shall mean each of the Holders of Debt Instruments identified in a letter sent to the Administrative Agent on or prior to the Closing Date.

"Disqualified Stock" shall mean, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale, provided that the relevant asset sale or change of control provisions, taken as a whole, are not materially more disadvantageous to the Holders of Debt Instruments than is customary in comparable transactions (as determined in good faith by the Company));

(2) is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person; or

(3) is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

in each case prior to 91 days after the maturity date of the Debt Instruments or the date the Debt Instruments are no longer outstanding; provided, however, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; provided, further, however, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; provided, further, that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Domestic Subsidiary" shall mean any Subsidiary that is not a Foreign Subsidiary or a Qualified CFC Holding Company.

"environment" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or

Error! Unknown document property name.

subsurface strata, natural resources such as flora and fauna, the workplace or as otherwise defined in any Environmental Law.

"Environmental Laws" shall mean all applicable laws (including common law), rules, regulations, codes, ordinances, orders, decrees or judgments, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or exposure to, any Hazardous Material or to occupational health and safety matters (to the extent relating to the environment or Hazardous Materials).

"EBITDA" shall mean, with respect to any Person for any period, the Consolidated Net Profit of such Person for such period plus, without duplication, to the extent the same was deducted in calculating Consolidated Net Profit:

(1)     Consolidated Taxes; plus

(2)     Consolidated Interest Expense; plus

(3)     Consolidated Non-cash Charges; plus

(4)     business optimization expenses and other restructuring charges or expenses (which, for the avoidance of doubt, shall include, without limitation, the effect of inventory or service optimization programs, site closures, retention, systems establishment costs and excess pension charges); provided that with respect to each business optimization expense or other restructuring charge, the Company shall have delivered to the Administrative Agent an Officers' Certificate specifying and quantifying such expense or charge and stating that such expense or charge is a business optimization expense or other restructuring charge, as the case may be; plus

(5)     the amount of management, monitoring, consulting and advisory fees and related expenses paid to the Sponsors (or any accruals relating to such fees and related expenses) during such period pursuant to the terms of the agreements between the Sponsors and the Company and its Subsidiaries as described with particularity in the Offering Circular and as in effect on the CEVA Note Issuance Date;

less, without duplication,

(6)     non-cash items increasing Consolidated Net Profit for such period (excluding the recognition of deferred revenue or any items which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period and any items for which cash was received in a prior period).

"Equity Interests" shall mean Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

Error! Unknown document property name.

"Equity Offering" shall mean any public or private sale after the CEVA Note Issuance Date of common stock or Preferred Stock of the Company or any direct or indirect parent of the Company, as applicable (other than Disqualified Stock), other than:

(1)     public offerings with respect to the Company's or such direct or indirect parent's common stock registered on Form S-8; and

(2)     any such public or private sale that constitutes an Excluded Contribution.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time and any final regulations promulgated and the rulings issued thereunder.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with the Company or a Subsidiary, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) any Reportable Event or the requirements of Section 4043(b) of ERISA apply with respect to a Plan; (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 412(m) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the incurrence by the Company, a Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or Multiemployer Plan; (e) the receipt by the Company, a Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (f) the incurrence by the Company, a Subsidiary or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; (g) the receipt by the Company, a Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Company, a Subsidiary or any ERISA Affiliate of any notice, concerning the impending imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) the conditions for imposition of a lien under Section 302(f) of ERISA shall have been met with respect to any Plan; (i) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 307 of ERISA or (j) any Foreign Benefit Event.

"EURIBO Rate" shall mean the rate per annum equal to the Banking Federation of the European Union EURIBOR Rate ("BFEA EURIBOR"), as published by Telerate (or other commercially available source providing quotations of BFEA

Error! Unknown document property name.

EURIBOR as designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Target Days prior to the commencement of such Interest Period, for deposits in Euro (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; provided that if such rate is not available at such time for any reason, then the "EURIBO Rate" for such Interest Period shall be the rate per annum determined by the Administrative Agent to be the rate at which deposits in Euro for delivery on the first day of such Interest Period in same day funds in the approximate aggregate amount of the Debt Instruments being purchased, continued or converted by Credit Suisse and with a term equivalent to such Interest Period would be offered by Credit Suisse's London Branch in the European interbank market at their request at approximately 11:00 a.m. (London time) two Target Days prior to the commencement of such Interest Period.

"Euro" or "€" shall mean the single currency of the Participating Member States.

"Euro Equivalent" shall mean, with respect to any monetary amount in a currency other than euro, at any time of determination thereof by the Company or the Administrative Agent, the amount of euro obtained by converting such currency other than euro involved in such computation into euro at the spot rate for the purchase of euro with the applicable currency other than euro as published in *The Financial Times* in the "Currency Rates" section (or, if *The Financial Times* is no longer published, or if such information is no longer available in *The Financial Times*, such source as may be selected in good faith by the Company) on the date of such determination.

"Excluded Contributions" shall mean the Cash Equivalents or other assets (valued at their Fair Market Value as determined in good faith by senior management or the Board of Directors of the Company) received by the Company after the CEVA Note Issuance Date from:

(1)     contributions to its common equity capital; and

(2)     the sale (other than to a Subsidiary of the Company or to any Subsidiary management equity plan or stock option plan or any other management or employee benefit plan or agreement) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Company,

in each case designated as Excluded Contributions pursuant to an Officers' Certificate executed by an Officer of the Company on or promptly after the date such capital contributions are made or the date such Capital Stock is sold, as the case may be.

"Event of Default" shall have the meaning assigned to such term in Section 4.01 of Annex A.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

Error! Unknown document property name.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Holder of Debt Instruments or any other recipient of any payment to be made by or on account of any obligation of the Company hereunder,

(1) any Taxes that would not have been so imposed but for the existence of any present or former connection between the relevant Holder of Debt Instruments (or between a fiduciary, settlor, beneficiary, member or shareholder of, or possessor of power over the relevant Holder of Debt Instruments, if the relevant Holder of Debt Instruments is an estate, nominee, trust, partnership, limited liability company or corporation) and the Relevant Taxing Jurisdiction (including being a citizen or resident or national of, or carrying on a business or maintaining a permanent establishment in, or being physically present in, the Relevant Taxing Jurisdiction) but excluding, in each case, any connection arising solely from the acquisition, ownership or holding of such Debt Instrument or the receipt of any payment in respect thereof;

(2) any Taxes that would not have been so imposed if the Holder of Debt Instruments had reasonably cooperated with the Company in completing any claims or the procedural requirements necessary for the Company to obtain authentication from the Relevant Taxing Jurisdiction to make such payment without such a deduction or withholding of any Taxes;

(3) any Taxes that are payable otherwise than by withholding from a payment of the principal of, premium, if any, or interest on the Debt Instruments;

(4) any estate, inheritance, gift, sales, excise, transfer, personal property or similar tax, assessment or other governmental charge;

(5) any Taxes that are required to be deducted or withheld on a payment to an individual pursuant to the Directive or any law implementing, or introduced in order to conform to, the Directive;

(6) except in the case of the liquidation, dissolution or winding-up of the Company, any Taxes imposed in connection with a Debt Instrument presented for payment by or on behalf of a Holder of Debt Instruments or beneficial owner who would have been able to avoid such Tax by presenting the relevant Debt Instrument to, or otherwise accepting payment from, another paying agent in a member state of the European Union; or

(7) any combination of the above.

"Fair Market Value" shall mean, with respect to any asset or property, the price that could be negotiated in an arm's length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction (as determined by the Company).

"Federal Funds Effective Rate" shall mean, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions

Error! Unknown document property name.

with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Credit Suisse on such day on such transactions as determined by the Administrative Agent.

"Fee Letter" shall mean that certain Fee Letter dated as of January 30, 2007, by and among the Company and Credit Suisse.

"Fees" shall mean the fees under the Fee Letter and the Administrative Agent Fees.

"Financial Officer" of any person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer or Controller or, if applicable, a managing director or director of such person or any other person that the board of directors of such person shall designate that is reasonably satisfactory to the Administrative Agent.

"First Priority Lien Obligations" shall mean (i) all Secured Bank Indebtedness, (ii) all other Obligations (not constituting Indebtedness) of the Company and its Restricted Subsidiaries under the agreements governing Secured Bank Indebtedness and (iii) all other Obligations of the Company or any of its Restricted Subsidiaries in respect of Hedging Obligations or Obligations in respect of cash management services, in each case owing to a Person that is a holder of Indebtedness described in clause (i) or Obligations described in clause (ii) or an Affiliate of such holder at the time of entry into such Hedging Obligations or Obligations in respect of cash management services.

"Fixed Charge Coverage Ratio" shall mean, with respect to any Person for any period, the ratio of EBITDA of such Person for such period to the Fixed Charges of such Person for such period. In the event that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of revolving credit borrowings or revolving advances in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "Calculation Date"), then the Fixed Charge Coverage Ratio shall be calculated giving pro forma effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

Error! Unknown document property name.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Initial Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Calculation Date (each, for purposes of this definition, a "pro forma event") shall be calculated on a pro forma basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Initial Transactions), discontinued operations and operational changes (and the change of any associated fixed charge obligations and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, amalgamation, consolidation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving pro forma effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, consolidation or operational change had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever pro forma effect is to be given to any pro forma event, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Company. Any such pro forma calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officers' Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable pro forma event (including, to the extent applicable, from the Initial Transactions and the Transactions) and (2) all adjustments of the nature used in connection with the calculation of "Pro Forma Adjusted EBITDA" as set forth in footnote 2 in "Summary Financial Information—Pro Forma and Other Financial Data" in the Offering Circular to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Company to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a pro forma basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or

Error! Unknown document property name.

similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Company may designate.

"Fixed Charges" shall mean, with respect to any Person for any period, the sum, without duplication, of:

(1)     Consolidated Interest Expense of such Person for such period; and

(2)     all cash dividend payments (excluding items eliminated in consolidation) on any series of Preferred Stock or Disqualified Stock of such Person and its Restricted Subsidiaries.

"Foreign Benefit Event" shall mean, with respect to any Foreign Benefit Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure to make the required contributions or payments under any applicable law on or before the due date for such contributions or payments, (c) the receipt of a notice by a Governmental Authority relating to the intention to terminate any such Foreign Benefit Plan or to appoint a trustee or similar official to administer any such Foreign Benefit Plan, or alleging the insolvency of any such Foreign Benefit Plan, (d) the incurrence of any liability in excess of €5.0 million by the Company or any of its Subsidiaries under applicable law on account of the complete or partial termination of such Foreign Benefit Plan or the complete or partial withdrawal of any participating employer therein or (e) the occurrence of any transaction that is prohibited under any applicable law and could reasonably be expected to result in the incurrence of any liability by the Company or any of its Subsidiaries, or the imposition on the Company or any of its Subsidiaries of any fine, excise tax or penalty resulting from any noncompliance with any applicable law, in each case in excess of €5.0 million.

"Foreign Benefit Plan" shall mean any benefit plan that under applicable law is required to be funded through a trust or other funding vehicle other than a trust or funding vehicle maintained exclusively by a Governmental Authority.

"Foreign Subsidiary" shall mean any Subsidiary that is incorporated or organized under the laws of any jurisdiction other than the United States of America, any State thereof or the District of Columbia.  For the avoidance of doubt, a Subsidiary that is incorporated or organized under the laws of the Commonwealth of Puerto Rico, or any other possession of the United States, shall be considered a Foreign Subsidiary.

"Fund" shall have the meaning assigned to such term in the first recital hereto.

"Fund Affiliates" shall mean (i) each Affiliate of the Fund, and (ii) any individual who is a partner or employee of Apollo Management, L.P., Apollo Management IV, L.P., Apollo Management V, L.P, or Apollo Management VI, L.P.

Error! Unknown document property name.

"GAAP" shall mean the International Financial Reporting Standards ("IFRS") as in effect (except as otherwise provided in this Agreement) on the Closing Date. Except as otherwise expressly provided in this Agreement, all ratios and calculations based on GAAP contained in this Agreement shall be computed in conformity with GAAP, as defined herein. At any time after the Closing Date, the Company may elect to apply generally accepted accounting principles in the U.S. ("U.S. GAAP") in lieu of GAAP and, upon any such election, references herein to GAAP shall thereafter be construed to mean U.S. GAAP as in effect (except as otherwise provided in this Agreement) on the date of such election; provided that any such election, once made, shall be irrevocable and that, upon first reporting its fiscal year results under U.S. GAAP it shall restate its financial statements on the basis of U.S. GAAP for the fiscal year ending immediately prior to the first fiscal year for which financial statements have been prepared on the basis of U.S. GAAP.

"Governmental Authority" shall mean any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body.

"Guarantee" means any guarantee of the obligations of the Company under this Debt Instrument Agreement by any Person in accordance with the provisions of this Debt Instrument Agreement.

"guarantee" shall mean a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"guarantor" shall have the meaning assigned to such term in the definition of the term "Guarantee".

"Hazardous Materials" shall mean all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including, without limitation, explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas, of any nature subject to regulation or which can give rise to liability under any Environmental Law.

"Hedging Obligations" shall mean, with respect to any Person, the obligations of such Person under:

(1)     currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements and currency exchange, interest rate or commodity collar agreements; and

(2)     other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices.

Error! Unknown document property name.

"Holder of Debt Instruments" shall mean each financial institution listed on Schedule 2.01, as well as any person that becomes a "Holder of Debt Instruments" hereunder pursuant to Section 2.21 or Section 10.04.

"Holder of Debt Instruments Default" shall mean the refusal (which has not been retracted) or actual failure of a Holder of Debt Instruments to subscribe any Debt Instruments.

"IASB" shall mean the International Accounting Standards Board and any other organization or agency that shall issue pronouncements regarding the application of GAAP.

"Immaterial Subsidiary" shall mean any Subsidiary that, as of the last day of the fiscal quarter of the Company most recently ended, (a) (i) did not have assets with a value in excess of 5.0% of the Consolidated Total Assets or EBITDA (substituting such Subsidiary and its consolidated subsidiaries for the Company in the definition of the term "EBITDA") representing in excess of 5.0% of EBITDA of the Company and the Subsidiaries on a consolidated basis as of such date and (ii) when taken together with all other Immaterial Subsidiaries as of such date, did not have assets with a value in excess of 10.0% of the Consolidated Total Assets or EBITDA (substituting all such Subsidiaries and their consolidated subsidiaries for the Company in the definition of the term "EBITDA") representing in excess of 10.0% of EBITDA of the Company and the Subsidiaries on a consolidated basis as of such date or (b) less than 66% of the Equity Interests of which are beneficially owned, directly or indirectly, by the Company and the management or policies of which the Company does not have the power, directly or indirectly, to direct.  The Immaterial Subsidiaries as of the Closing Date are set forth on Schedule 1.01(a).

"Incur" shall mean issue, assume, guarantee, incur or otherwise become liable for; provided, however, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"Indebtedness" shall mean, with respect to any Person (without duplication):

(1)     the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except any such balance that (i) constitutes a trade payable or similar obligation to a trade creditor Incurred in the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP, (d) in respect of Capitalized Lease Obligations or (e) representing any Hedging Obligations, if and

Error! Unknown document property name.

to the extent that any of the foregoing indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)     to the extent not otherwise included, any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business);

(3)     to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); provided, however, that the amount of such Indebtedness will be the lesser of:  (a) the Fair Market Value of such asset at such date of determination and (b) the amount of such Indebtedness of such other Person; and

(4)     to the extent not otherwise included, with respect to the Company and its Restricted Subsidiaries, the amount then outstanding (i.e., advanced, and received by, and available for use by, the Company or any of its Restricted Subsidiaries) under any Receivables Financing (as set forth in the books and records of the Company or any Restricted Subsidiary and confirmed by the agent, Administrative Agent or other representative of the institution or group providing such Receivables Financing) where there is recourse to the Company or its Restricted Subsidiaries (as that term is understood in the context of recourse and non-recourse receivable financings),

provided, however, that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations Incurred in the ordinary course of business and not in respect of borrowed money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; (4) Obligations under or in respect of Qualified Receivables Financing; (5) obligations under the Acquisition Documents; or (6) Subordinated Shareholder Funding.

Notwithstanding anything in this Agreement to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under this Agreement but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Agreement.

"Indemnified Taxes" shall mean all Taxes other than Excluded Taxes.

Error! Unknown document property name.

"Indemnitee" shall have the meaning assigned to such term in Section 10.05(b).

"Independent Financial Advisor" shall mean an accounting, appraisal or investment banking firm or consultant, in each case of nationally recognized standing, that is, in the good faith determination of the Company, qualified to perform the task for which it has been engaged.

"Ineligible Institution" shall mean any Disqualified Holders of Debt Instruments, the persons identified in writing to the Administrative Agent by a Responsible Officer of the Company on the Closing Date, and as may be identified in writing to the Administrative Agent by a Responsible Officer of the Company from time to time thereafter, with the written consent of the Administrative Agent, by delivery of a notice thereof to the Administrative Agent setting forth such person or persons (or the person or persons previously identified to the Administrative Agent that are no longer to be considered "Ineligible Institutions").

"Information" shall have the meaning assigned to such term in Section 3.14(a).

"Initial Notice" shall mean a request by a Company in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C.

"Initial Transactions" means the "Transactions" as defined in the CEVA Credit Agreement as in effect on the Closing Date.

"Interest Payment Date" shall mean the last day of the Interest Period applicable to the Issuance of which such Debt Instrument is a part.

"Interest Period" shall mean (a) in the case of the first Interest Period applicable to the Debt Instruments, the period commencing on and including the Closing Date and ending on but excluding March 1, 2007 and (b) in the case of each subsequent Interest Period, the period beginning on and including the last day of the prior Interest Period and ending on but excluding the numerically corresponding date in the third month thereafter; provided, however, that such Interest Period shall in no case end on a date after the Maturity Date.

"Investment Grade Rating" shall mean a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"Investment Grade Securities" shall mean:

(1)    securities issued or directly and fully guaranteed or insured by the U.S., Canadian or Japanese government or any member state of the European Monetary Union or any agency or instrumentality thereof (other than Cash Equivalents);

Error! Unknown document property name.

(2)        securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's or BBB- (or equivalent) by S&P, or an equivalent rating by any other Rating Agency, but excluding any debt securities or loans or advances between and among the Company and its Subsidiaries;

(3)        investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/or distribution; and

(4)        corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"Investments" shall mean, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of the Company in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and Section 2.04 of Annex A:

(1)        "Investments" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of a Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; provided, however, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to:

(a)        the Company's "Investment" in such Subsidiary at the time of such redesignation; less

(b)        the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(2)        any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Company.

"Issuance" shall mean the issuance of the Debt Instruments.

"Lien" shall mean, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset,

Error! Unknown document property name.

whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any other agreement to give a security interest and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction); <u>provided</u> that in no event shall an operating lease be deemed to constitute a Lien.

"<u>Local Time</u>" shall mean London time.

"<u>Management Group</u>" shall mean the group consisting of the directors, executive officers and other management personnel of the Company or any direct or indirect parent of the Company, as the case may be, on the Closing Date together with (1) any new directors whose election by such boards of directors or whose nomination for election by the shareholders of the Company or any direct or indirect parent of the Company, as applicable, was approved by a vote of a majority of the directors of the Company or any direct or indirect parent of the Company, as applicable, then still in office who were either directors on the CEVA Note Issuance Date or whose election or nomination was previously so approved and (2) executive officers and other management personnel of the Company or any direct or indirect parent of the Company, as applicable, hired at a time when the directors on the CEVA Note Issuance Date together with the directors so approved constituted a majority of the directors of the Company or any direct or indirect parent of the Company, as applicable.

"<u>Margin Stock</u>" shall have the meaning assigned to such term in Regulation U.

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on the business, property, operations or condition of the Company and its Subsidiaries, taken as a whole, or the validity or enforceability of any of the material Debt Instrument Documents or the rights and remedies of the Administrative Agent and the Holders of Debt Instruments thereunder.

"<u>Material Subsidiary</u>" shall mean any Subsidiary other than Immaterial Subsidiaries.

"<u>Maturity Date</u>" shall mean June 1, 2017.

"<u>Maximum Rate</u>" shall have the meaning assigned to such term in Section 10.09.

"<u>Minimum Denomination</u>" shall mean €2.5 million and integral multiples of €500,000 thereafter.

"<u>Moody's</u>" shall mean Moody's Investors Service, Inc.

"<u>Multiemployer Plan</u>" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Company or any Subsidiary or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m)

Error! Unknown document property name.

or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"Net Proceeds" shall mean the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received in respect of or upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), net of the direct costs relating to such Asset Sale and the sale or disposition of such Designated Non-cash Consideration (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), any relocation expenses Incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required (other than pursuant to Section 2.06 of Annex A) to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by the Company as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Company after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"Net Profit" shall mean, with respect to any Person, the Net Profit (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"Non-Consenting Holder of Debt Instruments" shall have the meaning assigned to such term in Section 2.19(c).

"Note Certificate" shall have the meaning assigned to such term in Section 2.08(e).

"Obligations" shall mean any principal, interest, penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness; provided that Obligations with respect to the Debt Instruments shall not include fees or indemnifications in favor of the Administrative Agent and other third parties other than the Holders of Debt Instruments.

"Other Taxes" shall mean any and all present or future stamp or documentary taxes or any other excise, transfer, sales, property, intangible, mortgage recording, or similar taxes, charges or levies arising from any payment made hereunder

Error! Unknown document property name.

or from the execution, delivery or enforcement of, or otherwise with respect to, the Debt Instrument Documents, and any and all interest and penalties related thereto (but not Excluded Taxes described in clause (a), clause (b) and, to the extent the Company has reasonably requested applicable certificates and/or forms from a Holder of Debt Instruments, clause (c)(y) of the definition of Excluded Taxes).

"Offering Circular" means the offering circular dated December 1, 2006, in connection with the issuance by CEVA of the CEVA Notes.

"Officer" of any Person means the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of such Person or any other person that the board of directors of such person shall designate for such purpose.

"Officers' Certificate" shall mean a certificate signed on behalf of the Company by two Officers of the Company or of a Subsidiary or parent of the Company that is designated by the Company, one of whom must be the principal executive officer, the principal financial officer, the treasurer, the principal accounting officer or similar position of the Company or such Subsidiary or parent that meets the requirements set forth in this Agreement.

"Opinion of Counsel" shall mean a written opinion from legal counsel who is acceptable to the Administrative Agent (acting reasonably). The counsel may be an employee of or counsel to the Company or the Administrative Agent.

"Pari Passu Indebtedness" shall mean the Debt Instruments and any Indebtedness that ranks pari passu in right of payment to the Debt Instruments.

"Participant" shall have the meaning assigned to such term in Section 10.04(c).

"Participating Member State" shall mean any member state of the European Communities that adopts or has adopted the Euro as its lawful currency in accordance with legislation of the European Community related to Economic and Monetary Union.

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Permitted Holder" shall mean, at any time, each of (i) the Sponsors, (ii) the Management Group, (iii) TNT N.V. and its Affiliates, (iv) AlpInvest Partners Beheer 2006 Ltd and its Affiliates and (v) AAA Investments, L.P and its Affiliates. Any Person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made in accordance with the requirements of this Agreement will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

Error! Unknown document property name.

"Permitted Investments" shall mean:

(1)     any Investment in the Company or any Restricted Subsidiary;

(2)     any Investment in Cash Equivalents or Investment Grade Securities;

(3)     any Investment by the Company or any Restricted Subsidiary of the Company in a Person if as a result of such Investment (a) such Person becomes a Restricted Subsidiary of the Company, or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company;

(4)     any Investment in securities or other assets not constituting Cash Equivalents and received in connection with an Asset Sale made pursuant to Section 2.06 of Annex A or any other disposition of assets not constituting an Asset Sale;

(5)     any Investment existing on, or made pursuant to binding commitments existing on, the Closing Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the Closing Date; provided that the amount of any such Investment only may be increased as required by the terms of such Investment as in existence on the Closing Date;

(6)     advances to officers, directors or employees, taken together with all other advances made pursuant to this clause (6), not to exceed €15.0 million at any one time outstanding;

(7)     any Investment acquired by the Company or any of its Restricted Subsidiaries (a) in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the company of such other Investment or accounts receivable or (b) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(8)     Hedging Obligations permitted under clause (j) of Section 2.03 of Annex A;

(9)     any Investment by the Company or any of its Restricted Subsidiaries in a Similar Business having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (9) that are at that time outstanding, not to exceed the greater of (x) €150.0 million and (y) 7.50% of Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to

subsequent changes in value); provided, however, that if any Investment pursuant to this clause (9) is made in any Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (9) for so long as such Person continues to be a Restricted Subsidiary;

(10)     additional Investments by the Company or any of its Restricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (10) that are at that time outstanding, not to exceed the greater of (x) €100.0 million and (y) 5.0% of Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); provided, however, that if any Investment pursuant to this clause (10) is made in any Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (10) for so long as such Person continues to be a Restricted Subsidiary;

(11)     loans and advances to officers, directors or employees for business-related travel expenses, moving expenses and other similar expenses, in each case Incurred in the ordinary course of business or consistent with past practice or to fund such person's purchase of Equity Interests of the Company or any direct or indirect parent of the Company;

(12)     Investments the payment for which consists of Equity Interests or Subordinated Shareholder Funding of the Company (other than Disqualified Stock) or any direct or indirect parent of the Company, as applicable;

(13)     any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Section 2.07(b) of Annex A (except transactions described in clauses (ii), (vi), (vii) and (xi)(2) of such Section);

(14)     Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(15)     [Reserved];

(16)     Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property;

(17)     any Investment in a Receivables Subsidiary or any Investment by a Receivables Subsidiary in any other Person in connection with a Qualified

Error! Unknown document property name.

Receivables Financing, including Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related Indebtedness; provided, however, that any Investment in a Receivables Subsidiary is in the form of a Purchase Money Note, contribution of additional receivables or an equity interest;

(18)     any Investment in an entity or purchase of a business or assets in each case owned (or previously owned) by a customer of a Restricted Subsidiary as a condition or in connection with such customer (or any member of such customer's group) contracting with a Restricted Subsidiary, in each case in the ordinary course of business;

(19)     any Investment in an entity which is not a Restricted Subsidiary to which a Restricted Subsidiary sells accounts receivable pursuant to a Receivables Financing;

(20)     additional Investments in joint ventures of the Company or any of its Restricted Subsidiaries existing on the Closing Date not to exceed at any one time in the aggregate outstanding, €50.0 million; provided, however, that if any Investment pursuant to this clause (20) is made in any Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (20) for so long as such Person continues to be a Restricted Subsidiary; and

(21)     Investments of a Restricted Subsidiary of the Company acquired after the CEVA Note Issuance Date or of an entity merged into, amalgamated with, or consolidated with the Company or a Restricted Subsidiary of the Company in a transaction that is not prohibited by Section 3.01 of Annex A after the CEVA Note Issuance Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation.

"Permitted Liens" shall mean, with respect to any Person:

(1)     pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

Error! Unknown document property name.

(2)    Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet due or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

(3)    Liens for taxes, assessments or other governmental charges not yet due or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings;

(4)    Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5)    minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)    (A) Liens on assets of a Restricted Subsidiary securing Indebtedness of such Restricted Subsidiary permitted to be Incurred pursuant to Section 2.03 of Annex A, (B) Liens securing an aggregate principal amount of First Priority Lien Obligations not to exceed the greater of (x) the aggregate amount of Indebtedness permitted to be Incurred pursuant to clause (i) of Section 2.03(b) of Annex A and (y) the maximum principal amount of Indebtedness that, as of the date such Indebtedness was Incurred, and after giving effect to the Incurrence of such Indebtedness and the application of proceeds therefrom on such date, would not cause the Secured Indebtedness Leverage Ratio of CEVA to exceed 3.00 to 1.00 and (C) Liens securing Indebtedness permitted to be Incurred pursuant to clauses (iv), (xvii) or (xxv) of Section 2.03(b) of Annex A;

(7)    Liens existing on the Closing Date;

(8)    Liens on assets, property or shares of stock of a Person at the time such Person becomes a Subsidiary; provided, however, that such Liens are not created or Incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; provided, further, however, that such Liens may not extend to any other property owned by the Company or any Restricted Subsidiary of the Company;

(9)    Liens on assets or property at the time the Company or a Restricted Subsidiary of the Company acquired the assets or property, including any

Error! Unknown document property name.

acquisition by means of a merger, amalgamation or consolidation with or into the Company or any Restricted Subsidiary of the Company; provided, however, that such Liens are not created or Incurred in connection with, or in contemplation of, such acquisition; provided, further, however, that the Liens may not extend to any other property owned by the Company or any Restricted Subsidiary of the Company;

(10)     Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Company or another Restricted Subsidiary of the Company permitted to be Incurred in accordance with Section 2.03 of Annex A;

(11)     Liens securing Hedging Obligations not Incurred in violation of this Agreement; provided that with respect to Hedging Obligations relating to Indebtedness, such Lien extends only to the property securing such Indebtedness;

(12)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13)     leases and subleases of real property which do not materially interfere with the ordinary conduct of the business of the Company or any of its Restricted Subsidiaries;

(14)     Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company and its Restricted Subsidiaries in the ordinary course of business;

(15)     Liens in favor of the Company or any Restricted Subsidiary;

(16)     Liens on accounts receivable and related assets of the type specified in the definition of "Receivables Financing" Incurred in connection with a Qualified Receivables Financing;

(17)     deposits made in the ordinary course of business to secure liability to insurance carriers;

(18)     Liens on the Equity Interests of Unrestricted Subsidiaries;

(19)     grants of software and other technology licenses in the ordinary course of business;

(20)     Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in clauses (6), (7), (8), (9), (10), (11), (15) and (20); provided, however, that (x) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property) and

(y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), (9), (10), (11), (15) and (20) at the time the original Lien became a Permitted Lien under this Agreement and (B) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement; provided, further, however, that in the case of any Liens to secure any refinancing, refunding, extension or renewal of Indebtedness secured by a Lien referred to in clause (6)(B), the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension or renewal shall be deemed secured by a Lien under clause (6)(B) and not this clause (20) for purposes of determining the principal amount of Indebtedness outstanding under clause (6)(B), and for purposes of the definition of Secured Bank Indebtedness;

(21) Liens on equipment of the Company or any Restricted Subsidiary granted in the ordinary course of business to the Company's or such Restricted Subsidiary's client at which such equipment is located;

(22) judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(23) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(24) liens arising by virtue of any statutory or common law provisions relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository or financial institution;

(25) any interest or title of a lessor under any Capitalized Lease Obligation;

(26) any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(27) Liens Incurred to secure cash management services or to implement cash pooling arrangements in the ordinary course of business;

(28) other Liens securing obligations Incurred in the ordinary course of business which obligations do not exceed €20.0 million at any one time outstanding; and

(29) Liens pursuant to the Security Documents as defined in the CEVA Credit Agreement.

"Person" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Plan" shall mean any employee pension benefit plan, as such term is defined in Section 3(2) of ERISA, (other than a Multiemployer Plan), (i) subject to the provisions of Title IV of ERISA, (ii) sponsored or maintained (at the time of determination or at any time within the five years prior thereto) by the Company or any ERISA Affiliate, or (iii) in respect of which the Company, any Subsidiary or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Platform" shall have the meaning assigned to such term in Section 10.17(b).

"Preferred Stock" shall mean any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding-up.

"primary obligor" shall have the meaning given such term in the definition of the term "Guarantee".

"principal amount" shall mean, for any day on which a determination is made, (i) the principal amount of Debt Instruments issued on the Closing Date, plus (ii) the principal amount of any additional Debt Instruments issued under this Agreement, plus (iii) the amount of interest accrued as a separate obligation (including any interest accrued with respect to such interest), other than the interest accrued with respect to the period in which the determination of principal amount is made.

"Pro Forma Adjusted EBITDA" shall have the meaning assigned to such term in Section 3.05.

"Projections" shall mean the projections of the Company and the Subsidiaries and any forward-looking statements (including statements with respect to booked business) of such entities furnished to the Holders of Debt Instruments or the Administrative Agent by or on behalf of the Company or any of the Subsidiaries prior to the Closing Date.

"Purchase Money Note" shall mean a promissory note of a Receivables Subsidiary evidencing a line of credit, which may be irrevocable, from the Company or any Subsidiary of the Company to a Receivables Subsidiary in connection with a Qualified Receivables Financing, which note is intended to finance that portion of the purchase price that is not paid by cash or a contribution of equity.

"Qualification" shall have the meaning assigned to such term in Section 2.15 of Annex A.

"Qualified Receivables Financing" shall mean any Receivables Financing that meets the following conditions:

(1)     the Board of Directors of the Company shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Company or, as the case may be, the Subsidiary in question;

(2)     all sales of accounts receivable and related assets are made at Fair Market Value (as determined in good faith by the Company); and

(3)     the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Company) and may include Standard Securitization Undertakings.

The grant of a security interest in any accounts receivable of the Company or any of its Subsidiaries (other than a Receivables Subsidiary or the Subsidiary undertaking such Receivables Financing) to secure Bank Indebtedness, Indebtedness in respect of the Debt Instruments or any Refinancing Indebtedness with respect to the Debt Instruments shall not be deemed a Qualified Receivables Financing.

"Rating Agency" shall mean (1) each of Moody's and S&P and (2) if Moody's or S&P ceases to rate the Debt Instruments for reasons outside of the Company's control, a "nationally recognized statistical rating organization" within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act selected by the Company or any direct or indirect parent of the Company as a replacement agency for Moody's or S&P, as the case may be.

"Real Property" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by the Company, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"Receivables Fees" shall mean distributions or payments made directly or by means of discounts with respect to any participation interests issued or sold in connection with, and all other fees paid to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

"Receivables Financing" shall mean any transaction or series of transactions that may be entered into by the Company or any of its Subsidiaries pursuant to which the Company or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Receivables Subsidiary or (b) any other Person, or may grant a security interest in, any accounts receivable (whether now existing or arising in the future) of the Company or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable

Error! Unknown document property name.

and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Company or any such Subsidiary in connection with such accounts receivable.

"Receivables Repurchase Obligation" shall mean any obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"Receivables Subsidiary" shall mean a Wholly Owned Subsidiary of the Company (or another Person formed for the purposes of engaging in Qualified Receivables Financing with the Company in which the Company or any Subsidiary of the Company makes an Investment and to which the Company or any Restricted Subsidiary of the Company transfers accounts receivable and related assets) that engages in no activities other than in connection with the financing of accounts receivable of the Company and its Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and that is designated by the Board of Directors of the Company (as provided below) as a Receivables Subsidiary and:

(a)     no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by the Company or any other Restricted Subsidiary of the Company (excluding guarantees of obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is with recourse to or obligates the Company or any other Subsidiary of the Company in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Company or any other Subsidiary of the Company, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b)     with which neither the Company nor any other Restricted Subsidiary of the Company has any material contract, agreement, arrangement or understanding other than on terms which the Company reasonably believes to be no less favorable to the Company or such Restricted Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Company; and

(c)     to which neither the Company nor any other Restricted Subsidiary of the Company has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the Company shall be evidenced to the Administrative Agent by filing with the Administrative Agent a certified

Error! Unknown document property name.

copy of the resolution of the Board of Directors of the Company giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing conditions.

"Refinance" shall have the meaning assigned to such term in the definition of the term "Permitted Refinancing Indebtedness," and "Refinanced" shall have a meaning correlative thereto.

"Refinancing Indebtedness" shall have the meaning given to it in Section 2.03(b)(xiii) of Annex A.

"Register" shall have the meaning assigned to such term in Section 10.04(b).

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Fund" shall mean, with respect to any Holder of Debt Instruments that is a fund that invests in bank or commercial loans and similar extensions of credit, any other fund that invests in bank or commercial loans and similar extensions of credit and is advised or managed by (a) such Holder of Debt Instruments, (b) an Affiliate of such Holder of Debt Instruments or (c) an entity (or an Affiliate of such entity) that administers, advises or manages such Holder of Debt Instruments.

"Related Parties" shall mean, with respect to any specified person, such person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such person and such person's Affiliates.

"Release" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the environment.

"Relevant Taxing Jurisdiction" shall have the meaning assigned to such term in Section 2.17(a).

"Reportable Event" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan (other than a Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"Representative" shall mean the trustee, agent or representative (if any) for an issue of Indebtedness; provided that if, and for so long as, such Indebtedness lacks such a Representative, then the Representative for such Indebtedness shall at all times

Error! Unknown document property name.

constitute the holder or holders of a majority in outstanding principal amount of obligations under such Indebtedness.

"Required Holders of Debt Instruments" shall mean Holders of Debt Instruments having Debt Instruments outstanding that represent more than 50% of the sum of all Debt Instruments at such time.

"Responsible Officer" of any person shall mean any executive officer or Financial Officer of such person or any other person that the board of directors of such person shall designate and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement.

"Restricted Investment" shall mean an Investment other than a Permitted Investment.

"Restricted Subsidiary" shall mean, with respect to any Person, any Subsidiary of such Person other than an Unrestricted Subsidiary of such Person. Unless otherwise indicated in this Agreement, all references to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Company.

"S&P" shall mean Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

"Sale/Leaseback Transaction" shall mean an arrangement relating to property now owned or hereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Subsidiary transfers such property to a Person and the Company or such Restricted Subsidiary leases it from such Person, other than leases between the Company and a Restricted Subsidiary of the Company or between Restricted Subsidiaries of the Company.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Bank Indebtedness" shall mean any Bank Indebtedness that is secured by a Permitted Lien Incurred or deemed Incurred pursuant to clause (6)(B) of the definition of Permitted Lien.

"Secured Indebtedness" shall mean any Indebtedness secured by a Lien.

"Secured Indebtedness Leverage Ratio" shall mean, with respect to any Person, at any date the ratio of (i) Secured Indebtedness of such Person and its Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance with GAAP) that constitutes First Priority Lien Obligations to (ii) EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date on which such additional Indebtedness is Incurred. In the event that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Secured Indebtedness Leverage Ratio is being calculated but prior to

Error! Unknown document property name.

the event for which the calculation of the Secured Indebtedness Leverage Ratio is made (the "Secured Leverage Calculation Date"), then the Secured Indebtedness Leverage Ratio shall be calculated giving pro forma effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; provided that the Company may elect pursuant to an Officers' Certificate delivered to the Administrative Agent to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Initial Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Company or any of its Restricted Subsidiaries has determined to make and/or have made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Secured Leverage Calculation Date (each, for purposes of this definition, a "pro forma event") shall be calculated on a pro forma basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Initial Transactions), discontinued operations and other operational changes (and the change of any associated Indebtedness and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, amalgamation, consolidation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Secured Indebtedness Leverage Ratio shall be calculated giving pro forma effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever pro forma effect is to be given to any pro forma event, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Company. Any such pro forma calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officers' Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable pro forma event (including, to the extent applicable, from the Transactions and the Initial Transactions) and (2) all adjustments of the nature used in connection with the calculation of "Pro Forma Adjusted EBITDA" as set forth in footnote 2 in "Summary Financial Information—Pro Forma and Other Financial Data" in the Offering Circular to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

**Error! Unknown document property name.**

"Securities Act" shall mean the U.S. Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Senior Notes" shall mean CEVA's Senior Notes due 2014 issued pursuant to the Senior Notes Indenture.

"Senior Notes Indenture" shall mean the senior notes indenture, dated December 6, 2006, among CEVA, the subsidiary guarantors party thereto, The Bank of New York as trustee, registrar, transfer agent and principal paying agent, and AIB/BNY Fund Management (Ireland) Limited, as Irish paying agent and transfer agent.

"Senior Subordinated Notes" shall mean CEVA's Senior Subordinated Notes due 2016 issued pursuant to the Senior Subordinated Notes Indenture.

"Senior Subordinated Notes Indenture" shall mean the senior subordinated notes indenture, dated December 6, 2006, among CEVA, the subsidiary guarantors party thereto, The Bank of New York as trustee, registrar, transfer agent and principal paying agent, and AIB/BNY Fund Management (Ireland) Limited, as Irish paying agent and transfer agent.

"Significant Subsidiary" shall mean any Restricted Subsidiary that meets any of the following conditions:

(1)  the Company's and its Restricted Subsidiaries' investments in and advances to the Restricted Subsidiary exceed 10% of the total assets of the Company and its Restricted Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year;

(2)  the Company's and its Restricted Subsidiaries' proportionate share of the total assets (after intercompany eliminations) of the Restricted Subsidiary exceeds 10% of the total assets of the Company and its Restricted Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year; or

(3)  the Company's and its Restricted Subsidiaries' equity in the income from continuing operations before income taxes, extraordinary items and cumulative effect of a change in accounting principle of the Restricted Subsidiary exceeds 10% of such income of the Company and its Restricted Subsidiaries on a consolidated basis for the most recently completed fiscal year.

"Signing Date" shall mean February 15, 2007.

"Similar Business" shall mean (a) any businesses, services or activities engaged in by the Company or any of its Subsidiaries on the CEVA Note Issuance Date and (b) any businesses, services and activities engaged in by the Company or any of its Subsidiaries that are related, complementary, incidental, ancillary or similar to any of the foregoing or are extensions or developments of any thereof.

Error! Unknown document property name.

"Sponsors" shall mean (i) Apollo Management, L.P., and any of its Affiliates (collectively, the "Apollo Sponsors") and (ii) any Person that forms a group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) with any Apollo Sponsors; provided that any Apollo Sponsor (x) owns a majority of the voting power and (y) controls a majority of the Board of Directors of the Company.

"Standard Securitization Undertakings" shall mean representations, warranties, covenants, indemnities and guarantees of performance entered into by the Company or any Subsidiary of the Company which the Company has determined in good faith to be customary in a Receivables Financing including, without limitation, those relating to the servicing of the assets of a Subsidiary, it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"Stated Maturity" shall mean, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"Subagent" shall have the meaning assigned to such term in Section 8.02.

"Subordinated Indebtedness" shall mean any Indebtedness of the Company which is by its terms subordinated in right of payment to the Debt Instruments.

"Subordinated Shareholder Funding" shall mean, collectively, any funds provided to the Company by any Parent, any Affiliate of any Parent or any Permitted Holder or any Affiliate thereof, in exchange for or pursuant to any security, instrument or agreement other than Capital Stock, in each case issued to and held by any of the foregoing Persons, together with any such security, instrument or agreement and any other security or instrument other than Capital Stock issued in payment of any obligation under any Subordinated Shareholder Funding; provided, however, that such Subordinated Shareholder Funding:

(1) does not mature or require any amortization, redemption or other repayment of principal or any sinking fund payment prior to the first anniversary of the Stated Maturity of the Debt Instruments (other than through conversion or exchange of such funding into Capital Stock (other than Disqualified Stock) of the Company or any funding meeting the requirements of this definition);

(2) does not require, prior to the first anniversary of the Maturity Date of the Debt Instruments, payment of cash interest, cash withholding amounts or other cash gross-ups;

(3) contains no change of control or similar provisions and does not accelerate and has no right to declare a default or event of default or take any

enforcement action or otherwise require any cash payment (in each case, prior to the first anniversary of the Stated Maturity of the Debt Instruments); and

(4)    does not provide for or require any security interest or encumbrance over any asset of the Company or any of its Subsidiaries.

"<u>Subordinated Shareholder Loans</u>" shall mean participating equity certificates, cumulative participating equity certificates and Indebtedness of the Company to a Permitted Holder that requires no scheduled payment of principal or interest and contains terms and provisions (including subordination terms) that are no less favorable to the Company and the Holders of Debt Instruments than those contained in the Subordinated Shareholder Loans issued on the Closing Date as part of the Equity Financing.

"<u>Subsidiary</u>" shall mean, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, and (2) any partnership, joint venture or limited liability company of which more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"<u>Successor Company</u>" shall have the meaning assigned to such term in Section 3.01(a)(i) of Annex A.

"<u>Swap Agreement</u>" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; <u>provided</u> that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Company or any of the Subsidiaries shall be a Swap Agreement.

"<u>Target Day</u>" shall mean any day on which the Trans-European Automated Real-time Gross Settlement Express Transfer payment system is open for the settlement of payments in Euro.

Error! Unknown document property name.

"Tax Distributions" shall mean any distributions described in Section 2.04(b)(12) of Annex A.

"Taxes" shall mean all present and future taxes, levies, imposts, deductions, charges, duties and withholdings and any charges of a similar nature (including interest, penalties and other liabilities with respect thereto) that are imposed by any government or other taxing authority.

"Tax Redemption Date" shall have the meaning assigned to such term in Section 2.10(e).

"Total Assets" shall mean the total consolidated assets of the Company and its Restricted Subsidiaries, as shown on the most recent balance sheet of the Company.

"Transaction Expenses" means any fees or expenses incurred or paid by the Fund, the Company, CEVA (or any direct or indirect parent of CEVA) or any of its Subsidiaries in connection with the Transactions, this Agreement and the other Debt Instrument Documents and the transactions contemplated hereby and thereby.

"Transactions" shall mean the transactions to occur pursuant to the Debt Instrument Documents, including (a) the execution and delivery of the Debt Instrument Documents, (b) the payment of dividends or return of capital to the equity holders of the Company and the initial borrowings hereunder; and (c) the payment of all fees and expenses to be paid on or prior to the Closing Date and owing in connection with the foregoing.

"Unfunded Pension Liability" means the excess of a Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Plan's assets, determined in accordance with the assumptions used for funding the Plan pursuant to Section 412 of the Code for the applicable plan year.

"Uniform Commercial Code" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"Unrestricted Cash" shall mean cash or cash equivalents of the Company or any of the Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of the Company or any of the Subsidiaries.

"Unrestricted Subsidiary" shall mean:

(1)     any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(2)     any Subsidiary of an Unrestricted Subsidiary.

Error! Unknown document property name.

The Board of Directors of the Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary of the Company) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; provided, however, that the Subsidiary to be so designated and its Subsidiaries do not at the time of designation have and do not thereafter Incur any Indebtedness pursuant to which the lender has recourse to any of the assets of the Company or any of its Restricted Subsidiaries; provided, further, however, that either:

(a) the Subsidiary to be so designated has total consolidated assets of €1,000 or less; or

(b) if such Subsidiary has consolidated assets greater than €1,000, then such designation would be permitted under Section 2.05 of Annex A.

The Board of Directors of the Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; provided, however, that immediately after giving effect to such designation:

(x) (A) if the designated Subsidiary is a Subsidiary of the Company or any of its Restricted Subsidiaries (but is not a Subsidiary of CEVA or any of its Restricted Subsidiaries) (1) the Company could Incur €1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 2.03(a) of Annex A hereto or (2) the Fixed Charge Coverage Ratio for the Company and its Restricted Subsidiaries would be greater than such ratio for the Company and its Restricted Subsidiaries immediately prior to such designation, in each case on a pro forma basis taking into account such designation and (B) if the designated Subsidiary is a Subsidiary of CEVA or any of its Restricted Subsidiaries (1) CEVA could Incur €1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 2.03(b) of Annex A hereto or (2) the Fixed Charge Coverage Ratio for CEVA and its Restricted Subsidiaries would be greater than such ratio for CEVA and its Restricted Subsidiaries immediately prior to such designation, in each case on a pro forma basis taking into account such designation; and

(y) no Event of Default shall have occurred and be continuing.

Any such designation by the Board of Directors of the Company shall be evidenced to the Administrative Agent by promptly filing with the Administrative Agent a copy of the resolution of the Board of Directors of the Company giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

Error! Unknown document property name.

"US Bankruptcy Code" shall mean Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"VAT" means value added tax as provided for in the Value Added Tax Act 1994 (UK) and any other tax of a similar nature.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness or Disqualified Stock, as the case may be, at any date, the quotient obtained by dividing (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock multiplied by the amount of such payment, by (2) the sum of all such payments.

"Wholly Owned Restricted Subsidiary" is any Wholly Owned Subsidiary that is a Restricted Subsidiary.

"Wholly Owned Subsidiary" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or other similar shares required pursuant to applicable law) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02.  Terms Generally.  The definitions set forth or referred to in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  All references herein to Articles, Sections, Exhibits, Schedules and Annexes shall be deemed references to Articles and Sections of, and Exhibits, Schedules and Annexes to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, any reference in this Agreement to any document or agreement shall mean such document or agreement as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements hereof and thereof.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in

Error! Unknown document property name.

effect from time to time; provided that, if the Company notifies the Administrative Agent of a request to amend any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Company that the Required Holders of Debt Instruments request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

## ARTICLE II

### The Credits

Section 2.01.  Commitments.  Subject to the terms and conditions set forth herein, the Holders of Debt Instruments purchased Debt Instruments denominated in Euro from the Company on the Closing Date in an initial aggregate principal amount equal to €75,000,000.  Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.

Section 2.02.  Debt Instruments.  (a)  The Debt Instruments were purchased by the Holders of Debt Instruments ratably in accordance with their respective Commitments on the Closing Date.  The failure of any Holder of Debt Instruments to purchase any Debt Instrument required to be subscribed by it shall not relieve any other Holder of Debt Instruments of its obligations hereunder; provided that the Commitments of the Holders of Debt Instruments are several and no Holder of Debt Instruments shall be responsible for the failure of any other Holder of Debt Instruments to purchase Debt Instruments as required.

(b)  The Commitments shall terminate after the purchase of the Debt Instruments on the Closing Date.  No more than one Initial Notice in respect of the Debt Instruments may be delivered and such request was delivered prior to the Closing Date.

Section 2.03.  [Intentionally Omitted]

Section 2.04.  [Intentionally Omitted]

Section 2.05.  [Intentionally Omitted]

Section 2.06.  [Intentionally Omitted]

Section 2.07.  [Intentionally Omitted]

Error! Unknown document property name.

Section 2.08.  Redemption of Debt Instruments; Evidence of Debt.  (a)  The Company hereby unconditionally promises to pay, on the Maturity Date, to the Administrative Agent for the account of each Holder of Debt Instruments, the then unpaid principal amount of each Debt Instrument (plus any accrued and previously capitalized interest thereon) purchased from the Company.

(b)  Each Holder of Debt Instruments shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Company to such Holder of Debt Instruments resulting from each Debt Instrument held by such Holder of Debt Instruments, including the amounts of principal and interest payable and paid to such Holder of Debt Instruments from time to time hereunder.

(c)  The Administrative Agent shall maintain a record of (i) the amount of each Debt Instrument purchased hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Company to each Holder of Debt Instruments hereunder and (iii) any amount received by the Administrative Agent hereunder for the account of the Holders of Debt Instruments and the share of each Holder of Debt Instruments thereof.

(d)  The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Holder of Debt Instruments or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Company to repay the Debt Instruments in accordance with the terms of this Agreement.

(e)  Any Holder of Debt Instruments may request that Debt Instruments purchased by it be evidenced by a certificate (a "Note Certificate").  In such an event, the Company shall prepare, execute and deliver to such Holder of Debt Instruments a certificate payable to the order of such Holder of Debt Instruments (or, if requested by such Holder of Debt Instruments, to such Holder of Debt Instruments and its registered assigns) and in a form approved by the Administrative Agent and reasonably acceptable to the Company.  Thereafter, the Debt Instruments evidenced by such certificate and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more certificates in such form payable to the order of the payee named therein (or, if such certificate is a registered certificate, to such payee and its registered assigns).

Section 2.09.  [Intentionally Omitted]

Section 2.10.  Optional Early Redemption; Tax Redemption.  (a)  Subject to this Section 2.10, the Company may redeem (or procure the redemption of) any Debt Instrument at any time after the six-month anniversary of the Closing Date in whole or in part by giving not less than three Business Days prior notice to

Error! Unknown document property name.

the Administrative Agent; <u>provided</u>, <u>however</u>, that each partial redemption shall be in an amount that is an integral multiple of the €500,000 and not less than the Minimum Denomination.

(b)  Optional early redemption of Debt Instruments made pursuant to Section 2.10(a) shall be accompanied by payment of a premium on the aggregate principal amount of the Debt Instruments to be redeemed indicated below if redeemed within the relevant time period indicated below:

| Period | Early Redemption Premium |
|---|---|
| On or after the 6-month anniversary of the Closing Date but prior to the 12-month anniversary of the Closing Date | 3.0% |
| On or after the 12-month anniversary of the Closing Date but prior to the 24-month anniversary of the Closing Date | 2.0% |
| On or after the 24-month anniversary of the Closing Date but prior to the 36-month anniversary of the Closing Date | 1.0% |
| On or after the 36-month anniversary of the Closing Date and thereafter | 0.0% |

(c)  Notwithstanding anything to the contrary provided herein, during the first six months after the Closing Date the Company may, by giving not less than three Business Days prior notice to the Administrative Agent, redeem (or procure the redemption of) any Debt Instrument at 100% of the principal amount plus the Applicable Premium and accrued and unpaid interest to the early redemption date.

(d)  Each notice of early redemption shall specify the early redemption date and the principal amount of the Debt Instrument (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Company to redeem the Debt Instrument by the amount stated therein on the date stated therein; <u>provided</u> that notices of early redemption may be conditioned upon the occurrence of an early redemption event.  All redemptions under this Section 2.10 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

(e)  The Company shall be entitled to redeem the Debt Instruments at its option, at any time as a whole or in part, upon not less than 30 nor more than 60 days' notice to the Administrative Agent at 100% of the principal amount plus any accrued and unpaid interest on the principal amount to be repaid to but excluding the date fixed for early redemption (the "<u>Tax Redemption Date</u>") and any Additional Amounts, if any, then due and that will become due on the Tax Redemption Date as a result of the redemption or otherwise, if any, if the Company determines in good faith that, as a result of:

**Error! Unknown document property name.**

(i) any change in, or amendment to, the law or treaties (or any regulations or rulings promulgated thereunder) of a Relevant Taxing Jurisdiction affecting taxation; or

(ii) any change in position regarding the application, administration or interpretation of such laws, treaties, regulations or rulings (including a holding, judgment or order by a court of competent jurisdiction) (each of the foregoing in clauses (i) and (ii), a "Change in Tax Law"), the Company, is, or on the next interest payment date in respect of the Debt Instruments would be, required to pay any Additional Amounts, and such obligation cannot be avoided by taking reasonable measures available to the Company.

The Change in Tax Law must become effective on or after the Signing Date.

(f)  Notwithstanding the foregoing, no notice of early redemption will be given (a) earlier than 90 days prior to the earliest date on which the Company would be obliged to make such payment of Additional Amounts and (b) unless at the time such notice is given, such obligation to pay such Additional Amounts remains in effect. Prior to the publication or mailing of any notice of early redemption of the Debt Instruments pursuant to the foregoing, the Company will deliver to the Administrative Agent (a) an Officers' Certificate stating that it is entitled to effect such early redemption and setting forth a statement of facts showing that the conditions precedent to its right so to redeem have been satisfied and (b) an opinion of an independent tax counsel of recognized standing to the effect that the circumstances referred to above exist. The Administrative Agent will accept such Officers' Certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent described above, in which event it will be conclusive and binding on the Holders of Debt Instruments.

(g)  In addition, provided that the Company has taken all commercially reasonable steps to avoid withholding tax, including by using commercially reasonable efforts to list the Debt Instruments, the Debt Instruments may be repaid at 101% of the outstanding principal amount plus accrued and unpaid interest on the principal amount to be repaid to but excluding the Tax Redemption Date and any Additional Amounts, if any, then due and that will become due on the Tax Redemption Date as a result of the early redemption or otherwise, if any, if the Debt Instruments do not qualify under the "quoted Eurobond exemption" under § 349(3)(c) of the UK Income and Corporation Taxes Act 1988.

Section 2.11.  Mandatory Offer to Purchase.  (a)  In the event of a Change of Control occurs, subject to the terms of this Section 2.11, each Holder of Debt Instruments will have the right to require the Company to redeem all of the Debt Instruments of such Holder of Debt Instruments in cash at a price equal to 101% of the principal amount of the Debt Instruments, plus accrued and unpaid interest on the principal amount to be redeemed to but excluding the date of payment.

Error! Unknown document property name.

(b)     Within 60 days following any Change of Control, except to the extent that the Company has exercised its right to redeem the Debt Instruments in accordance with Section 2.10, the Company shall mail a notice (a "<u>Change of Control Offer</u>") to each Holder of Debt Instruments with a copy to the Administrative Agent stating:

(i) that a Change of Control has occurred and that such Holder of Debt Instruments has the right to require the Company to repurchase the Debt Instruments of such Holder of Debt Instruments at a redemption price in cash equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to the date of redemption (the "<u>Change of Control Payment</u>");

(ii) the circumstances and relevant facts and financial information regarding such Change of Control;

(iii) the early redemption date (the "<u>Change of Control Redemption Date</u>") (which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed);

(iv) that any Debt Instrument accepted for redemption pursuant to the Change of Control Offer shall cease to accrue interest after the Change of Control Redemption Date unless the Change of Control Payment is not paid;

(v) that any Debt Instrument or part thereof not tendered shall continue to accrue interest; and

(vi) the instructions determined by the Company, consistent with this Section 2.11, that a Holder of Debt Instruments must follow in order to have its Debt Instruments purchased.

(c)     A Change of Control Offer may be made in advance of a Change of Control, and conditioned upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

(d)     Notwithstanding the foregoing provisions of this Section, the Company shall not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 2.11 applicable to a Change of Control Offer made by the Company and purchases all Debt Instruments validly tendered and not withdrawn under such Change of Control Offer.

(e)     On the Change of Control Redemption Date, if the Change of Control shall have occurred, the Company will, to the extent lawful:

(i) accept for redemption all Debt Instruments properly tendered pursuant to the Change of Control Offer;

(ii) pay in immediately available funds the Administrative Agent an

Error! Unknown document property name.

amount equal to the Change of Control Payment in respect of all Debt Instruments so tendered;

(iii) deliver or cause to be delivered to the Administrative Agent an Officers' Certificate stating the Debt Instruments or portions of the Debt Instruments being purchased by the Company in the Change of Control Offer.

(f) The Company's obligation under this Section 2.11 to make an offer to repurchase the Debt Instruments as a result of a Change of Control may be waived or modified with the written consent of the Required Holders of Debt Instruments.

Section 2.12. <u>Fees.</u> (a) The Company agrees to pay to the Administrative Agent, for the account of the Administrative Agent, the administrative fees set forth in the Fee Letter, as amended, restated, supplemented or otherwise modified from time to time, at the times specified therein (the "<u>Administrative Agent Fees</u>").

(b) All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent. Once paid, none of the Fees shall be refundable under any circumstances.

Section 2.13. <u>Applicable Interest.</u> (a) The Debt Instruments shall bear interest at a rate per annum equal to EURIBO Rate plus the Applicable Margin (the "<u>Applicable Rate</u>").

(b) Subject to clause (c) below, accrued interest on each Debt Instrument shall be capitalized as of and added to principal on (i) the last Business Day of each Interest Period, (ii) without duplication, on the date of any early redemption (on the amount redeemed), (iii) at maturity (whether by acceleration or otherwise) and (iv) after maturity, on the last Business Day of each month; provided that the Company may, at its election, pay any such accrued interest in cash; <u>provided</u>, <u>however</u>, that such interest payment is made entirely in cash. The Company may make such election at the end of the Interest Period and shall deliver to the Administrative Agent, a written notice setting forth that such interest payment will be made in the form of cash.

(c) For so long as the Company does not obtain Qualification, accrued interest shall accrue at the Applicable Rate as a separate obligation and shall not be payable in the form of additional Debt Instruments; provided that such interest accrued shall be payable when principal is due and payable with the same premium thereon, if any, that is then due and payable with respect to such principal amount.

(d) Notwithstanding the foregoing, if any principal of or interest on any Debt Instrument or any Fees or other amount payable by a Company hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to 2% plus the rate otherwise applicable to the Debt Instruments as provided in the preceding paragraphs of this Section, <u>provided</u> that this paragraph (d) shall not apply to

Error! Unknown document property name.

any Event of Default that has been remedied or has been waived by the Holders of Debt Instruments pursuant to Section 10.08.

(e)  All interest hereunder shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

Section 2.14.  [Intentionally Omitted]

Section 2.15.  Increased Costs.  (a)  If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Holder of Debt Instruments; or

(ii) impose on any Holder of Debt Instruments or the London interbank market any other condition affecting this Agreement;

and the result of any of the foregoing shall be to increase the cost to such Holder of Debt Instruments of purchasing or holding any Debt Instrument (or of maintaining its obligation to purchase any such Debt Instrument) or to reduce the amount of any sum received or receivable by such Holder of Debt Instruments hereunder (whether of principal, interest or otherwise), then the Company will pay to such Holder of Debt Instruments such additional amount or amounts as will compensate such Holder of Debt Instruments for such additional costs incurred or reduction suffered.

(b)  If any Holder of Debt Instruments determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Holder of Debt Instruments capital or on the capital of the holding company of such Holder of Debt Instruments, if any, as a consequence of this Agreement or the Debt Instruments subscribed by such Holder of Debt Instruments to a level below that which such Holder of Debt Instruments or the holding company of such Holder of Debt Instruments could have achieved but for such Change in Law (taking into consideration such Holder of Debt Instruments' policies and the policies of the holding company of such Holder of Debt Instruments with respect to capital adequacy), then from time to time the Company shall pay to such Holder of Debt Instruments such additional amount or amounts as will compensate such Holder of Debt Instruments or the holding company of such Holder of Debt Instruments for any such reduction suffered.

(c)  A certificate of a Holder of Debt Instruments setting forth the amount or amounts necessary to compensate such Holder of Debt Instruments or its holding company, as applicable, as specified in paragraph (a) or (b) of this Section shall be delivered to the Company and shall be conclusive absent manifest error.  The Company shall pay such Holder of Debt Instruments the amount shown as due on any such certificate within 10 days after receipt thereof.

Error! Unknown document property name.

(d)  Promptly after any Holder of Debt Instruments has determined that it will make a request for increased compensation pursuant to this Section 2.15, such Holder of Debt Instruments shall notify the Company thereof.  Failure or delay on the part of any Holder of Debt Instruments to demand compensation pursuant to this Section shall not constitute a waiver of the right of such Holder of Debt Instruments to demand such compensation; provided that the Company shall not be required to compensate a Holder of Debt Instruments pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Holder of Debt Instruments notifies the Company of the Change in Law giving rise to such increased costs or reductions and of the intention of such Holder of Debt Instruments to claim compensation therefor; provided further, that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)  The foregoing provisions of this Section 2.15 shall not apply in the case of any Change in Law in respect of Taxes, which shall instead be governed by Section 2.17.

(f)  In addition, the Company will not be required to make any payment under this Section 2.15 to the extent any increased cost, or reduction in return or similar is:

(i)  compensated for by a payment under Section 2.17 or would have been compensated for but for one of the exclusions in Section 2.17; or

(ii) attributable to the breach by any Holder of Debt Instruments or any of their respective Affiliates of any law or regulation.

Section 2.16.  Break Funding Payments.  In the event of (a) the payment of any principal of any Debt Instrument other than on the last day of an Interest Period (including as a result of an Event of Default), (b) the failure to issue the Debt Instruments (other than due to the default of the relevant Holder of Debt Instruments), continue or redeem any Debt Instrument on the date specified in any notice delivered pursuant hereto or (c) the assignment of any Debt Instrument other than on the last day of the Interest Period applicable thereto as a result of a request by the Company pursuant to Section 2.19, then, in any such event, the Company shall compensate each Holder of Debt Instruments for the loss, cost and expense attributable to such event.  Such loss, cost or expense to any Holder of Debt Instruments shall be deemed to be the amount determined by such Holder of Debt Instruments (it being understood that the deemed amount shall not exceed the actual amount) to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Debt Instrument had such event not occurred, at the EURIBO Rate that would have been applicable to such Debt Instrument, for the period

Error! Unknown document property name.

from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to issue a Debt Instrument, for the period that would have been the Interest Period for such Debt Instrument), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Holder of Debt Instruments would bid were it to bid, at the commencement of such period, for deposits in EURO of a comparable amount and period from other banks in the Eurocurrency market.  A certificate of any Holder of Debt Instruments setting forth any amount or amounts that such Holder of Debt Instruments is entitled to receive pursuant to this Section shall be delivered to the Company and shall be conclusive absent manifest error.  The Company shall pay such Holder of Debt Instruments the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 2.17.  Taxes.  (a)  All payments made by the Company (or any successor) on the Debt Instruments shall be made free and clear of and without withholding or deduction for, or on account of, any Taxes unless the withholding or deduction of such Taxes is then required by law. If any deduction or withholding for, or on account of, any Taxes imposed or levied by or on behalf of:

(i) the United Kingdom or any political subdivision or governmental authority thereof or therein having power to tax;

(ii) any jurisdiction from or through which payment on the Debt Instruments is made, or any political subdivision or governmental authority thereof or therein having the power to tax; or

(iii) any other jurisdiction in which the Company is organized or otherwise considered to be a resident for tax purposes, or any political subdivision or governmental authority thereof or therein having the power to tax,

(each of clauses (i), (ii) and (iii), a "Relevant Taxing Jurisdiction"), will at any time be required from any payments made with respect to the Debt Instruments, including payments of principal, early redemption price, interest or premium, if any, the Company will pay (together with such payments) such additional amounts (the "Additional Amounts") as may be necessary in order that the net amounts received in respect of such payments by the Holders of Debt Instruments or the Administrative Agent, as the case may be, after such withholding or deduction (including any such deduction or withholding from such Additional Amounts), will not be less than the amounts that would have been received in respect of such payments on the Debt Instruments in the absence of such withholding or deduction; provided, however, that no such Additional Amounts will be payable for or on account of Excluded Taxes.

Error! Unknown document property name.

Such Additional Amounts will also not be payable (x) if the payment could have been made without such deduction or withholding if the beneficiary of the payment had presented the Debt Instrument for payment (where presentation is required) within 30 days after the relevant payment was first made available for payment to the Holder of Debt Instruments or (y) where, had the beneficial owner of the Debt Instrument been the Holder of Debt Instruments of the Debt Instrument, such beneficial owner would not have been entitled to payment of Additional Amounts by reason of any of clauses (1) to (7) inclusive of the definition of Excluded Taxes.

(b)  The Company will (i) make any required withholding or deduction and (ii) remit the full amount deducted or withheld to the Relevant Taxing Jurisdiction in accordance with applicable law. The Company will use all reasonable efforts to obtain certified copies of tax receipts evidencing the payment of any Taxes so deducted or withheld from each Relevant Taxing Jurisdiction imposing such Taxes and will provide such certified copies to the Administrative Agent.  The Company will attach to each certified copy a certificate stating (x) that the amount of withholding Taxes evidenced by the certified copy was paid in connection with payments in respect of the principal amount of Debt Instruments then outstanding and (y) the amount of such withholding Taxes paid per €1,000 principal amount of the Debt Instruments.

(c)  [Reserved]

(d)  Wherever in this Agreement, the Debt Instruments are mentioned, in any context: (i) the payment of principal, (ii) early redemption prices or purchase prices in connection with an early redemption or purchase of Debt Instruments, (iii) interest, or (iv) any other amount payable on or with respect to any of the Debt Instruments, such reference shall be deemed to include payment of Additional Amounts as described under this heading to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

(e)  The Company will pay any present or future stamp, court or documentary taxes, or any other excise, property or similar taxes, charges or levies that arise in any jurisdiction from the execution, delivery, registration or enforcement of any Debt Instruments, this Agreement, or any other document or instrument in relation thereto (other than a transfer of the Debt Instruments) excluding any such taxes, charges or similar levies imposed by any jurisdiction that is not a Relevant Taxing Jurisdiction, and the Company agrees to indemnify the Holders of Debt Instruments for any such taxes paid by such Holders of Debt Instruments. The foregoing obligations will survive any termination, defeasance or discharge of this Agreement and will apply mutatis mutandis to any jurisdiction in which any successor to a Company or any Guarantor is organized or any political subdivision or taxing authority or agency thereof or therein.

(f)  Any Holder of Debt Instruments that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Company is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Company (with a copy to the Administrative Agent), to the extent such Holder of Debt Instruments is legally entitled to do so, at the

**Error! Unknown document property name.**

time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law as may reasonably be requested by the Company (including, as soon as reasonably practicable, documentation which is certified by the Governmental Authority in the jurisdiction in which the Holder of Debt Instruments is located) to permit such payments to be made without such withholding tax or at a reduced rate; provided, that no Holder of Debt Instruments shall have any obligation under this paragraph (f) with respect to any withholding Tax imposed by any jurisdiction other than the United Kingdom if in the reasonable judgment of such Holder of Debt Instruments such compliance would subject such Holder of Debt Instruments to any material unreimbursed cost or expense or would otherwise be disadvantageous to such Holder of Debt Instruments in any material respect.

(g)  If the Administrative Agent or a Holder of Debt Instruments receives a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Company or with respect to which the Company has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to the Company (but only to the extent of indemnity payments made, or additional amounts paid, by the Company under this Section 2.17 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Holder of Debt Instruments (including any Taxes imposed with respect to such refund) as is determined by the Administrative Agent or such Holder of Debt Instruments, as applicable, in good faith and in its sole discretion, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Company, upon the request of the Administrative Agent or such Holder of Debt Instruments, agrees to repay as soon as reasonably practicable the amount paid over to the Company (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Holder of Debt Instruments in the event the Administrative Agent or such Holder of Debt Instruments is required to repay such refund to such Governmental Authority.  This Section 2.17(g) shall not be construed to require the Administrative Agent or any Holder of Debt Instruments to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the Company or any other person.

(h)  All consideration expressed to be payable under any Debt Instrument Document by the Company to the Administrative Agent, the Arrangers and each Holder of Debt Instruments shall be deemed to be exclusive of any VAT.  If VAT is chargeable on any consideration payable by the Company to any such party in connection with a Debt Instrument Document, that Debt Instrument Party shall pay to such party (in addition to and at the same time as paying the consideration) an amount equal to the amount of VAT against production of a valid VAT invoice.  Where a Debt Instrument Document requires any person to reimburse the Administrative Agent, the Arrangers or any Holder of Debt Instruments for any costs or expenses, that person shall also at the same time pay and indemnify such party against all VAT incurred by such party in respect of the costs or expenses to the extent that such party reasonably determines that it is not entitled to a credit or repayment from the relevant tax authority in respect of the VAT.

Error! Unknown document property name.

Section 2.18.  Payments Generally; Pro Rata Treatment; Sharing of Set-offs.  (a)  Unless otherwise specified, the Company shall make each payment required to be made by it hereunder (whether of principal, interest, or fees, or of amounts payable under Section 2.15, 2.16, or 2.17, or otherwise) prior to 2:00 p.m., Local Time, on the date when due, in immediately available funds, without condition or deduction for any defense, recoupment, set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent to the applicable account designated to the Company by the Administrative Agent, except that payments pursuant to Sections 2.15, 2.16, 2.17 and 10.05 shall be made directly to the persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder of principal or interest in respect of any Debt Instrument (or any breakage indemnity or payment under Section 2.16 in respect of any Debt Instrument) and all other payments hereunder and each other Debt Instrument Document (other than reimbursement of out-of-pocket expenses and indemnities, which shall be payable in the currency in which incurred), and all Fees shall be paid in EURO.  Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)  If at any time insufficient funds are received by and available to the Administrative Agent from the Company to pay fully all amounts of principal, interest and fees then due from the Company hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due from the Company hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties and, (ii) second, towards payment of principal then due from the Company hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)  If any Holder of Debt Instruments shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or

Error! Unknown document property name.

interest on any of its Debt Instruments resulting in such Holder of Debt Instruments receiving payment of a greater proportion of the aggregate amount of its Debt Instruments and participations accrued interest thereon than the proportion received by any other Holder of Debt Instruments, then the Holder of Debt Instruments receiving such greater proportion shall purchase (for cash at face value) participations in the Debt Instruments and participations of other Holders of Debt Instruments to the extent necessary so that the benefit of all such payments shall be shared by the Holders of Debt Instruments ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Debt Instruments and participations provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph (c) shall not be construed to apply to any payment made by the Company pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Holder of Debt Instruments as consideration for the assignment of or sale of a participation in any of its Debt Instruments to any assignee or participant, other than to the Company or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph (c) shall apply).  The Company consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Holder of Debt Instruments acquiring a participation pursuant to the foregoing arrangements may exercise against the Company rights of set-off and counterclaim with respect to such participation as fully as if such Holder of Debt Instruments were a direct creditor of the Company in the amount of such participation.

(d)  Unless the Administrative Agent shall have received notice from a Company prior to the date on which any payment is due to the Administrative Agent for the account of the Holders of Debt Instruments hereunder that the Company will not make such payment, the Administrative Agent may assume that the Company has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Holders of Debt Instruments the amount due.  In such event, if the Company has not in fact made such payment, then each of the Holders of Debt Instruments severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Holder of Debt Instruments with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)  If any Holder of Debt Instruments shall fail to make any payment required to be made by it pursuant to Section 2.06(b) or 2.18(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Holder of Debt Instruments to satisfy the obligations of such Holder of Debt Instruments under such Sections until all such unsatisfied obligations are fully paid.

Section 2.19.  Mitigation Obligations; Replacement of Holders of Debt Instruments.  (a)  If any Holder of Debt

Error! Unknown document property name.

Instruments requests compensation under Section 2.15, or if the Company is required to pay any additional amount to any Holder of Debt Instruments or any Governmental Authority for the account of any Holder of Debt Instruments pursuant to Section 2.17, then such Holder of Debt Instruments shall use reasonable efforts to designate a different lending office for funding or booking its Debt Instruments hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the reasonable judgment of such Holder of Debt Instruments, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as applicable, in the future and (ii) would not subject such Holder of Debt Instruments to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Holder of Debt Instruments in any material respect. The Company hereby agrees to pay all reasonable costs and expenses incurred by any Holder of Debt Instruments in connection with any such designation or assignment.

(b) If any Holder of Debt Instruments requests compensation under Section 2.15, or if the Company is required to pay any additional amount to any Holder of Debt Instruments or any Governmental Authority for the account of any Holder of Debt Instruments pursuant to Section 2.17, or is a Defaulting Holder of Debt Instruments, then the Company may, at its sole expense and effort, upon notice to such Holder of Debt Instruments and the Administrative Agent, require such Holder of Debt Instruments to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 10.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Holder of Debt Instruments, if a Holder of Debt Instruments accepts such assignment); provided that (i) the Company shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Holder of Debt Instruments shall have received payment of an amount equal to the outstanding principal of its Debt Instruments accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Company (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments. Nothing in this Section 2.19 shall be deemed to prejudice any rights that the Company may have against any Holder of Debt Instruments that is a Defaulting Holder of Debt Instruments.

(c) If any Holder of Debt Instruments (such Holder of Debt Instruments, a "Non-Consenting Holder of Debt Instruments") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 10.08 requires the consent of all of the Holders of Debt Instruments affected and with respect to which the Required Holders of Debt Instruments shall have granted their consent, then the Company shall have the right (unless such Non-Consenting Holder of Debt Instruments grants such consent) at their sole expense (including with respect to the

processing and recordation fee referred to in Section 10.04(b)(ii)(B)) to replace such Non-Consenting Holder of Debt Instruments by deeming the Debt Instruments held by it hereunder to have been assigned to one or more assignees reasonably acceptable to (i) the Administrative Agent (unless, such assignee is a Holder of Debt Instruments, an Affiliate of a Holder of Debt Instruments or an Approved Fund) provided that: (a) all Obligations of the Company owing to such Non-Consenting Holder of Debt Instruments (including Fees and any amounts under Sections 2.15, 2.16 and 2.17) being replaced shall be paid in full to such Non-Consenting Holder of Debt Instruments concurrently with such assignment, and (b) the replacement Holder of Debt Instruments shall purchase the foregoing by paying to such Non-Consenting Holder of Debt Instruments a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  No action by or consent of the Non-Consenting Holder of Debt Instruments shall be necessary in connection with such assignment, which shall be immediately and automatically effective upon payment of such purchase price.  In connection with any such assignment the Company, the Administrative Agent, such Non-Consenting Holder of Debt Instruments and the replacement Holder of Debt Instruments shall otherwise comply with Section 10.04; provided that if such Non-Consenting Holder of Debt Instruments does not comply with Section 10.04 within three Business Days after the Company's request, compliance with Section 10.04 shall not be required to effect such assignment.

Section 2.20.  No Personal Liability.  No director, officer, employee, manager, incorporator or holder of any Equity Interests in the Company or any direct or indirect parent of the Company, as such, will have any liability for any obligations of the Company under the Debt Instruments, this Agreement, or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of Debt Instruments by purchasing a Debt Instrument waives and releases all such liability.  The waiver and release are part of the consideration for purchasing the Debt Instruments.

ARTICLE III

Representations and Warranties

On the Closing Date, the Company represents and warrants to each of the Holders of Debt Instruments that:

Section 3.01.  Organization; Powers.  Except as set forth on Schedule 3.01, the Company and each of the Material Subsidiaries (a) is a partnership, limited liability company or corporation duly organized, validly existing and in good standing (or, if applicable in such jurisdiction, enjoys the equivalent status under the laws of any jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization, (b) has all requisite corporate, limited liability company or partnership power and authority to own its property and assets and to carry on

Error! Unknown document property name.

its business as now conducted, (c) is qualified to do business in each jurisdiction where such qualification is required, except where the failure so to qualify would not reasonably be expected to have a Material Adverse Effect, and (d) in the case of the Company, has the power and authority to execute, deliver and perform its obligations under each of the Debt Instrument Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and to borrow and otherwise obtain credit hereunder.

Section 3.02.  Authorization.  The execution, delivery and performance by the Company of each of the Debt Instrument Documents to which it is a party, and the borrowings hereunder (a) have been duly authorized by all corporate, stockholder, partnership or limited liability company action required to be obtained by the Company and (b) will not (i) violate (A) any provision of law, statute, rule or regulation, or of the certificate or articles of incorporation or other constitutive documents (including any partnership, limited liability company or operating agreements) or by-laws of the Company, (B) any applicable order of any court or any rule, regulation or order of any Governmental Authority or (C) any provision of any Agreement, certificate of designation for preferred stock, agreement or other instrument to which the Company is a party or by which it or its property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) or to a loss of a material benefit under any such Agreement, certificate of designation for preferred stock, agreement or other instrument, where any such conflict, violation, breach or default referred to in clause (i) or (ii) of this Section 3.02(b), would reasonably be expected to have, individually or in the aggregate a Material Adverse Effect, or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Company, other than the Liens created by the Debt Instrument Documents and Permitted Liens.

Section 3.03.  Enforceability.  (a)  This Agreement has been duly executed and delivered by the Company and constitutes, and each other Debt Instrument Document when executed and delivered by the Company that is party thereto will constitute, a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a

Error! Unknown document property name.

proceeding in equity or at law), and (iii) implied covenants of good faith and fair dealing.

Section 3.04.  Governmental Approvals.  No action, consent or approval of, registration or filing with or any other action by any Governmental Authority or third party is or will be required in connection with the Transactions or the exercise by the Administrative Agent or any Holder of Debt Instruments of its rights under the Debt Instrument Documents, except (a) such as have been made or obtained and are in full force and effect, (b) such actions, consents and approvals the failure of which to be obtained or made would not reasonably be expected to have a Material Adverse Effect, and (c) filings or other actions listed on Schedule 3.04.

Section 3.05.  [Reserved]

Section 3.06.  No Material Adverse Effect.  Since December 31, 2005, there has been no event, development or circumstance that has or would reasonably be expected to have a Material Adverse Effect.

Section 3.07.  Title to Properties; Possession Under Leases.  (a)  The Company and each of the Subsidiaries has valid fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all its Real Properties and has valid title to its personal property and assets, in each case, except for Permitted Liens and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All such properties and assets except as set forth on Schedule 3.07(a) are free and clear of Liens, other than Permitted Liens.

(b)  The Company and each of the Subsidiaries has complied with all obligations under all leases to which it is a party, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 3.07(b), the Company and each of the Subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Error! Unknown document property name.

(c)  The Company and each of the Subsidiaries owns or possesses, or is licensed to use, all patents, patent rights, trademarks, service marks, trade names, copyrights, mask works, domain names, and any and all applications or registrations for any of the foregoing (collectively, "<u>Intellectual Property Rights</u>") and all licenses and rights with respect to any of the foregoing used by the Subsidiaries and material to their business, without any violation or misappropriation of, interference with, or infringement upon (of which the Company have been notified in writing) the rights of others, and free from any burdensome restrictions on the present conduct of the Company and its Subsidiaries, except where such conflicts and restrictions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or except as set forth on <u>Schedule 3.07(c)</u>.

Section 3.08.  <u>Subsidiaries.</u>  (a)  <u>Schedule 3.08(a)</u> sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of each direct and indirect subsidiary of the Company and, as to each such subsidiary, the percentage of each class of Equity Interests owned by the Company or by any such subsidiary.

(b)  As of the Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Equity Interests of the Company or any of the Subsidiaries, except in respect of joint ventures and rights of employees to purchase Equity Interests of the Company in connection with the Transactions or as set forth on <u>Schedule 3.08(b)</u>.

Section 3.09.  <u>Litigation; Compliance with Laws.</u> (a)  Except as set forth on Schedule 3.09(a), there are no actions, suits or proceedings at law or in equity or, to the knowledge of the Company, investigations by or on behalf of any Governmental Authority or in arbitration now pending, or, to the knowledge of the Company, threatened in writing against or affecting the Company or any of the Subsidiaries or any business, property or rights of any such person which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)  Except as set forth on Schedule 3.09(b), none of the Company, the Subsidiaries and their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permit, but excluding any Environmental Laws, which are subject to Section 3.16) or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.10.  <u>Federal Reserve Regulations.</u>  (a) None of the Company or the Subsidiaries is engaged principally, or

Error! Unknown document property name.

as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(b)  No part of the proceeds of any Debt Instrument will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose, or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X.

Section 3.11.  <u>Investment Company Act.</u>  None of the Company or the Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.12.  <u>Use of Proceeds.</u>  The Company used the proceeds of the Debt Instruments (a) to pay dividends or return of capital to the equity holders of the Company and (b) to pay the Transaction Expenses.  Notwithstanding anything to the contrary provided herein, no proceeds of any Debt Instruments were used to acquire the Equity Interests in the Company.  No amount borrowed under this Agreement shall be applied in any manner that may be illegal or contravene any applicable law or regulation in any relevant jurisdiction concerning financial assistance by a company for the acquisition of or subscription for shares or concerning the protection of shareholder's capital.

Section 3.13.  <u>Tax Returns.</u>  Except as set forth on <u>Schedule 3.13</u>:

(a) Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) the Company and each of the Subsidiaries has filed or caused to be filed all federal, state, provincial, local and non-U.S. Tax returns required to have been filed by it and (ii) taken as a whole, each such Tax return is true and correct;

(b) The Company and each of the Subsidiaries has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in clause (a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the Closing Date (except Taxes or assessments that are being contested in good faith by appropriate proceedings in accordance with Section 5.03 and for which the Company or any of the Subsidiaries (as the case may be) has set aside on its books adequate reserves in accordance with GAAP), which Taxes, if not paid or adequately provided for, would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

Error! Unknown document property name.

(c) Other than as would not be, individually or in the aggregate, reasonably expected to have a Material Adverse Effect: as of the Closing Date, with respect to the Company and the Subsidiaries, (i) there were no claims being asserted in writing with respect to any Taxes, (ii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes had been given or requested and (iii) no Tax returns were being examined by, and no written notification of intention to examine had been received from, the Internal Revenue Service or any other Taxing authority.

Section 3.14.  <u>No Material Misstatements.</u>  (a)  All written information (other than the Projections, estimates and information of a general economic nature or general industry nature) (the "<u>Information</u>") concerning the Company, the Subsidiaries, the Transactions and any other transactions contemplated hereby and prepared by or on behalf of the foregoing or their representatives and made available by the Company or any of its representatives to any Holders of Debt Instruments or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby, when taken as a whole, was true and correct in all material respects, as of the date such Information was furnished to the Holders of Debt Instruments and as of the Closing Date and did not, taken as a whole, contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements were made.

(b)  The Projections and estimates and information of a general economic nature prepared by or on behalf of the Company or any of its representatives and that have been made available to any Holders of Debt Instruments or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby (i) have been prepared in good faith based upon assumptions believed by the Company to be reasonable as of the date thereof (it being understood that actual results may vary materially from the Projections), as of the date such Projections and estimates were furnished to the Holders of Debt Instruments and as of the Closing Date, and (ii) as of the Closing Date, had not been modified in any material respect by the Company.

Section 3.15.  <u>Employee Benefit Plans.</u>  (a)  Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect:  (i) each Plan is in compliance in all material respects with the applicable provisions of ERISA and the Code; (ii) no Reportable Event has occurred during the past five years as to which the Company, any of its Subsidiaries or any ERISA Affiliate was required to file a report with the PBGC, other than reports that have been filed; (iii) no Plan has any Unfunded Pension Liability in excess of $20.0 million; (iv) no ERISA Event has occurred or is reasonably expected to occur;

Error! Unknown document property name.

(v) none of the Company and the Subsidiaries has engaged in a "prohibited transaction" (as defined in Section 406 of ERISA and Code Section 4975) in connection with any employee pension benefit plan (as defined in Section 3(2) of ERISA) that would subject the Company or any subsidiary to tax; and (vi) none of the Company, the Subsidiaries and the ERISA Affiliates (A) has received any written notification that any Multiemployer Plan is in reorganization or has been terminated within the meaning of Title IV of ERISA, or has knowledge that any Multiemployer Plan is reasonably expected to be in reorganization or to be terminated or (B) has incurred or is reasonably expected to incur any withdrawal liability to any Multiemployer Plan.

(b) Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, each Foreign Benefit Plan is in compliance in all material respects with all requirements of law applicable thereto and the respective requirements of the governing documents for such plan. With respect to each Foreign Benefit Plan, none of the Company, its Affiliates or any of their respective directors, officers, employees or agents has engaged in a transaction which would subject Company or any of its Subsidiaries, directly or indirectly, to a tax or civil penalty which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. With respect to each Foreign Benefit Plan, reserves have been established in the financial statements furnished to Holders of Debt Instruments in respect of any unfunded liabilities in accordance with applicable law and prudent business practice or, where required, in accordance with ordinary accounting practices in the jurisdiction in which such Foreign Benefit Plan is maintained. The aggregate unfunded liabilities with respect to such Foreign Benefit Plans could not reasonably be expected to result in a Material Adverse Effect.

(c) Except as would not reasonably be expected to result in a Material Adverse Effect, there are no pending, or to the knowledge of the Company, threatened claims (other than claims for benefits in the normal course), sanctions, actions or lawsuits, asserted or instituted against any Plan or any person as fiduciary or sponsor of any Plan that could result in liability to the Company, any Subsidiaries or the ERISA Affiliates.

(d) Within the last five years, no Plan of the Company, any Subsidiaries or the ERISA Affiliates has been terminated, whether or not in a "standard termination" as that term is used in Section 404(b)(1) of ERISA, that would reasonably be expected to result in liability to the Company, any Subsidiaries of the ERISA Affiliates in excess of $20.0 million, nor has any Plan of the Company, any Subsidiaries or the ERISA Affiliates (determined at any time within the past five years) with Unfunded Pension Liabilities been transferred outside of the "controlled group" (with the meaning of Section 4001(a)(14) of ERISA) of the Company, any Subsidiaries or the ERISA Affiliates that has or would reasonably be expected to result in a Material Adverse Effect.

Error! Unknown document property name.

Section 3.16.  Environmental Matters.  Except as set forth in Schedule 3.16 and except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) during the three-year period prior to the Closing Date, no written notice, request for information, order, complaint or penalty has been received by the Company or any of the Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the knowledge of the Company, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to the Company or any of the Subsidiaries, (b) the Company and the Subsidiaries have all environmental permits, licenses and other approvals necessary for its operations to comply with all applicable Environmental Laws and is, and during the term of all applicable statutes of limitation, has been, in compliance in all material respects with the terms of such permits, licenses and other approvals and with all other applicable Environmental Laws, (c) to the Company's knowledge, no Hazardous Material is located at, on or under any property currently owned, operated or leased by the Company or any of its Subsidiaries that would reasonably be expected to give rise to any cost, liability or obligation of the Company or any of its Subsidiaries under any Environmental Laws, and no Hazardous Material has been generated, owned, treated, stored, handled or controlled by the Company or any of its Subsidiaries and transported to or Released at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Company or any of its Subsidiaries under any Environmental Laws and (d) there are no agreements in which the Company or any of the Subsidiaries has expressly assumed or undertaken responsibility for any known or reasonably likely liability or obligation of any other person arising under or relating to Environmental Laws, which in any such case has not been made available to the Administrative Agent prior to the Closing Date.

Section 3.17.  [Intentionally Omitted]

Section 3.18.  [Intentionally Omitted]

Section 3.19.  Solvency.  (a)  Immediately after giving effect to the Transactions, (i) the fair value of the assets of the Company and its Subsidiaries on a consolidated basis, at a fair valuation, will exceed the debts and liabilities, direct, subordinated, unmatured, unliquidated, contingent or otherwise, of the Company and its Subsidiaries on a consolidated basis; (ii) the present fair saleable value of the property of the Company and its Subsidiaries on a consolidated basis will be greater than the amount that will be required to pay the probable liability of the Company and its

Error! Unknown document property name.

Subsidiaries on a consolidated basis on their debts and other liabilities, direct, subordinated, unmatured, unliquidated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) the Company and its Subsidiaries on a consolidated basis will be able to pay their debts and liabilities, direct, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) the Company (individually) and the Company and its Subsidiaries on a consolidated basis will not have unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are now conducted and are proposed to be conducted following the Closing Date.

(b) On the Closing Date, the Company does not intend to, and the Company does not believe that it or any of its subsidiaries will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing and amounts of cash to be received by it or any such subsidiary and the timing and amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such subsidiary.

Section 3.20.  <u>Labor Matters.</u>  Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect or as set forth on Schedule 3.20:  (a) there are no strikes or other labor disputes pending or threatened against the Company or any of the Subsidiaries; (b) the hours worked and payments made to employees of the Company and the Subsidiaries have not within the last three years been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; and (c) all payments due from the Company or any of the Subsidiaries or for which any claim may be made against the Company or any of the Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the respective books of the Company or such Subsidiary to the extent required by GAAP.  Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, the consummation of the Transactions will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which the Company or any of the Subsidiaries (or any predecessor) is a party or by which the Company or any of the Subsidiaries (or any predecessor) is bound.

Section 3.21.  <u>Insurance.</u>  Schedule 3.21 sets forth a true, complete and correct description of all material insurance maintained by or on behalf of the Company or the Subsidiaries as of the Closing Date.  As of such date, such insurance is in full force and effect.

Section 3.22.  <u>No Default.</u>  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Debt Instrument Document.

<center>ARTICLE IV</center>

<center>[Intentionally Omitted]</center>

<center>ARTICLE V</center>

<center>[Intentionally Omitted]</center>

<center>ARTICLE VI</center>

<center>[Intentionally Omitted]</center>

<center>ARTICLE VII</center>
<center><u>Events of Default</u></center>

The Events of Default and remedies shall be as set forth in Article IV of Annex A.

<center>ARTICLE VIII</center>

<center><u>The Administrative Agent</u></center>

Section 8.01.  <u>Appointment.</u>  (a)  Each Holder of Debt Instruments hereby irrevocably designates and appoints the Administrative Agent as the agent of such Holder of Debt Instruments under this Agreement and the other Debt Instrument Documents, and each such Holder of Debt Instruments irrevocably authorizes the Administrative Agent, in such capacities, to take such action on its behalf under the provisions of this Agreement and the other Debt Instrument Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Debt Instrument Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Holder of Debt Instruments, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Debt Instrument Document or otherwise exist against the

Error! Unknown document property name.

Administrative Agent.  To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Holder of Debt Instruments an amount equivalent to any applicable withholding Tax. If any Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Holder of Debt Instruments because the appropriate form was not delivered or was not properly executed or because such Holder of Debt Instruments failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, such Holder of Debt Instruments shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

(b)  In case of the pendency of any receivership, insolvency, liquidation, winding-up, bankruptcy, administration, reorganization, arrangement, adjustment, composition, moratorium or other judicial proceeding relative to the Company, (i) the Administrative Agent (irrespective of whether the principal of any Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on any Company) shall be entitled and empowered, by intervention in such proceeding or otherwise (A) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of any or all of the Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Holders of Debt Instruments, and the Administrative Agent and any Subagents allowed in such judicial proceeding, and (B) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and (ii) any custodian, receiver, assignee, trustee, liquidator, administrator, administrative receiver, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder of Debt Instruments to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Holders of Debt Instruments, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under the Debt Instrument Documents.  Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Holder of Debt Instruments any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Holder of Debt Instruments or to authorize the Administrative Agent to vote in respect of the claim of any Holder of Debt Instruments in any such proceeding.

Section 8.02.  Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement and the other Debt Instrument Documents by or through

Error! Unknown document property name.

agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

Section 8.03. <u>Exculpatory Provisions.</u> Neither the Administrative Agent nor its Affiliates nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by it or such person under or in connection with this Agreement or any other Debt Instrument Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such person's own gross negligence or willful misconduct) or (b) responsible in any manner to any of the Holders of Debt Instruments for any recitals, statements, representations or warranties made by the Company or any officer thereof contained in this Agreement or any other Debt Instrument Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Debt Instrument Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Debt Instrument Document or for any failure of the Company a party thereto to perform its obligations hereunder or thereunder. The Administrative Agent shall not be under any obligation to any Holder of Debt Instruments to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Debt Instrument Document, or to inspect the properties, books or records of the Company. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Debt Instrument Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, and (b) the Administrative Agent shall not, except as expressly set forth herein and in the other Debt Instrument Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Company or any Affiliate of the Company that is communicated to or obtained by the person serving as the Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until written notice describing such Default or Event of Default is given to the Administrative Agent by a Company or a Holder of Debt

Error! Unknown document property name.

Instruments. The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Debt Instrument Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Debt Instrument Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 8.04. <u>Reliance by Administrative Agent.</u> The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) or conversation believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to any Credit Event, that by its terms must be fulfilled to the satisfaction of a Holder of Debt Instruments, the Administrative Agent may presume that such condition is satisfactory to such Holder of Debt Instruments unless the Administrative Agent shall have received notice to the contrary from such Holder of Debt Instruments prior to such Credit Event. The Administrative Agent may consult with legal counsel (including counsel to the Company), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Administrative Agent may deem and treat the payee of any Note Certificate as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Debt Instrument Document unless it shall first receive such advice or concurrence of the Required Holders of Debt Instruments (or, if so specified by this Agreement, all or other Holders of Debt Instruments) as it deems appropriate or it shall first be indemnified

Error! Unknown document property name.

to its satisfaction by the Holders of Debt Instruments against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Debt Instrument Documents in accordance with a request of the Required Holders of Debt Instruments (or, if so specified by this Agreement, all or other Holders of Debt Instruments), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Holders of Debt Instruments and all future holders of the Debt Instruments.

Section 8.05.  <u>Notice of Default.</u>  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received written notice from a Holder of Debt Instruments, or the Company referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give prompt notice thereof to the Holders of Debt Instruments.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Holders of Debt Instruments (or, if so specified by this Agreement, all or other Holders of Debt Instruments); <u>provided</u> that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Holders of Debt Instruments.

Section 8.06.  <u>Non-Reliance on Administrative Agent and Other Holders of Debt Instruments.</u>  Each Holder of Debt Instruments expressly acknowledges that neither the Administrative Agent nor any of its respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by the Administrative Agent hereafter taken, including any review of the affairs of the Company or any affiliate of the Company, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Holder of Debt Instruments.  Each Holder of Debt Instruments represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Holder of Debt Instruments, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Company and their

Error! Unknown document property name.

affiliates and made its own decision to make its Debt Instruments hereunder and enter into this Agreement. Each Holder of Debt Instruments also represents that it will, independently and without reliance upon the Administrative Agent or any other Holder of Debt Instruments, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Debt Instrument Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Company and their affiliates. Except for notices, reports and other documents expressly required to be furnished to the Holders of Debt Instruments by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Holder of Debt Instruments with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Company or any affiliate of the Company that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

Section 8.07. <u>Indemnification.</u> The Holders of Debt Instruments agree to indemnify the Administrative Agent in its capacity as such (to the extent not reimbursed by the Company and without limiting the obligation of the Company to do so), in the amount of its pro rata share (based on the outstanding Debt Instruments it holds), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Debt Instruments) be imposed on, incurred by or asserted against the Administrative Agent in any way relating to or arising out of the Commitments, this Agreement, any of the other Debt Instrument Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent under or in connection with any of the foregoing; <u>provided</u> that no Holder of Debt Instruments shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the Administrative Agent's gross negligence or willful misconduct. The failure of any Holder of Debt Instruments to reimburse the Administrative Agent promptly upon demand for its ratable share of any amount required to be paid by the Holders of Debt Instruments to the Administrative Agent, as the

Error! Unknown document property name.

case may be, as provided herein shall not relieve any other Holder of Debt Instruments of its obligation hereunder to reimburse the Administrative Agent, as the case may be, for its ratable share of such amount, but no Holder of Debt Instruments shall be responsible for the failure of any other Holder of Debt Instruments to reimburse the Administrative Agent for such other Holders ratable share of such amount.  The agreements in this Section 8.07 shall survive the payment of the Debt Instruments and all other amounts payable hereunder.

Section 8.08.  <u>Administrative Agent in Its Individual Capacity.</u>  The Administrative Agent and its affiliates may issue Debt Instruments to, accept deposits from, and generally engage in any kind of business with the Company as though the Administrative Agent were not an Administrative Agent.  With respect to its Debt Instruments made or renewed by it, the Administrative Agent shall have the same rights and powers under this Agreement and the other Debt Instrument Documents as any Holder of Debt Instruments and may exercise the same as though it were not an Administrative Agent, and the terms "Holder of Debt Instruments" and "Holders of Debt Instruments" shall include the Administrative Agent in its individual capacity.

Section 8.09.  <u>Successor Administrative Agent.</u>  The Administrative Agent may resign as Administrative Agent upon 10 days' notice to the Holders of Debt Instruments and the Company.  If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Debt Instrument Documents, then the Required Holders of Debt Instruments shall appoint from among the Holders of Debt Instruments a successor agent for the Holders of Debt Instruments, which successor agent shall (unless an Event of Default under Section 4.01(b), (c), (h), or (i) of Annex A shall have occurred and be continuing) be subject to approval by the Company (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Debt Instruments.  If no successor agent has accepted appointment as Administrative Agent by the date that is 10 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the retiring Administrative Agent shall, on behalf of the Holders of Debt

Error! Unknown document property name.

Instruments appoint a successor agent which shall (unless an Event of Default under Section 4.01(b), (c), (h), or (i) of Annex A shall have occurred and be continuing) be subject to approval by the Company (which approval shall not be unreasonably withheld or delayed). After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Section 8.09 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Debt Instrument Documents.

Section 8.10.  Arrangers.  Neither of the Arrangers shall have any duties or responsibilities hereunder in its capacity as such.

ARTICLE IX

[Intentionally Omitted]

ARTICLE X

Miscellaneous

Section 10.01.  Notices; Communications.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 10.01(b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows

(i) if to the Company or the Administrative Agent, to the address, telecopier number, electronic mail address or telephone number specified for such person on Schedule 10.01; and

(ii) if to any other Holder of Debt Instruments, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

(b)  Notices and other communications to the Holders of Debt Instruments hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Holder of Debt Instruments pursuant to Article II if such Holder of Debt Instruments has notified the

Error! Unknown document property name.

Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Company may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)  Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received.  Notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided in Section 10.01(b) above shall be effective as provided in such Section 10.01(b).

(d)  Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.

(e)  Documents required to be delivered pursuant to Section 5.04 may be delivered electronically (including as set forth in Section 10.17) and if so delivered, shall be deemed to have been delivered on the date (i) on which a Company posts such documents, or provides a link thereto on its website on the Internet at the website address listed on Schedule 10.01, or (ii) on which such documents are posted on a Company's behalf on an Internet or intranet website, if any, to which each Holder of Debt Instruments and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that (A) the Company shall deliver paper copies of such documents to the Administrative Agent or any Holder of Debt Instruments that requests the Company to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Holder of Debt Instruments, and (B) the Company shall notify the Administrative Agent and each Holder of Debt Instruments (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Notwithstanding anything contained herein, in every instance the Company shall be required to provide paper copies of the certificates required by Section 5.04(c) to the Administrative Agent.  Except for such certificates required by Section 5.04(c), the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Company with any such request for delivery, and each Holder of Debt Instruments shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

Section 10.02.  Survival of Agreement.  All covenants, agreements, representations and warranties made by the Company herein, in the other Debt Instrument Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Debt Instrument Document shall be considered to have been relied upon by the

Error! Unknown document property name.

Holders of Debt Instruments and shall survive the making by the Holders of Debt Instruments, the execution and delivery of the Debt Instrument Documents, regardless of any investigation made by such persons or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Debt Instrument or any Fee or any other amount payable under this Agreement or any other Debt Instrument Document is outstanding and unpaid.  Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein (including pursuant to Sections 2.15, 2.17 and 10.05) shall survive the payment in full of the principal and interest hereunder.

Section 10.03.  <u>Binding Effect.</u>  This Agreement shall become effective when it shall have been executed by the Company and the Administrative Agent and when the Administrative Agent shall have received copies hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the Company, the Administrative Agent and each Holder of Debt Instruments and their respective permitted successors and assigns.

Section 10.04.  <u>Successors and Assigns.</u>  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Company may not assign or otherwise transfer any of their rights or obligations hereunder individually or collectively without the prior written consent of each Holder of Debt Instruments (and any attempted assignment or transfer by a Company without such consent shall be null and void), and (ii) no Holder of Debt Instruments may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 10.04), and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Holders of Debt Instruments) any legal or equitable right, remedy or claim under or by reason of this Agreement or the other Debt Instrument Documents.

(b)  (i)  Subject to the conditions set forth in paragraph (b)(ii) below, prior to the Debt Instrument Listing, any Holder of Debt Instruments may assign to one or more assignees (each, an "<u>Assignee</u>") all or a portion of its rights and obligations under this Agreement with notification to the Company and the prior written consent (such consent not to be unreasonably withheld) of the Administrative Agent; <u>provided</u> that no

consent of the Administrative Agent shall be required for an assignment of all or any portion of a Debt Instrument to a Holder of Debt Instruments, an Affiliate of a Holder of Debt Instruments or an Approved Fund; and

(ii) Assignments shall be subject to the following additional conditions:

(A) except in the case of an assignment to a Holder of Debt Instruments, an affiliate of a Holder of Debt Instruments or an Approved Fund or an assignment of the entire remaining amount of the Debt Instruments of the assigning Holder of Debt Instruments under any Facility, the amount of Debt Instruments of the assigning Holder of Debt Instruments subject to each such assignment (determined as of the date the Assignment and Acceptance is delivered to the Administrative Agent) shall not be less than €1.0 million, unless the Company and the Administrative Agent otherwise consent; provided that (1) no such consent of the Company shall be required if an Event of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Holder of Debt Instruments and its Affiliates or Approved Funds (with simultaneous assignments to or by two or more Related Funds shall be treated as one assignment), if any;

(B) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent);

(C) the Assignee, if it shall not be a Holder of Debt Instruments, shall deliver to the Administrative Agent an Administrative Questionnaire and all applicable tax forms; and

(D) the Assignee shall not be the Company or the Company's Affiliates or Subsidiaries.

(iii) After the Debt Instrument Listing, subject to compliance with paragraph (b)(ii)(A), (b)(ii)(B) and (b)(ii)(C), any Holder of Debt Instruments shall have the absolute and unconditional right to assign to one or more Assignees all or a portion of its rights and obligations under this Agreement at any time so long as such assignment complies with applicable laws. The Administrative Agent shall notify the Company of any such assignment.

For the purposes of this Section 10.04, "Approved Fund" means any person (other than a natural person) that is engaged in making, purchasing, holding or investing in Debt Instruments and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Holder of Debt Instruments, (b) an Affiliate of a Holder of Debt Instruments or (c) an entity or an

Error! Unknown document property name.

Affiliate of an entity that administers or manages a Holder of Debt Instruments. Notwithstanding the foregoing, no Holder of Debt Instruments shall be permitted to assign or transfer any portion of its rights and obligations under this Agreement to any entity previously identified in that certain letter dated as of the Closing Date from the Company to the Administrative Agent.

(iv) Subject to acceptance and recording thereof pursuant to paragraph (b)(v) below, from and after the effective date specified in each Assignment and Acceptance the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Holder of Debt Instruments under this Agreement, and the assigning Holder of Debt Instruments thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the rights and obligations under this Agreement of the assigning Holder of Debt Instruments, such Holder of Debt Instruments shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 10.05).  Any assignment or transfer by a Holder of Debt Instruments of rights or obligations under this Agreement that does not comply with this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Holder of Debt Instruments of a participation in such rights and obligations in accordance with paragraph (c) of this Section 10.04.

(v) The Administrative Agent, acting for this purpose as an agent of the Company, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Holders of Debt Instruments and principal amount of the Debt Instruments owing to each Holder of Debt Instruments pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Company, the Administrative Agent and the Holders of Debt Instruments may treat each person whose name is recorded in the Register pursuant to the terms hereof as a Holder of Debt Instruments hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Company and any Holder of Debt Instruments, at any reasonable time and from time to time upon reasonable prior notice.

(vi) Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Holder of Debt Instruments and an Assignee, the Assignee's completed Administrative Questionnaire (unless the Assignee shall already be a Holder of Debt Instruments hereunder), all applicable tax forms, the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall promptly accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this

Error! Unknown document property name.

Agreement unless it has been recorded in the Register as provided in this paragraph (b)(v).

(c)  (i) Any Holder of Debt Instruments may, without the consent of the Company or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of the rights and obligations of such Holder of Debt Instruments under this Agreement; provided that (A) the obligations of such Holder of Debt Instruments under this Agreement shall remain unchanged, (B) such Holder of Debt Instruments shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Company, the Administrative Agent and the other Holders of Debt Instruments shall continue to deal solely and directly with such Holder of Debt Instruments in connection with the rights and obligations of such Holder of Debt Instruments under this Agreement.  Any agreement pursuant to which a Holder of Debt Instruments sells such a participation shall provide that such Holder of Debt Instruments shall retain the sole right to enforce this Agreement and the other Debt Instrument Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Debt Instrument Documents; provided that (x) such agreement may provide that such Holder of Debt Instruments will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Holder of Debt Instruments directly affected thereby pursuant to Section 10.04(a)(i), (2) requires the consent of Holders of Debt Instruments of not less than 90% of the then outstanding aggregate principal amount of the Debt Instruments directly affected thereby pursuant to Section 10.08(c) and (3) directly affects such Participant and (y) no other agreement with respect to amendment, modification or waiver may exist between such Holder of Debt Instruments and such Participant.  Subject to paragraph (c)(ii) of this Section 10.04, the Company agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 to the same extent as if it were a Holder of Debt Instruments and had acquired its interest by assignment pursuant to paragraph (b) of this Section 10.04.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.06 as though it were a Holder of Debt Instruments, provided such Participant shall be subject to Section 2.18(c) as though it were a Holder of Debt Instruments.

(ii) A Participant shall not be entitled to receive any greater payment under Section 2.15, 2.16 or 2.17 than the applicable Holder of Debt Instruments would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Company's prior written consent.  A Participant shall not be entitled to the benefits of Section 2.17 to the extent such Participant fails to comply with Section 2.17(e) and (f) as though it were a Holder of Debt Instruments.

(d)  Any Holder of Debt Instruments may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Holder of Debt Instruments, including (i) any pledge or assignment to secure obligations to a Federal Reserve Bank, (ii) the case of any Holder of Debt Instruments that is a Fund, any pledge or assignment to any holders of obligations owed, or securities issued, by such Holder of Debt Instruments including to any trustee for, or

Error! Unknown document property name.

any other representative of, such holders and in each case, this Section 10.04 shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest shall release a Holder of Debt Instruments from any of its obligations hereunder or substitute any such pledgee or Assignee for such Holder of Debt Instruments as a party hereto.

(e)  The Company, upon receipt of written notice from the relevant Holder of Debt Instruments, agrees to issue Note Certificates to any Holder of Debt Instruments requiring Note Certificates to facilitate transactions of the type described in paragraph (d) above.

(f)  [Reserved]

(g)  Notwithstanding the foregoing, no assignment may be made or participation sold to an Ineligible Institution without the prior written consent of the Company.

Section 10.05.  <u>Expenses; Indemnity.</u>  (a)  The Company agrees to pay (i) all reasonable out-of-pocket expenses (including Other Taxes) incurred by the Administrative Agent in connection with the preparation of this Agreement and the other Debt Instrument Documents, or by the Administrative Agent in connection with the syndication of the Commitments or the administration of this Agreement (including expenses incurred in connection with due diligence or in connection with the administration of this Agreement and any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the Transactions hereby contemplated shall be consummated), including the reasonable fees, charges and disbursements of Cravath, Swaine & Moore LLP, special counsel for the Administrative Agent and the Arrangers, and, if necessary, the reasonable fees, charges and disbursements of one local counsel per jurisdiction, and (ii) all out-of-pocket expenses (including Other Taxes) incurred by the Administrative Agent or any Holder of Debt Instruments in connection with the enforcement or protection of their rights in connection with this Agreement and the other Debt Instrument Documents, in connection with the Debt Instruments made hereunder, including the fees, charges and disbursements of counsel for the Administrative Agent (including any special and local counsel).

(b)  The Company agrees to indemnify the Administrative Agent, the Arrangers, each Holder of Debt Instruments, each of their respective Affiliates and each of their respective directors, trustees, officers, employees, agents, trustees and advisors (each such person being called an "<u>Indemnitee</u>") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees, charges and disbursements (except the allocated costs

Error! Unknown document property name.

of in-house counsel), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Debt Instrument Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated hereby, (ii) the use of the proceeds of the Debt Instruments or (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, and regardless of whether any of the foregoing is raised or initiated by a third party or the Company or any other Debt Instrument Party or any Subsidiary; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee (for purposes of this proviso only, each of the Administrative Agent, any Arranger or any Holder of Debt Instruments shall be treated as several and separate Indemnitees, but each of them together with its respective Related Parties, shall be treated as a single Indemnitee). Subject to and without limiting the generality of the foregoing sentence, the Company agrees to indemnify each Indemnitee against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel or consultant fees, charges and disbursements (limited to not more than one counsel, plus, if necessary, one local counsel per jurisdiction) (except the allocated costs of in-house counsel), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (A) any claim related in any way to Environmental Laws and the Company or any of the Subsidiaries, or (B) any actual or alleged presence, Release or threatened Release of Hazardous Materials at, under, on or from any Property; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any of its Related Parties. None of the Indemnitees (or any of their respective affiliates) shall be responsible or liable to the Company or any of their respective subsidiaries, Affiliates or stockholders or any other person or entity for any special, indirect, consequential or punitive damages, which may be alleged as a result of the Facilities or the Transactions. The provisions of this Section 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the invalidity or unenforceability of any term or provision of this Agreement or any other Debt Instrument Document, or any investigation made by or on behalf of the Administrative Agent or any Holder of Debt Instruments. All amounts due under this Section 10.05 shall be payable on written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(c) Except as expressly provided in Section 10.05(a) with respect to Other Taxes, which shall not be duplicative with any amounts paid pursuant to Section 2.17, this Section 10.05 shall not apply to Taxes.

Error! Unknown document property name.

(d)  To the fullest extent permitted by applicable law, the Company shall not assert, and hereby waives, any claims against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Debt Instrument Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Debt Instrument or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Debt Instrument Documents or the transactions contemplated hereby or thereby.

(e)  The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Holder of Debt Instruments, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations and the termination of this Agreement.

Section 10.06.  <u>Right of Set-off.</u>  If an Event of Default shall have occurred and be continuing, each Holder of Debt Instruments is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Holder of Debt Instruments to or for the credit or the account of the Company or any Subsidiary against any of and all the obligations of the Company now or hereafter existing under this Agreement or any other Debt Instrument Document held by such Holder of Debt Instruments, irrespective of whether or not such Holder of Debt Instruments  shall have made any demand under this Agreement or such other Debt Instrument Document and although the obligations may be unmatured.  The rights of each Holder of Debt Instruments under this Section 10.06 are in addition to other rights and remedies (including other rights of set-off) that such Holder of Debt Instruments  may have.

Section 10.07.  <u>Applicable Law.</u>  THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Section 10.08.  <u>Waivers; Amendment.</u>  (a)  No failure or delay of the Administrative Agent or any Holder of Debt Instruments in exercising any right or power hereunder or under any Debt Instrument Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise

Error! Unknown document property name.

of any other right or power. The rights and remedies of the Administrative Agent and the Holders of Debt Instruments hereunder and under the other Debt Instrument Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Debt Instrument Document or consent to any departure by the Company therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on the Company in any case shall entitle such person to any other or further notice or demand in similar or other circumstances.

(b) The Company and the Administrative Agent may amend this Agreement without notice to or consent of any Holder of Debt Instruments:

(i) to cure any ambiguity, omission, mistake, defect or inconsistency;

(ii) to effect any provision of this Agreement;

(iii) to provide for the assumption by a Successor Company of the obligations of the Company under this Agreement;

(iv) to comply with Article III of Annex A;

(v) to add to the covenants of the Company for the benefit of the Holders of Debt Instruments or to surrender any right or power conferred upon the Company;

(vi) to evidence and process for the acceptance and appointment under this Agreement of a successor Administrative Agent;

(vii) to provide for the accession of the Administrative Agent to any instrument in connection with the Debt Instruments;

(viii) to provide for the issuance of additional Debt Instruments, which shall have terms substantially consistent in all material respects to this Agreement and the Senior Notes, and which shall be treated, together with any outstanding Debt Instruments, as a single class; or

(ix) to make any change that does not adversely affect the rights of any Holder of Debt Instruments.

In formulating its opinion on such matters, the Administrative Agent shall be entitled to require and rely absolutely on such evidence as it reasonably deems appropriate, including an Opinion of Counsel, and an Officers' Certificate.

Error! Unknown document property name.

(c)  The Company and the Administrative Agent may amend this Agreement with the written consent of the Required Holders of Debt Instruments voting as a single class.  However, without the consent of not less than 90% of the then outstanding aggregate principal amount of the Debt Instruments held by Holders of Debt Instruments adversely affected thereby, no amendment may:

(i) reduce the amount of Debt Instruments whose Holders of Debt Instruments must consent to an amendment;

(ii) reduce the rate of or extend the time for payment of interest on any Debt Instruments;

(iii) reduce the principal of or extend the Maturity Date of the Debt Instruments;

(iv) reduce the premium payable upon the early redemption of the Debt Instruments or change the time at which the Debt Instruments may be redeemed in accordance with Section 2.10;

(v) expressly subordinate the Debt Instruments to any other Indebtedness of the Company not otherwise permitted by this Agreement;

(vi) impair the right of any Holder of Debt Instruments to receive payment of principal of, premium, if any, and interest on the Debt Instruments of such Holder of Debt Instruments on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to the Debt Instruments of such Holder of Debt Instruments; or

(vii) make any change in Section 3.04 or 3.07 of Annex A or the second sentence of this Section 10.08(c).

It shall not be necessary for the consent of the Holders of Debt Instruments under this Section 10.08(c) to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

(d)  The Administrative Agent shall have the right and power to, and shall, enter into amendments to this Agreement and the Debt Instrument Documents, on its behalf or on behalf of the Holders of Debt Instruments, without the consent of the Holders of Debt Instruments, as necessary to effect the Debt Instrument Listing; provided that such amendments are not materially adverse to the interests of the Holders of Debt Instruments.

(e)  After an amendment under clause (b) or (c) of this Section 10.08 becomes effective, the Company shall deliver to the Holders of Debt Instruments a notice briefly describing such amendment.  The failure to give such notice to all Holders of Debt Instruments, or any defect therein, shall not impair or affect the validity of an amendment under this Section 10.08.

Error! Unknown document property name.

(f)  A written consent to an amendment or a waiver by a Holder of Debt Instruments shall bind the Holder of Debt Instruments and every subsequent Holder of Debt Instruments of that Debt Instrument or portion of the Debt Instrument that evidences the same debt as the Debt Instrument of the consenting Holder of Debt Instruments, even if notation of the consent or waiver is not made on the Debt Instrument.  However, any such Holder of Debt Instruments or subsequent Holder of Debt Instruments may revoke the written consent or waiver as to the Debt Instrument of such Holder of Debt Instruments or portion of the Debt Instrument if the Administrative Agent receives the notice of revocation before the earlier of (a) the date on which the Administrative Agent receives an Officer's Certificate from the Company certifying that the requisite number of consents have been received and (b) the effective date of the amendment.  After an amendment or waiver becomes effective, it shall bind every Holder of Debt Instruments.  An amendment or waiver becomes effective upon the (i) receipt by the Company or the Administrative Agent of the requisite number of consents, (ii) satisfaction of conditions to effectiveness as set forth in this Agreement and any amendment hereto containing such amendment or waiver and (iii) execution of such amendment or waiver (or amendment) by the Company and the Administrative Agent.

Section 10.09.  Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the applicable interest rate, together with all fees and charges that are treated as interest under applicable law (collectively, the "Charges"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Holder of Debt Instruments, shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by such Holder of Debt Instruments in accordance with applicable law, the rate of interest payable hereunder, together with all Charges payable to such Holder of Debt Instruments, shall be limited to the Maximum Rate; provided that such excess amount shall be paid to such Holder of Debt Instruments on subsequent payment dates to the extent not exceeding the legal limitation.

Section 10.10.  Entire Agreement.  This Agreement, including Annex A hereto which forms an integral part of this Agreement, the other Debt Instrument Documents and the agreements regarding certain Fees referred to herein constitute the entire contract between the parties relative to the subject matter hereof.  Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Debt Instrument Documents.  Notwithstanding the foregoing, the Fee Letter shall survive the execution and delivery of this Agreement and remain in full force and effect.  Nothing in this Agreement or in the other Debt Instrument Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto any rights,

Error! Unknown document property name.

remedies, obligations or liabilities under or by reason of this Agreement or the other Debt Instrument Documents.

Section 10.11.  WAIVER OF JURY TRIAL.  **EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER DEBT INSTRUMENT DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DEBT INSTRUMENT DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.11.**

Section 10.12.  Severability.  In the event any one or more of the provisions contained in this Agreement or in any other Debt Instrument Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 10.13.  Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in Section 10.03.  Delivery of an executed counterpart to this Agreement by facsimile transmission (or other electronic transmission pursuant to procedures approved by the Administrative Agent) shall be as effective as delivery of a manually signed original.

Section 10.14.  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to

affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 10.15.  Jurisdiction; Consent to Service of Process.  (a)  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof (collectively, "New York Courts"), in any action or proceeding arising out of or relating to this Agreement or the other Debt Instrument Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Debt Instrument Documents in the courts of any jurisdiction, except that the Company agrees that (a) it will not bring any such action or proceeding in any court other than New York Courts (it being acknowledged and agreed by the parties hereto that any other forum would be inconvenient and inappropriate in view of the fact that more of the Holders of Debt Instruments who would be affected by any such action or proceeding have contacts with the State of New York than any other jurisdiction), and (b) in any such action or proceeding brought against the Company in any other court, it will not assert any cross-claim, counterclaim or setoff, or seek any other affirmative relief, except to the extent that the failure to assert the same will preclude the Company from asserting or seeking the same in the New York Courts.

(b)  Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Debt Instrument Documents in any New York State or federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

Section 10.16.  Confidentiality.  Each of the Holders of Debt Instruments and the Administrative Agent agrees that it shall maintain in confidence any information relating to the Company and any Subsidiary furnished to it by or on behalf of the

Error! Unknown document property name.

Company or any Subsidiary (other than information that (a) has become generally available to the public other than as a result of a disclosure by such party, (b) has been independently developed by such Holder of Debt Instruments or the Administrative Agent without violating this Section 10.16 or (c) was available to such Holder of Debt Instruments or the Administrative Agent from a third party having, to such person's knowledge, no obligations of confidentiality to the Company or any other Debt Instrument Party) and shall not reveal the same other than to its directors, trustees, officers, employees and advisors with a need to know or to any person that approves or administers the Debt Instruments on behalf of such Holder of Debt Instruments (so long as each such person shall have been instructed to keep the same confidential in accordance with this Section 10.16), except:  (A) to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, the National Association of Insurance Commissioners or of any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded, (B) as part of normal reporting or review procedures to, or examinations by, Governmental Authorities or self-regulatory authorities, including the National Association of Insurance Commissioners or the National Association of Securities Dealers, Inc., (C) to its parent companies, Affiliates or auditors (so long as each such person shall have been instructed to keep the same confidential in accordance with this Section 10.16), (D) in order to enforce its rights under any Debt Instrument Document in a legal proceeding, (E) to any pledgee under Section 10.04(d) or any other prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such person shall have been instructed to keep the same confidential in accordance with this Section 10.16) and (F) to any direct or indirect contractual counterparty in Swap Agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 10.16).

Section 10.17.  <u>Platform; Company Materials.</u>  The Company hereby acknowledges that (a) the Administrative Agent and/or the Arrangers will make available to the Holders of Debt Instruments materials and/or information provided by or on behalf of the Company hereunder (collectively, "<u>Company Materials</u>") by posting the Company Materials on IntraLinks or another similar electronic system (the "<u>Platform</u>"), and (b) certain of the Holders of Debt Instruments may be "public-side" Holders of Debt Instruments (<u>i.e.</u>, Holders of Debt Instruments that do not wish to receive material non-public information with respect to the Company or its

Error! Unknown document property name.

securities) (each, a "<u>Public Holder of Debt Instruments</u>").  The Company hereby agrees that it will use commercially reasonable efforts to identify that portion of the Company Materials that may be distributed to the Public Holders of Debt Instruments and that (i) all the Company Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Company Materials "PUBLIC," the Company shall be deemed to have authorized the Administrative Agent, the Arranger and the Holders of Debt Instruments to treat the Company Materials as either publicly available information or not material information (although it may be sensitive and proprietary) with respect to the Company or their securities for purposes of United States Federal and state securities laws, (iii) all Company Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor;" and (iv) the Administrative Agent and the Arrangers shall be entitled to treat the Company Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor".

Section 10.18.  [Intentionally Omitted]

Section 10.19.  <u>Judgment Currency.</u>  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Debt Instrument Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Company in respect of any such sum due from it to the Administrative Agent or the Holders of Debt Instruments hereunder or under the other Debt Instrument Documents shall, notwithstanding any judgment in a currency (the "<u>Judgment Currency</u>") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "<u>Agreement Currency</u>"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Company in the Agreement Currency, the Company agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the person to whom such

Error! Unknown document property name.

obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Company (or to any other person who may be entitled thereto under applicable law).

Section 10.20.  <u>USA PATRIOT Act Notice.</u>  Each Holder of Debt Instruments that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Holder of Debt Instruments) hereby notifies the Company that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies the Company, which information includes the name and address of the Company and other information that will allow such Holder of Debt Instruments or the Administrative Agent, as applicable, to identify the Company in accordance with the Act.

Error! Unknown document property name.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

LOUIS TOPCO LIMITED,

by

_____/S/ LUKAS KOLFF_____
Name: Lukas Kolff
Title:   Director

**Error! Unknown document property name.**

CREDIT SUISSE, LONDON BRANCH
as Administrative Agent and Holder of Debt
Instruments,

by

_____
/s/ GERALD GLEESON VAN RIET
Name:  Gerald Gleeson Van Riet
Title:   Managing Director

by

_____
/s/ THIBAUT PARAYRE
Name:  Thibaut Parayre
Title:   Managing Director

**Error! Unknown document property name.**

DEUTSCHE BANK AG, LONDON BRANCH
as Holder of Debt Instruments,

by

_____
/S/ KARL-HEINZ HERWECK
Name: Karl-Heinz Herweck
Title: Director

by

_____
/S/ JOSHUA WELLS
Name: Joshua Wells
Title: VP

**Error! Unknown document property name.**

# ARTICLE I

## Rules of Construction

SECTION 1.01. Rules of Construction.................................................................3

# ARTICLE II

## Covenants

SECTION 2.01. [Intentionally Omitted] ...............................................................3
SECTION 2.02. Reports and Other Information .......................................................3
SECTION 2.03. Limitation on Incurrence of Indebtedness and Issuance of Disqualified
            Stock and Preferred Stock................................................................5
SECTION 2.04. Limitation on Restricted Payments ...............................................12
SECTION 2.05. Dividend and Other Payment Restrictions Affecting Subsidiaries...................18
SECTION 2.06. Asset Sales .............................................................................20
SECTION 2.07. Transactions with Affiliates ..........................................................23
SECTION 2.08. [Intentionally Omitted] ...............................................................27
SECTION 2.09. Compliance Certificate ................................................................27
SECTION 2.10. Further Instruments and Acts .........................................................27
SECTION 2.11. Future Guarantors .....................................................................27
SECTION 2.12. Liens....................................................................................28
SECTION 2.13. [Intentionally Omitted] ...............................................................28
SECTION 2.14. [Intentionally Omitted] ...............................................................29
SECTION 2.15. Loan Listing ...........................................................................29
SECTION 2.16. Suspension/Fall-Away of Covenants on Achievement of Investment
            Grade Status ..............................................................................29
SECTION 2.17. [Intentionally Omitted] ...............................................................29

# ARTICLE III

## Successor Company

SECTION 3.01. When Company May Merge or Transfer Assets .............................................30

# ARTICLE IV

## Defaults and Remedies

SECTION 4.01. Events of Default .......................................................................32
SECTION 4.02. Acceleration .............................................................................33
SECTION 4.03. Other Remedies..........................................................................34
SECTION 4.04. Waiver of Past Defaults ................................................................34
SECTION 4.05. Control by Majority .....................................................................34
SECTION 4.06. Limitation on Suits......................................................................35

SECTION 4.07. Rights of the Holders of Debt Instruments to Receive Payment ......................35
SECTION 4.08. Collection Suit by Administrative Agent............................................................35
SECTION 4.09. Administrative Agent May File Proofs of Claim................................................36
SECTION 4.10. Priorities..............................................................................................................36
SECTION 4.11. Undertaking for Costs ........................................................................................36
SECTION 4.12. Waiver of Stay or Extension Laws .................................................................37

# ARTICLE I

## Rules of Construction

SECTION 1.01.  <u>Rules of Construction.</u>  Unless the context otherwise requires:

(a) a term has the meaning assigned to it;

(b) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c) "or" is not exclusive;

(d) "including" shall mean including without limitation;

(e) words in the singular include the plural and words in the plural include the singular;

(f) unsecured Indebtedness shall not be deemed to be subordinate or junior to Secured Indebtedness merely by virtue of its nature as unsecured Indebtedness;

(g) the principal amount of any non-interest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the issuer dated such date prepared in accordance with GAAP;

(h) the principal amount of any Preferred Stock shall be (i) the maximum liquidation value of such Preferred Stock or (ii) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater; and

(i) unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP.

# ARTICLE II

## Covenants

SECTION 2.01.  [Intentionally Omitted]

SECTION 2.02.  <u>Reports and Other Information.</u>  (a)  Within 130 days after the end of each of the Company's fiscal years beginning with the fiscal year ending December 31, 2007 annual reports containing the following information:  (i) audited consolidated balance sheets of the Company as of the end of the two most recent fiscal years and audited consolidated income statements and statements of cash flow of the Company for the three most recent fiscal

years, including complete footnotes to such financial statements and the report of the independent auditors on the financial statements; (ii) pro forma income statement and balance sheet information of the Company (which need not comply with Article 11 of Regulation S-X under the Exchange Act, "<u>Regulation S-X</u>"), together with explanatory footnotes, for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the most recently completed fiscal year unless pro forma information has been provided in a previous report pursuant to clause (b) or (c) below; (iii) an operating and financial review of the audited financial statements, including a discussion of the results of operations, financial condition, and liquidity and capital resources of the Company, and a discussion of material commitments and contingencies and critical accounting policies; (iv) a description of the business, management, management compensation and shareholders of the Company, all material affiliate transactions and a description of all material contractual arrangements, including material debt instruments (in each case to the extent such information would be required to be disclosed if the Company were a reporting company under the Exchange Act); (v) a description of material risk factors and material recent developments; (vi) earnings before interest, taxes, depreciation and amortization; (vii) capital expenditures; (viii) depreciation and amortization; (ix) income (loss) from operations; and (x) information for Subsidiaries substantially consistent with the disclosure provided in the Offering Circular; <u>provided</u> that any item of disclosure that complies in all material respects with the requirements that would be applicable under Form 20-F under the Exchange Act with respect to such item will be deemed to satisfy the Company's obligations under this clause (a) with respect to such item.

(b)  within 70 days following the end of the first three fiscal quarters in each fiscal year of the Company all quarterly financial statements of the Company containing the following information: (i) an unaudited condensed consolidated balance sheet as of the end of such quarter and unaudited condensed statements of income and cash flow for the most recent year-to-date period ending on the unaudited condensed balance sheet date, and the comparable prior year periods, together with condensed footnote disclosure; (ii) pro forma income statement and balance sheet information of the Company (which need not comply with Article 11 of Regulation S-X), together with explanatory footnotes, for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the most recently completed fiscal year unless pro forma information has been provided in a previous report pursuant to clause (a) or (c); (iii) an operating and financial review of the unaudited financial statements, including a discussion of the results of operations, financial condition, and liquidity and capital resources of the Company, and a discussion of material commitments and contingencies and critical accounting policies; and (iv) material recent developments and any material changes to the risk factors disclosed in the most recent annual report; <u>provided</u> that that any item of disclosure that complies in all material respects with the requirements that would be applicable under Form 10-Q under the Exchange Act with respect to such item will be deemed to satisfy the Company's obligations under this clause (b) with respect to such item.

(c)  promptly after the occurrence of any material acquisition, disposition or restructuring of the Company and the Restricted Subsidiaries, taken as a whole, or any senior executive officer changes at the Company or change in auditors of the Company or any other material event that the Company or any of its Restricted Subsidiaries announces publicly, a report containing a description of such event.

(d)  In the event that the Company becomes subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, or elects to comply with such provisions, the Company will, for so long as it continues to file the reports required by Section 13(a) with the SEC, make available to the Administrative Agent the annual reports, information, documents and other reports that the Company is required to file with the SEC pursuant to such Section 13(a) or 15(d). By complying with the foregoing requirements of this paragraph, the Company will be deemed to have complied with the provisions contained in Sections 2.02(a) through (c) for the relevant period.

(e)  So long as any of the Debt Instruments remain outstanding and during any period during which the Company is not subject to section 13 or 15(d) of the Exchange Act, or otherwise permitted to furnish the SEC with certain information pursuant to Rule 12g 3-2(b) of the Exchange Act, the Company will make available to the Holders of Debt Instruments and to prospective investors, upon their request, the information required to be delivered pursuant to by Rule 144A(d)(4) under the Securities Act.

(f)  All financial statements shall be for the Company and/or the Company's predecessor, as applicable. All financial statements and pro forma financial information shall be prepared in accordance with GAAP on a consistent basis for the periods presented and shall comply with the applicable requirements of any exchange on which the Debt Instruments are listed; *provided*, *however*, that the reports set forth in clauses (a), (b) and (c) above may, in the event of a change in applicable GAAP, present earlier periods on a basis that applied to such periods, subject to the provisions of this Agreement. Except as provided for above, no report need include separate financial statements for the Company or the Subsidiaries or any disclosure with respect to the results of operations or any other financial or statistical disclosure not of a type included in the Offering Circular.

SECTION 2.03.  <u>Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock</u>.  (a)    (i) The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock; and (ii) the Company shall not permit any of its Restricted Subsidiaries to issue any shares of Preferred Stock; *provided, however*, that (x) the Company and any Restricted Subsidiary (other than CEVA and any Restricted Subsidiary of CEVA) may Incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock and any Restricted Subsidiary (other than CEVA and any Restricted Subsidiary of CEVA) may issue shares of Preferred Stock, in each case if the Fixed Charge Coverage Ratio of the Company for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 1.75 to 1.00 (y) CEVA and any Restricted Subsidiary of CEVA may Incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock or issue shares of Preferred Stock, in each case if the Fixed Charge Coverage Ratio of CEVA for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00, in the case of each of clauses (i) and (ii), determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been Incurred, or the

Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period.

(b) The foregoing limitations shall not apply to (collectively, "Permitted Debt"):

(i) the Incurrence by the Company or its Restricted Subsidiaries of Indebtedness under the CEVA Credit Agreement and the issuance and creation of letters of credit and bankers' acceptances thereunder (with letters of credit and bankers' acceptances being deemed to have a principal amount equal to the face amount thereof) in the aggregate principal amount of €1,005.0 million plus an aggregate additional principal amount outstanding at any one time that does not cause the Secured Indebtedness Leverage Ratio of CEVA to exceed 3.00 to 1.00 determined on a pro forma basis (including a pro forma application of the net proceeds therefrom);

(ii) the Incurrence by the Company of Indebtedness represented by the Debt Instruments;

(iii) Indebtedness existing on the Closing Date (other than Indebtedness described in clauses (i) and (ii) of this Section 2.03(b));

(iv) Indebtedness (including Capitalized Lease Obligations) Incurred by the Company or any of its Restricted Subsidiaries, Disqualified Stock issued by the Company or any of its Restricted Subsidiaries and Preferred Stock issued by any Restricted Subsidiaries of the Company to finance (whether prior to or within 270 days after) the purchase, lease, construction or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets); *provided* that if, immediately after Incurring such Indebtedness, the Secured Indebtedness Leverage Ratio of CEVA would be greater than 3.00 to 1.00, then the aggregate amount of all Indebtedness Incurred pursuant to this clause (iv) shall not exceed the greater of €100.0 million and 4.25% of Total Assets;

(v) Indebtedness Incurred by the Company or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including without limitation letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families or property, casualty or liability insurance or self-insurance, and letters of credit in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits or licenses from governmental authorities, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(vi) Indebtedness arising from agreements of the Company or a Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, Incurred in connection with the Initial Transactions or any

other acquisition or disposition of any business, assets or a Subsidiary of the Company in accordance with the terms of this Agreement, other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

(vii) Indebtedness of the Company to a Restricted Subsidiary; *provided*, that any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (vii);

(viii) shares of Preferred Stock of a Restricted Subsidiary issued to the Company or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary that holds such shares of Preferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Company or another Restricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock not permitted by this clause (viii);

(ix) Indebtedness of a Restricted Subsidiary to the Company or another Restricted Subsidiary; *provided*, that any subsequent issuance or transfer of any Capital Stock or any other event that results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (ix);

(x) Hedging Obligations that are Incurred not for speculative purposes but (1) for the purpose of fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Agreement to be outstanding; (2) for the purpose of fixing or hedging currency exchange rate risk with respect to any currency exchanges; or (3) for the purpose of fixing or hedging commodity price risk with respect to any commodity purchases or sales;

(xi) obligations in respect of performance, bid, appeal and surety bonds and completion guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business or consistent with past practice;

(xii) any guarantee by the Company or a Restricted Subsidiary of Indebtedness or other obligations of the Company or any of its Restricted Subsidiaries so long as the Incurrence of such Indebtedness Incurred by the Company or such Restricted Subsidiary is permitted under the terms of this Agreement;

(xiii) the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary of the Company that serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under Section 2.03(a) of this Annex A and clauses (ii), (iii), (iv), (xiii), and (xiv) of this Section 2.03(b) or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premium), defeasance costs and fees in connection therewith (subject to the following proviso, "Refinancing Indebtedness") prior to its respective maturity; *provided*, *however*, that such Refinancing Indebtedness will be Refinancing Indebtedness if and to the extent it:

(1) has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred that is not less than the shorter of (A) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced or defeased and (B) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and Preferred Stock being refunded or refinanced that were due on or after the date one year following the last maturity date of any Debt Instruments then outstanding were instead due on such date one year following the last maturity date of the Debt Instruments;

(2) has a Stated Maturity that is not earlier than the earlier of (A) the Stated Maturity of the Indebtedness being refunded or refinanced or (B) 91 days following the maturity date of the Debt Instruments;

(3) refinances (A) Indebtedness junior to the Debt Instruments, such Refinancing Indebtedness is junior to the Debt Instruments or (B) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock; and

(4) does not include Indebtedness of the Company or a Restricted Subsidiary that refinances Indebtedness of an Unrestricted Subsidiary,

*provided*, *further*, that subclauses (1) and (2) of this clause (xiii) will not apply to any refunding or refinancing of (i) the Debt Instruments, (ii) any Indebtedness of CEVA and its subsidiaries (including the CEVA Notes) or (iii) any Secured Indebtedness.

(xiv) Indebtedness, Disqualified Stock or Preferred Stock of (1) the Company or any of its Restricted Subsidiaries Incurred to finance an acquisition or (2) Persons that are acquired by the Company or any of its Restricted Subsidiaries or merged, consolidated or amalgamated with or into the Company or any of its Restricted Subsidiaries in accordance with the terms of this Agreement; *provided*, *however*, that after giving effect to such acquisition or merger, consolidation or amalgamation either:

(A) (1) in the case of Indebtedness, Disqualified Stock or Preferred Stock of the Company or any of its Restricted Subsidiaries (other than CEVA or any Restricted Subsidiary of CEVA), the Company would be permitted to Incur at least €1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 2.03(a)(x) of this Annex A; or (2) the Fixed Charge Coverage Ratio of the Company would be greater than immediately prior to such acquisition or merger, consolidation or amalgamation;

(B) in the case of Indebtedness, Disqualified Stock or Preferred Stock of CEVA or any of its Restricted Subsidiaries, (1) CEVA would be permitted to Incur at least €1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 2.03(a)(y); or (2) the Fixed Charge Coverage Ratio of CEVA would be greater than immediately prior to such acquisition or merger, consolidation or amalgamation;

(xv) Indebtedness Incurred by a Receivables Subsidiary in a Qualified Receivables Financing that is not with recourse to the Company or any Restricted Subsidiary other than a Receivables Subsidiary (except for Standard Securitization Undertakings);

(xvi) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of its Incurrence;

(xvii) Indebtedness of the Company or any Restricted Subsidiary supported by a letter of credit or bank guarantee issued pursuant to the CEVA Credit Agreement, in a principal amount not in excess of the stated amount of such letter of credit;

(xviii) Indebtedness of a Restricted Subsidiary of the Company; *provided*, *however*, that the aggregate principal amount of Indebtedness Incurred under this clause (xviii) then outstanding does not exceed the greater of €100.0 million and 4.25% of Total Assets at the time of Incurrence (it being understood that any Indebtedness Incurred under this clause (xviii) shall cease to be deemed Incurred or outstanding for purposes of this clause (xviii) but shall be deemed Incurred for purposes of Section 2.03(a) of this Annex A from and after the first date on which the Company, or the Restricted Subsidiary, as the case may be, could have Incurred such Indebtedness under Section 2.03(a) of this Annex A without reliance upon this clause (xviii));

(xix) Indebtedness of the Company or any Restricted Subsidiary consisting of (1) the financing of insurance premiums or (2) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xx) Indebtedness Incurred on behalf of, or representing guarantees of Indebtedness of, joint ventures of the Company or any Restricted Subsidiary not in

excess, at any one time outstanding, the greater of €50.0 million and 2.00% of Total Assets at the time of Incurrence;

(xxi) Indebtedness under daylight borrowing facilities Incurred in connection with the Initial Transactions or any refinancing (including by way of setoff or exchange) so long as any such Indebtedness is repaid within three Business Days of the date on which such Indebtedness is Incurred;

(xxii) Indebtedness or Disqualified Stock of the Company or any Restricted Subsidiary of the Company and Preferred Stock of any Restricted Subsidiary of the Company not otherwise permitted hereunder in an aggregate principal amount or liquidation preference not exceeding at any one time outstanding 200.0% of the net cash proceeds received by the Company and the Restricted Subsidiaries since immediately after the CEVA Note Issuance Date from the issue or sale of Equity Interests or Subordinated Shareholder Funding of the Company or any direct or indirect parent of the Company (which proceeds are contributed to the Company or a Restricted Subsidiary) or cash contributed to the capital of the Company (in each case other than proceeds of Disqualified Stock or sales of Equity Interests to, or contributions received from, the Company or any of its Subsidiaries) as determined in accordance with clauses (2) and (3) of the definition of "Cumulative Credit" to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to Section 2.04(b) of this Annex A or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof);

(xxiii) Indebtedness arising as a result of implementing composite accounting or other cash pooling arrangements involving solely the Company and the Restricted Subsidiaries or solely among Restricted Subsidiaries and entered into in the ordinary course of business;

(xxiv) Indebtedness consisting of Indebtedness issued by the Company or a Restricted Subsidiary of the Company to current or former officers, directors and employees thereof or any direct or indirect parent thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Company or any of its direct or indirect parent companies to the extent described in clause (4) of Section 2.04(b) of this Annex A; and

(xxv) Indebtedness or Disqualified Stock of the Company or any Restricted Subsidiary of the Company and Preferred Stock of any Restricted Subsidiary of the Company not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (xxv), does not exceed the greater of €100 million and 4.25% of Total Assets at the time of Incurrence (it being understood that any Indebtedness Incurred under this clause (xxv) shall cease to be deemed Incurred or outstanding for purposes of this clause (xxv) but shall be deemed Incurred under Section 2.03(a) of this Annex A from and after the first date

on which the Company, or the Restricted Subsidiary, as the case may be, could have Incurred such Indebtedness under Section 2.03(a) of this Annex A without reliance upon this clause (xxv)).

(c)    For purposes of determining compliance with this Section 2.03:

(1)    in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness described in clauses 2.03(b)(i) through (xxv) above or is entitled to be Incurred pursuant to Section 2.03(a) of this Annex A, the Company shall, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) in any manner that complies with this Section 2.03; *provided* that all Indebtedness under the CEVA Credit Agreement outstanding on the Closing Date shall be deemed to have been Incurred pursuant to clause 2.03(b)(i) of this Annex A and the Company shall not be permitted to reclassify all or any portion of such Indebtedness under the CEVA Credit Agreement outstanding on the Closing Date; and

(2)    the Company will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in Sections 2.03(a) and (b) above, and in that connection shall be entitled to treat a portion of such Indebtedness as having been Incurred under Section 2.03(a) of this Annex A and thereafter the remainder of such Indebtedness having been Incurred under the Section 2.03(b) of this Annex A.

(d)    Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness (including with respect to the Debt Instruments), Disqualified Stock or Preferred Stock, as applicable, accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 2.03. Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness that is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 2.03.

(e)    For purposes of determining compliance with this Section 2.03, the Euro Equivalent of the principal amount of Indebtedness denominated in another currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term Indebtedness, or first drawn, in the case of Indebtedness Incurred under a revolving credit facility; *provided* that (a) if such Indebtedness is Incurred to refinance other Indebtedness denominated in a currency other than euro, and such refinancing would cause the applicable euro-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such euro-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced; (b) the Euro Equivalent of the principal amount of any such Indebtedness outstanding on the Closing

Date shall be calculated based on the relevant currency exchange rate in effect on the Closing Date; and (c) if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreements.

(f)  Notwithstanding any other provision of this Section 2.03, the maximum amount of Indebtedness that the Company and its Restricted Subsidiaries may Incur pursuant to this Section 2.03 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Refinancing Indebtedness is denominated that is in effect on the date of such refinancing.

SECTION 2.04.  <u>Limitation on Restricted Payments.</u>  (a)   The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

(i) declare or pay any dividend or make any distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests or pay any amounts in respect of Subordinated Shareholder Funding, including any payment made in connection with any merger, amalgamation or consolidation involving the Company (other than (1) dividends or distributions by the Company payable solely in Equity Interests (other than Disqualified Stock) of the Company or in Subordinated Shareholder Funding of the Company; (2) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly Owned Restricted Subsidiary, the Company or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities (except to the extent non pro rata payments of such dividends or distributions are required by law or under the terms of any agreement in effect on the Closing Date) or (3) dividends or distributions made by the Company on or after the Closing Date with the net proceeds of the Debt Instruments);

(ii) purchase or otherwise acquire or retire for value any Equity Interests of the Company or any direct or indirect parent of the Company, other than purchases, acquisitions or retirements for value made with net proceeds of the Debt Instruments;

(iii) make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Subordinated Shareholder Funding or any Subordinated Indebtedness of the Company or any of its Restricted Subsidiaries (other than the payment, prepayment, redemption, repurchase, defeasance, acquisition or retirement of (1) Subordinated Indebtedness in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such payment, prepayment, redemption, repurchase, defeasance, acquisition or retirement

and (2) any Subordinated Indebtedness between the Company and the Restricted Subsidiaries or between any of the Restricted Subsidiaries); or

      (iv) make any Restricted Investment,

(all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as "Restricted Payments"), unless, at the time of such Restricted Payment:

      (1)   no Default shall have occurred and be continuing or would occur as a consequence thereof;

      (2)   (i) with respect to a Restricted Payment by the Company or any Restricted Subsidiary of the Company (other than CEVA or any Restricted Subsidiary of CEVA), immediately after giving effect to such transaction on a pro forma basis, the Company could Incur €1.00 of additional Indebtedness under Section 2.03(a)(x) of this Annex A; and the Consolidated Leverage Ratio of the Company would have been less than 5.00 to 1.00 and (ii) with respect to a Restricted Payment by CEVA or any Restricted Subsidiary of CEVA, immediately after giving effect to such transaction on a pro forma basis, CEVA could Incur €1.00 of additional Indebtedness under Section 2.03(a)(y) of this Annex A; and

      (3)   such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries after the CEVA Note Issuance Date (and not returned or rescinded) (including Restricted Payments permitted by clauses (1), (4) (only to the extent of one-half of the amounts paid pursuant to such clause), (6) and (8) of Section 2.04(b) of this Annex A, but excluding all other Restricted Payments permitted by Section 2.04(b) of this Annex A), is less than the amount equal to the Cumulative Credit.

    (b)  The provisions of Section 2.04(a) of this Annex A shall not prohibit:

      (1)   the payment of any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement;

      (2)(A)  the redemption, repurchase, retirement or other acquisition of any Equity Interests ("Retired Capital Stock") or Subordinated Indebtedness or Subordinated Shareholder Funding of the Company, any direct or indirect parent of the Company or any Subsidiary of the Company in exchange for, or out of the proceeds of, the substantially concurrent sale of, Equity Interests or Subordinated Shareholder Funding of the Company or any direct or indirect parent of the Company or contributions to the equity capital of the Company (other than any Disqualified Stock or any Equity Interests sold to a Subsidiary of the Company) (collectively, including any such contributions, "Refunding Capital Stock"), and (B) the declaration and payment of dividends on the Retired Capital Stock out of the proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of Refunding Capital Stock;

(3)   the redemption, prepayment, repurchase, defeasance or other acquisition or retirement of Subordinated Indebtedness of the Company or any Restricted Subsidiary made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Company or Restricted Subsidiary which is Incurred in accordance with Section 2.03 of this Annex A so long as:

(A)   the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable), plus any accrued and unpaid interest, of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value (plus the amount of any premium required to be paid under the terms of the instrument governing the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired, any tender premiums, plus any defeasance costs, fees and expenses Incurred in connection therewith);

(B)   such Indebtedness if Incurred by the Company is subordinated to the Debt Instruments at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, prepaid, repurchased, defeased, acquired or retired for value;

(C)   such Indebtedness has a final scheduled maturity date equal to or later than the earlier of (x) the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, prepaid, repurchased, defeased, acquired or retired or (y) 91 days following the maturity date of the Debt Instruments; and

(D)   such Indebtedness has a Weighted Average Life to Maturity at the time Incurred that is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Subordinated Indebtedness being redeemed, repurchased, defeased, acquired or retired that were due on or after the date one year following the last maturity date of any Debt Instruments then outstanding were instead due on such date one year following the last date of maturity of the Debt Instruments;

(4)   a Restricted Payment to pay for the purchase, repurchase, retirement, defeasance, redemption or other acquisition for value of Equity Interests of the Company or any direct or indirect parent of the Company held by any future, present or former employee, director or consultant of the Company or any direct or indirect parent of the Company or any Subsidiary of the Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement made after the CEVA Note Issuance Date; *provided*, *however*, that the aggregate Restricted Payments made under this clause (4) do not exceed €15.0 million in any calendar year commencing with 2006 (with unused amounts in any calendar year being permitted to be carried over for the two succeeding calendar years subject to a maximum payment (without giving effect to the following proviso) of €30.0 million in

any calendar year); *provided*, *further*, *however*, that such amount in any calendar year may be increased by an amount not to exceed:

(A) the cash proceeds received by the Company or any of its Restricted Subsidiaries from the sale of Equity Interests (other than Disqualified Stock) of the Company or any direct or indirect parent of the Company (to the extent contributed to the Company) to members of management, directors or consultants of the Company and its Restricted Subsidiaries or any direct or indirect parent of the Company that occurs after the CEVA Note Issuance Date (*provided* that the amount of such cash proceeds utilized for any such repurchase, retirement, other acquisition or dividend shall not increase the amount available for Restricted Payments under clause (3) of Section 2.04(a) of this Annex A); plus

(B) the cash proceeds of key man life insurance policies received by the Company or any direct or indirect parent of the Company (to the extent contributed to the Company) or the Company's Restricted Subsidiaries after the CEVA Note Issuance Date,

*provided* that the Company may elect to apply all or any portion of the aggregate increase contemplated by clauses (A) and (B) above in any calendar year;

(5) the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Company or any of its Restricted Subsidiaries issued or Incurred in accordance with Section 2.03 of this Annex A;

(6) (A) the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock of CEVA or its direct or indirect parent (other than Disqualified Stock) issued after the CEVA Note Issuance Date, (B) a Restricted Payment to any direct or indirect parent of CEVA, the proceeds of which will be used to fund the payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of any direct or indirect parent of the Company issued after the CEVA Note Issuance Date and (C) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to clause (2) of this Section 2.04(b) of this Annex A; *provided*, *however*, that, (x) for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a pro forma basis (i) in the case of Designated Preferred Stock of the Company or any Restricted Subsidiary (other than CEVA or any Restricted Subsidiary of CEVA) the Company would have had a Fixed Charge Coverage Ratio of at least 1.75 to 1.00 and (ii) in the case of Designated Preferred Stock of CEVA or any Restricted Subsidiary of CEVA, CEVA would have had a Fixed Charge Coverage Ratio of at least 2.00 to 1.00 and (y) the aggregate amount of dividends declared and paid pursuant to (A) and (B) of this clause (6) does not exceed the net cash proceeds actually received by the Company or any Restricted Subsidiary from any such sale or issuance of Designated Preferred Stock (other than Disqualified Stock) issued after the CEVA Note Issuance Date or contributed to Subordinated Shareholder Funding

to the Company or any Restricted Subsidiary of the Company after the CEVA Note Issuance Date;

(7)    Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (7) that are at that time outstanding, not to exceed the greater of €25.0 million and 1.0% of Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(8)    the payment of dividends on the Company's common stock (or a Restricted Payment to any direct or indirect parent of the Company to fund the payment by such direct or indirect parent of the Company of dividends on such entity's common stock) of up to 6% per annum of the net proceeds received by the Company from any public offering of common stock of the Company or any direct or indirect parent of the Company;

(9)    Restricted Payments that are made with Excluded Contributions;

(10)  other Restricted Payments in an aggregate amount not to exceed the greater of €50.0 million and 2.0% of Total Assets at the time made;

(11)  the distribution, as a dividend or otherwise, of shares of Capital Stock of, or Indebtedness owed to the Company or a Restricted Subsidiary of the Company by, Unrestricted Subsidiaries;

(12)  the payment of dividends or other distributions to any direct or indirect parent of the Company in amounts required for such parent to pay federal, state or local income taxes (as the case may be) imposed directly on such parent to the extent such income taxes are attributable to the income of the Company and its Restricted Subsidiaries (including, without limitation, by virtue of such parent being the common parent of a consolidated or combined tax group of which the Company and/or its Restricted Subsidiaries are members);

(13)  the payment of dividends, other distributions or other amounts or the making of Debt Instruments or advances or any other Restricted Payment, if applicable:

(A)  in amounts required for any direct or indirect parent of the Company, to pay fees and expenses (including franchise or similar taxes) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers and employees of any direct or indirect parent of the Company and general corporate operating and overhead expenses of any direct or indirect parent of the Company, if applicable, in each case to the extent such fees and expenses are attributable to the ownership or operation of the Company, if applicable, and its Subsidiaries;

(B)  in amounts required for any direct or indirect parent of the Company, to pay interest and/or principal on Indebtedness the proceeds of which have been

contributed to the Company or any of its Restricted Subsidiaries and that has been guaranteed by, or is otherwise considered Indebtedness of, the Company Incurred in accordance with Section 2.03 of this Annex A; and

(C) in amounts required for any direct or indirect parent of the Company to pay fees and expenses, other than to Affiliates of the Company, related to any unsuccessful equity or debt offering of such parent;

(14) any Restricted Payment used to fund the Initial Transactions and the Transactions and the payment of fees and expenses Incurred in connection with the Initial Transactions and the Transactions or owed by the Company or any direct or indirect parent of the Company, as the case may be, or Restricted Subsidiaries of the Company to Affiliates, in each case to the extent permitted by Section 2.07 of this Annex A;

(15) repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(16) purchases of receivables pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing and the payment or distribution of Receivables Fees;

(17) payments of cash, or dividends, distributions, advances or other Restricted Payments by the Company or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

(18) the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness pursuant to the provisions similar to those described under Sections 2.06 of this Annex A and 2.08 of this Annex A; *provided* that all Debt Instruments tendered by Holders of Debt Instruments in connection with a Change of Control or Asset Sale Offer, as applicable, have been repaid, repurchased, redeemed or acquired for value;

(19) any payments made, including any such payments made to any direct or indirect parent of the Company to enable it to make payments, in connection with the consummation of the Initial Transactions or as contemplated by the Acquisition Documents (other than payments to any Permitted Holder of Debt Instruments or any Affiliate thereof); and

(20) payments or distributions to dissenting stockholders pursuant to applicable law or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Company and its Restricted Subsidiaries, taken as a whole, that complies with Article III of this Annex A; *provided* that as a result of such consolidation, amalgamation, merger or transfer of assets, the Company shall have made a Change of Control Offer (if required by this Agreement) and that all Debt Instruments tendered by Holders of Debt Instruments in connection with such Change of Control Offer have been repurchased, redeemed or acquired for value,

*provided*, *however*, that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (10) and (11) of this Section 2.04(b), no Default shall have occurred and be continuing or would occur as a consequence thereof.

(c)   As of the Closing Date, all of the Company's Subsidiaries shall be Restricted Subsidiaries. The Company shall not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Company and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated shall be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments." Such designation shall only be permitted if a Restricted Payment in such amount would be permitted at such time and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

SECTION 2.05.   <u>Dividend and Other Payment Restrictions Affecting Subsidiaries.</u>  (a)   The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(i) (1) pay dividends or make any other distributions to the Company or any of its Restricted Subsidiaries (A) on its Capital Stock; or (B) with respect to any other interest or participation in, or measured by, its profits; or (2) pay any Indebtedness owed to the Company or any of its Restricted Subsidiaries;

(ii) make Debt Instruments or advances to the Company or any of its Restricted Subsidiaries; or

(iii) sell, lease or transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries;

except in each case for such encumbrances or restrictions existing under or by reason of:

(1)   contractual encumbrances or restrictions in effect on the Closing Date, including pursuant to the CEVA Credit Agreement and the other CEVA Credit Agreement Documents;

(2)   (A) this Agreement and the Debt Instruments (ii) the Senior Notes Indenture and the Senor Subordinated Notes Indenture and the CEVA Notes (and guarantees thereof) and (iii) any Currency Agreement;

(3)   applicable law or any applicable rule, regulation or order;

(4)   any agreement or other instrument of a Person acquired by the Company or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person

and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(5)   contracts or agreements for the sale of assets, including any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of such Restricted Subsidiary pending the closing of such sale or disposition;

(6)   Secured Indebtedness otherwise permitted to be Incurred pursuant to Sections 2.03 of this Annex A and 2.12 of this Annex A that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(7)   restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(8)   customary provisions in joint venture agreements, similar agreements relating solely to such joint venture and other similar agreements entered into in the ordinary course of business;

(9)   Capitalized Lease Obligations and purchase money obligations for property acquired in the ordinary course of business;

(10)  customary provisions contained in operating leases, licenses and other similar agreements entered into in the ordinary course of business;

(11)  any encumbrance or restriction of a Receivables Subsidiary effected in connection with a Qualified Receivables Financing; *provided*, *however*, that such restrictions apply only to such Receivables Subsidiary;

(12)  any encumbrance or restriction arising pursuant to an agreement or instrument relating to any Indebtedness permitted to be Incurred subsequent to the CEVA Note Issuance Date under Section 2.03 of this Annex A (A) if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favorable to the Holders of Debt Instruments than the encumbrances and restrictions contained in the CEVA Credit Agreement as of the CEVA Note Issuance Date (as determined in good faith by the Company) or (B) if such encumbrance or restriction is not materially more disadvantageous to the Holders of Debt Instruments than is customary in comparable financings (as determined in good faith by the Company) and either (x) the Company determines that such encumbrance or restriction will not materially affect the Company's ability to make principal or interest payments on the Debt Instruments as and when the come due or (y) such encumbrance or restriction applies only if a default occurs in respect of a payment or financial covenant relating to such Indebtedness;

(13)  any Restricted Investment not prohibited by Section 2.04 of this Annex A and any Permitted Investment; or

(14) any encumbrances or restrictions of the type referred to in clauses (i), (ii) and (iii) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (1) through (13) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Company, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

(b)   For purposes of determining compliance with this Section 2.05, (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Company or a Restricted Subsidiary of the Company to other Indebtedness Incurred by the Company or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

SECTION 2.06.  Asset Sales.  (a)   The Company shall not, and shall not permit any of its Restricted Subsidiaries to, cause or make an Asset Sale, unless (x) the Company or any of its Restricted Subsidiaries, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value (as determined in good faith by the Company) of the assets sold or otherwise disposed of, and (y) at least 75% of the consideration therefor received by the Company or such Restricted Subsidiary, as the case may be, is in the form of Cash Equivalents; *provided* that the amount of:

(i) any liabilities (as shown on the Company's or such Restricted Subsidiary's most recent balance sheet or in the notes thereto) of the Company or any Restricted Subsidiary of the Company (other than liabilities that are by their terms subordinated to the Debt Instruments or any Guarantee) that are assumed by the transferee of any such assets;

(ii) any notes or other obligations or other securities or assets received by the Company or such Restricted Subsidiary of the Company from such transferee that are converted by the Company or such Restricted Subsidiary of the Company into cash within 180 days of the receipt thereof (to the extent of the cash received); and

(iii) any Designated Non-cash Consideration received by the Company or any of its Restricted Subsidiaries in such Asset Sale having an aggregate Fair Market Value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (iii) that is at that time outstanding, not to exceed the greater of 1.5% of Total Assets and €35.0 million at the time of the receipt of such Designated Non-cash Consideration (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value),

shall be deemed to be Cash Equivalents for the purposes of this Section 2.06(a).

(b)  Within 16 months after the Company's or any Restricted Subsidiary of the Company's receipt of the Net Proceeds of any Asset Sale, the Company or such Restricted Subsidiary of the Company may apply the Net Proceeds from such Asset Sale, at its option:

(i) to repay (1) Secured Indebtedness, (2) Indebtedness of a Restricted Subsidiary, (3) Obligations under the Debt Instruments or (4) Pari Passu Indebtedness (*provided* that if the Company shall so reduce Obligations under unsecured Pari Passu Indebtedness, the Company will make an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all Holders of Debt Instruments to prepay at a prepayment price equal to 100% of the principal amount thereof, plus accrued and unpaid interest, if any, the pro rata principal amount of Debt Instruments), in each case other than Indebtedness owed to the Company or an Affiliate of the Company; provided, however, that if an offer to repay or repurchase any Indebtedness of any Restricted Subsidiary is made in accordance with the terms of such Indebtedness, the obligation to permanently repay Indebtedness of a Restricted Subsidiary will be deemed to be satisfied to the extent of the amount of the offer, whether or not accepted by the holders thereof, and no Excess Proceeds in the amount of such offer will be deemed to exist following such offer;

(ii) to make an investment in any one or more businesses (*provided* that if such investment is in the form of the acquisition of Capital Stock of a Person, such acquisition results in such Person becoming a Restricted Subsidiary of the Company), assets, or property or capital expenditures, in each case used or useful in a Similar Business; or

(iii) to make an investment in any one or more businesses (provided that if such investment is in the form of the acquisition of Capital Stock of a Person, such acquisition results in such Person becoming a Restricted Subsidiary of the Company), properties or assets that replace the properties and assets that are the subject of such Asset Sale.

In the case of Sections 2.06(b)(ii) and (iii) of this Annex A, a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment; *provided* that in the event such binding commitment is later canceled or terminated for any reason before such Net Proceeds are so applied, the Company or such Restricted Subsidiary enters into another binding commitment (a "Second Commitment") within nine months of such cancellation or termination of the prior binding commitment; *provided*, *further* that the Company or such Restricted Subsidiary may only enter into a Second Commitment under the foregoing provision one time with respect to each Asset Sale.

Pending the final application of any such Net Proceeds, the Company or such Restricted Subsidiary of the Company may temporarily reduce Indebtedness under a revolving credit facility, if any, or otherwise invest such Net Proceeds in Cash Equivalents or Investment Grade Securities. Any Net Proceeds from any Asset Sale that are not applied as provided and within the time period set forth in the immediately preceding paragraph (it being understood that

any portion of such Net Proceeds used to make an offer to prepay Debt Instruments, as described in clause (i) of this Section 2.06(b), shall be deemed to have been invested whether or not such offer is accepted) shall be deemed to constitute "Excess Proceeds." When the aggregate amount of Excess Proceeds exceeds €20.0 million, the Company shall make an offer to all Holders of Debt Instruments (and, at the option of the Company, to holders of any Pari Passu Indebtedness) (an "Asset Sale Offer") to prepay the maximum principal amount of Debt Instruments (and such Pari Passu Indebtedness), that is at least €50,000 and an integral multiple of €1,000 that may be prepaid out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof (or, in the event such Pari Passu Indebtedness was issued with significant original issue discount, 100% of the accreted value thereof), plus accrued and unpaid interest, if any (or, in respect of such Pari Passu Indebtedness, such lesser price, if any, as may be provided for by the terms of such Pari Passu Indebtedness), to the date fixed for the closing of such offer, in accordance with the procedures set forth in this Section 2.06; *provided*, *however*, notwithstanding the foregoing, in the case of an Asset Sale by CEVA or any Restricted Subsidiary of CEVA, the Company shall not be required to make an Asset Sale Offer to the extent CEVA is not permitted pursuant to the terms of its outstanding Indebtedness, any other agreement or applicable law to fund such Asset Sale Offer. The Company will commence an Asset Sale Offer with respect to Excess Proceeds within ten (10) Business Days after the date that Excess Proceeds exceeds €20.0 million by providing the notice required pursuant to the terms of Section 2.06(h), with a copy to the Administrative Agent. To the extent that the aggregate amount of Debt Instruments (and such Pari Passu Indebtedness) prepaid pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Company may use any remaining Excess Proceeds for general corporate purposes. If the aggregate principal amount of Debt Instruments (and such Pari Passu Indebtedness) surrendered by holders thereof exceeds the amount of Excess Proceeds, the Company shall prepay Debt Instruments (and such Pari Passu Indebtedness) to be prepaid in the manner described in Section 2.06. Upon completion of any such Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero.

(c)   If more Debt Instruments (and such Pari Passu Indebtedness) are tendered pursuant to an Asset Sale Offer than the Company is required to prepay, selection of such Debt Instruments for prepayment will be made by the Administrative Agent on a pro rata basis, by lot or by such other method as Administrative Agent shall deem fair and appropriate (and in such manner as complies with applicable legal requirements). Selection of such Pari Passu Indebtedness will be made pursuant to the terms of such Pari Passu Indebtedness.

(d)   An Asset Sale Offer insofar as it relates to the Debt Instruments, will remain open for a period of not less than 20 Business Days following its commencement (the "Asset Sale Offer Period"). No later than five Business Days after the termination of the Asset Sale Offer Period the Company will prepay the principal amount of the Debt Instruments (and purchase or repay any relevant Pari Passu Indebtedness required to be so purchased or prepaid as set out above) validly tendered.

(e)   To the extent that any portion of the Net Proceeds payable in respect of the Debt Instruments is denominated in a currency other than the currency in which the relevant Debt Instruments are denominated, the amount payable in respect of such Debt Instruments shall not exceed the net amount of funds in the currency in which such Debt Instruments are denominated

as is actually received by the Company upon converting the relevant portion of the Net Proceeds into such currency.

(f)  Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Administrative Agent as provided above, the Company shall deliver to the Administrative Agent an Officers' Certificate as to (i) the amount of the Excess Proceeds, (ii) the allocation of the Net Proceeds from the Asset Sales pursuant to which such Asset Sale Offer is being made and (iii) the compliance of such allocation with the provisions of Section 2.06(b).  On such date, the Company shall also irrevocably deposit with the Administrative Agent an amount equal to the Excess Proceeds to be invested in Cash Equivalents, as directed in writing by the Company, and to be held for payment in accordance with the provisions of this Section 2.06. Upon the expiration of the Asset Sale Offer Period, the Company shall deliver to the Administrative Agent the Debt Instruments or portions thereof that have been properly tendered to and are to be accepted by the Company.  The Administrative Agent shall, on the date of prepayment, mail or deliver payment to each tendering Holder of Debt Instruments in the amount of the prepayment price.  In the event that the Excess Proceeds delivered by the Company to the Administrative Agent are greater than the prepayment price of the Debt Instruments prepaid, the Administrative Agent shall deliver the excess to the Company immediately after the expiration of the Offer Period for application in accordance with this Section 2.06.

(g)  [Intentionally Omitted]

(h)  Notices of an Asset Sale Offer shall be provided, at least 30 but not more than 60 days before the purchase date to each Holder of Debt Instruments through the Administrative Agent.  If any Debt Instrument is to be purchased in part only, any notice of purchase that relates to such Debt Instrument shall state the portion of the principal amount thereof that has been or is to be purchased.

SECTION 2.07.  <u>Transactions with Affiliates.</u>  (a)  The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each of the foregoing, an "Affiliate Transaction") involving aggregate consideration in excess of €10.0 million, unless:

(i) such Affiliate Transaction is on terms that are not materially less favorable to the Company or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person; and

(ii) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of €20.0 million, the Company delivers to the Administrative Agent a resolution adopted in good faith by the majority of the Board of Directors of the Company, approving such Affiliate Transaction and set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (i) above.

(b)  The provisions of Section 2.07(a) of this Annex A shall not apply to the following:

(i) transactions between or among the Company and/or any of its Restricted Subsidiaries (or an entity that becomes a Restricted Subsidiary as a result of such transaction) and/or between or among Restricted Subsidiaries or any Receivables Subsidiary and any merger, consolidation or amalgamation of the Company and any direct parent of the Company; *provided* that such parent shall have no material liabilities and no material assets other than cash, Cash Equivalents and the Capital Stock of the Company and such merger, consolidation or amalgamation is otherwise in compliance with the terms of this Agreement and effected for a bona fide business purpose;

(ii) Restricted Payments permitted by Section 2.04 of this Annex A and Permitted Investments;

(iii) (1) the entering into of any agreement (and any amendment or modification of any such agreement) to pay, and the payment of, annual management, consulting, monitoring and advisory fees to the Sponsors in an aggregate amount in any fiscal year not to exceed the greater of (A) €3.0 million and (B) 1.5% of EBITDA of the Company and its Restricted Subsidiaries for the immediately preceding fiscal year, *plus* out-of-pocket expense reimbursement; *provided, however*, that any payment not made in any fiscal year may be carried forward and paid in the following two fiscal years and (2) the payment of the present value of all amounts payable pursuant to any agreement described in clause (iii)(1) of this Section 2.07(b) in connection with the termination of such agreement;

(iv) the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Company or any Restricted Subsidiary or any direct or indirect parent of the Company;

(v) payments by the Company or any of its Restricted Subsidiaries to the Sponsors made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with the Initial Transactions, the Transactions, acquisitions or divestitures, which payments are (1) made pursuant to the agreements with the Sponsors described in the Offering Circular or (2) approved by a majority of the Board of Directors of the Company in good faith;

(vi) transactions in which the Company or any of its Restricted Subsidiaries, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Company or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (i) of Section 2.07(a);

(vii) payments or loans (or cancellation of loans) to directors, employees or consultants which are approved by a majority of the Board of Directors of the Company in good faith;

(viii) any agreement as in effect as of the CEVA Note Issuance Date or any amendment thereto (so long as any such agreement together with all amendments thereto, taken as a whole, is not more disadvantageous to the Holders of Debt Instruments in any material respect than the original agreement as in effect on the CEVA Note Issuance Date) or any transaction contemplated thereby as determined in good faith by senior management or the Board of Directors of the Company;

(ix) the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under the terms of the Acquisition Documents, the CEVA Credit Agreement Documents, any stockholders agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the CEVA Note Issuance Date or any other agreement or arrangement in existence on the CEVA Note Issuance Date or described in Offering Circular relating to the CEVA Notes under the heading "Certain Relationships and Related Party Transactions", and, in each case, any amendment thereto or similar transactions, agreements or arrangements which it may enter into thereafter; *provided*, *however*, that the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under, any future amendment to any such existing transaction, agreement or arrangement or under any similar transaction, agreement or arrangement entered into after the CEVA Note Issuance Date shall only be permitted by this clause (ix) to the extent that the terms of any such existing transaction, agreement or arrangement together with all amendments thereto, taken as a whole, or new transaction, agreement or arrangement are not otherwise more disadvantageous to the Holders of Debt Instruments in any material respect than the original transaction, agreement or arrangement as in effect on the CEVA Note Issuance Date;

(x) the execution of the Initial Transactions and the Transactions and the payment of all fees and expenses related to the Initial Transactions and the Transactions, including fees to the Sponsors that are described in the Offering Circular or contemplated by the Acquisition Documents.

(xi) (1) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement, which are fair to the Company and its Restricted Subsidiaries in the reasonable determination of the Board of Directors or the senior management of the Company, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party or (2) transactions with joint ventures or Unrestricted Subsidiaries entered into in the ordinary course of business;

(xii) any transaction effected as part of a Qualified Receivables Financing;

(xiii) the issuance of Equity Interests (other than Disqualified Stock) of the Company or Subordinated Shareholder Funding to any Person;

(xiv) the issuance of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans approved by the Board of Directors of the Company or any direct or indirect parent of the Company or of a Restricted Subsidiary of the Company, as appropriate;

(xv) the entering into of any tax sharing agreement or arrangement and any payments permitted by Section 2.04(b)(12);

(xvi) any contribution to the capital of the Company;

(xvii) transactions permitted by, and complying with, Section 3.01 of this Annex A;

(xviii) transactions between the Company or any of its Restricted Subsidiaries and any Person, a director of which is also a director of the Company or any direct or indirect parent of the Company; *provided*, *however*, that such director abstains from voting as a director of the Company or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(xix) pledges of Equity Interests of Unrestricted Subsidiaries;

(xx) the formation and maintenance of any consolidated group or subgroup for tax, accounting or cash pooling or management purposes in the ordinary course of business;

(xxi) any employment agreements entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(xxii) intercompany transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Company in an Officers' Certificate) for the purpose of improving the consolidated tax efficiency of the Company and its Subsidiaries and not for the purpose of circumventing any covenant set forth in this Agreement;

(xxiii) the payment of premiums, receipt of insurance proceeds and other insurance related transactions in each case on terms customary for such transactions between the Company or any Restricted Subsidiary of the Company and any Affiliate of the Company that is a "captive insurance" entity whose sole business is providing insurance to the Company and its Restricted Subsidiaries; and

(xxiv) the declaration and payment of dividends to holders of the Company's common stock on or after the Closing Date with the proceeds received by the Company from the Debt Instruments.

SECTION 2.08.  [Intentionally Omitted]

SECTION 2.09.  <u>Compliance Certificate.</u>  The Company shall deliver to the Administrative Agent within 120 days after the end of each fiscal year of the Company, beginning with the fiscal year end on December 31, 2006, an Officers' Certificate stating that in the course of the performance by the signers of their duties as Officers of the Company they would normally have knowledge of any Default and whether or not the signers know of any Default that occurred during such period.  If they do, the certificate shall describe the Default, its status and what action the Company is taking or proposes to take with respect thereto.

SECTION 2.10.  <u>Further Instruments and Acts.</u>  Upon request of the Administrative Agent, the Company shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Agreement.

SECTION 2.11.  <u>Future Guarantors.</u>  (a)  The Company shall not permit any of its Restricted Subsidiaries (unless such Subsidiary is a Receivables Subsidiary) to guarantee, assume or in any other manner become liable with respect to any Indebtedness of the Company, unless such Subsidiary executes and delivers to the Administrative Agent a loan guarantee pursuant to which such Subsidiary will Guarantee payment of the Debt Instruments.

(b)  Notwithstanding Section 2.11(a):

(i) no loan guarantee shall be required as a result of any guarantee of Indebtedness that existed at the time such Person became a Restricted Subsidiary if the guarantee was not Incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary;

(ii) such loan guarantee need not be secured unless required pursuant to Section 2.12;

(iii) if such Indebtedness is by its terms expressly subordinated to the Debt Instruments or any loan guarantee, any such assumption, guarantee or other liability of such Restricted Subsidiary with respect to such Indebtedness shall be subordinated to such Restricted Subsidiary's loan guarantee at least to the same extent as such Indebtedness is subordinated to the Debt Instruments or any other senior guarantee;

(iv) no loan guarantee shall be required as a result of any guarantee given to a bank or trust company incorporated in any member state of the European Union as of the date of this Agreement or any commercial banking institution that is a member of the U.S. Federal Reserve System, (or any branch, Subsidiary or Affiliate thereof) in each case having combined capital and surplus and undivided profits of not less than €500.0 million, whose debt has a rating, at the time such guarantee was given, of at least A or the equivalent thereof by S&P and at least A2 or the equivalent thereof by Moody's, in connection with the operation of cash management programs established for the Company's benefit or that of any Restricted Subsidiary;

(v) no loan guarantee shall be required if such loan guarantee could reasonably be expected to give rise to or result in (A) personal liability for the officers, directors or shareholders of such Restricted Subsidiary, (B) any violation of applicable law that cannot be avoided or otherwise prevented through measures reasonably available to the Company or such Restricted Subsidiary, including, for the avoidance of doubt, "whitewash" or similar procedures or (C) any significant cost, expense, liability or obligation (including with respect of any Taxes) other than reasonable out-of-pocket expenses and other than reasonable expenses Incurred in connection with any governmental or regulatory filings required as a result of, or any measures pursuant to clause (B) undertaken in connection with, such loan guarantee, which cannot be avoided through measures reasonably available to the Company or the Restricted Subsidiary; and

(vi) each such loan guarantee will be limited as necessary to recognize certain defenses generally available to guarantors (including those that relate to fraudulent conveyance or transfer, voidable preference, financial assistance, corporate purpose, capital maintenance or similar laws, regulations or defenses affecting the rights of creditors generally) or other considerations under applicable law.

Notwithstanding the foregoing clauses (a) and (b) of this Section 2.11, in the event any Restricted Subsidiary rendering a guarantee of the Debt Instruments is released and discharged in full from all of is obligations under the guarantees of such other Indebtedness of the Company, then the guarantee of the Debt Instruments by such Restricted Subsidiary shall be automatically and unconditionally released or discharged. Any future loan guarantee shall be released upon the occurrence of certain events described in the CEVA Credit Agreement. For the avoidance of doubt, the guarantee by any Restricted Subsidiary of Indebtedness of another Restricted Subsidiary at a time that such Indebtedness is also guaranteed by the Company shall not constitute a guarantee of Indebtedness of the Company.

SECTION 2.12. Liens. (a) The Company shall not, directly or indirectly, create, Incur or suffer to exist any Lien, other than a Permitted Lien, on any asset or property of the Company securing Indebtedness (an "Initial Lien") unless the Debt Instruments are equally and ratably secured with (or on a senior basis to, in the case of obligations subordinated in right of payment to the Debt Instruments) the obligations so secured until such time as such obligations are no longer secured by a Lien.

(b) Any Lien created for the benefit of the Holders of Debt Instruments pursuant to this Section 2.12 will provide by its terms that such Lien shall be automatically and unconditionally released and discharged (a) upon the release and discharge of the Initial Lien, (b) upon the sale or other disposition of the assets subject to such Initial Lien (or the sale or other disposition of the Person that owns such assets) in compliance with the terms of this Agreement, (c) upon the designation of a Restricted Subsidiary whose property or assets secure such Initial Lien as an Unrestricted Subsidiary in accordance with the terms of this Agreement or (d) upon the effectiveness of any defeasance or satisfaction and discharge of the Debt Instruments as specified in Article VIII of this Agreement.

SECTION 2.13. [Intentionally Omitted]

SECTION 2.14.  [Intentionally Omitted]

SECTION 2.15.  <u>Debt Instrument Listing.</u>  The Company shall have the right to obtain and maintain a listing of the Debt Instruments on a recognized exchange (the "<u>Debt Instrument Listing</u>") at any time in order to qualify the Debt Instruments (the "<u>Qualification</u>") under the "quoted Eurobond exemption" under § 349(3)(c) of the UK Income and Corporation Taxes Act 1988. The Administrative Agent shall use commercially reasonable efforts to facilitate and cooperate with the Company in connection with the Debt Instrument Listing; *provided*, *however*, that the Debt Instruments shall not be required to be deposited into a clearing system such as Euroclear.

SECTION 2.16.  <u>Suspension/Fall-Away of Covenants on Achievement of Investment Grade Status.</u>  (a)    If, on any date following the Closing Date, (i) the Debt Instruments have Investment Grade Ratings from both Rating Agencies, and the Company has delivered written notice of such Investment Grade Ratings to the Administrative Agent, and (ii) no Default has occurred and is continuing under this Agreement then, beginning on that day and continuing at all times thereafter regardless of any subsequent changes in the rating of the Debt Instruments, the Company and the Restricted Subsidiaries will cease to be subject to Sections 2.03, 2.04, 2.05, 2.06, 2.07 and Section 3.01(a)(iv) of this Annex A.

(b)    During any period of time that (i) the Debt Instruments have Investment Grade Ratings from both Rating Agencies, and the Company has delivered written notice of such Investment Grade Ratings to the Administrative Agent, and (ii) no Default has occurred and is continuing under this Agreement (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "Covenant Suspension Event"), the Company and its Restricted Subsidiaries will not be subject to Section 2.11 of this Agreement (the "Suspended Covenant"). In the event that the Company and its Restricted Subsidiaries are not subject to the Suspended Covenant under this Agreement for any period of time as a result of the foregoing, and on any subsequent date one or both of the Rating Agencies (1) withdraw their Investment Grade Rating or downgrade the rating assigned to the Debt Instruments below an Investment Grade Rating and/or (2) the Company or any of its Affiliates enters into an agreement to effect a transaction that would result in a Change of Control and one or more of the Rating Agencies indicate that if consummated, such transaction (alone or together with any related recapitalization or refinancing transactions) would cause such Rating Agency to withdraw its Investment Grade Rating or downgrade the ratings assigned to the Debt Instruments below an Investment Grade Rating, then the Company and its Restricted Subsidiaries shall thereafter again be subject to the Suspended Covenant under this Agreement with respect to future events, including, without limitation, a proposed transaction described in clause (2) of this clause (b). Any Change of Control that shall have occurred during such period shall be treated as if a Change of Control Offer shall have been made with respect to such period.

SECTION 2.17.  [Intentionally Omitted]

## ARTICLE III

### Successor Company

SECTION 3.01.  <u>When Company May Merge or Transfer Assets.</u>  (a)  The Company shall not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Company is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(i)  the Company is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation, partnership or limited liability company organized or existing under the laws of any member state of the European Union on January 1, 2004, the United States, the District of Columbia, or any state or territory thereof, (the Company or such Person, as the case may be, being herein called the "Successor Company"); *provided* that in the case where the surviving Person is not a corporation, a co-obligor of the Debt Instruments is a corporation;

(ii) the Successor Company (if other than the Company) expressly assumes all the obligations of the Company under this Agreement and the Debt Instruments pursuant to supplemental indentures or other documents or instruments in form reasonably satisfactory to the Administrative Agent;

(iii) immediately after giving effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Company or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Company or such Restricted Subsidiary at the time of such transaction) no Default shall have occurred and be continuing; and

(iv) immediately after giving pro forma effect to such transaction, as if such transaction had occurred at the beginning of the applicable four-quarter period (and treating any Indebtedness which becomes an obligation of the Successor Company or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Company or such Restricted Subsidiary at the time of such transaction), either:

(1) the Successor Company would be permitted to Incur at least €1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 2.03(a)(x); or

(2) the Fixed Charge Coverage Ratio for the Successor Company and the Restricted Subsidiaries would be greater than such ratio for the

Company and the Restricted Subsidiaries immediately prior to such transaction.

The Successor Company (if other than the Company) shall succeed to, and be substituted for, the Company under this Agreement and the Debt Instruments, and in such event the Company will automatically be released and discharged from its obligations under this Agreement and the Debt Instruments.  Notwithstanding the foregoing clauses (iii) and (iv) of this Section 3.01 of this Annex A, (1) any Restricted Subsidiary may merge, consolidate or amalgamate with or transfer all or part of its properties and assets to the Company or to another Restricted Subsidiary, and (2) the Company may merge, consolidate or amalgamate with an Affiliate incorporated solely for the purpose of reincorporating the Company in another member state of the European Union on January 1, 2004, the United States, the District of Columbia, or any state or territory thereof,  or may convert into a limited liability company, so long as the amount of Indebtedness of the Company and the Restricted Subsidiaries is not increased thereby. This Article III of this Annex A will not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Company and the Restricted Subsidiaries.

# ARTICLE IV

## Defaults and Remedies

SECTION 4.01. <u>Events of Default.</u> An "Event of Default" occurs if:

(a) there is a default in any payment of interest on any Debt Instrument when the same becomes due and payable, and such default continues for a period of 30 days;

(b) there is a default in the payment of principal or premium, if any, of any Debt Instrument when due at the Maturity Date, upon optional prepayment, upon required repurchase, upon declaration or otherwise;

(c) the Company or any of the Restricted Subsidiaries fails to comply with its obligations under Article III of this Annex A;

(d) the Company or any of the Restricted Subsidiaries fails to comply with any of its agreements in the Debt Instruments or this Agreement (other than those referred to in clause (a), (b) or (c) above) and such failure continues for 60 days after the notice specified below;

(e) the Company or any Significant Subsidiary fails to pay any Indebtedness (other than Indebtedness owing to the Company or a Restricted Subsidiary) within any applicable grace period after final maturity or the acceleration of any such Indebtedness by the holders thereof because of a default, in each case, if the total amount of such Indebtedness unpaid or accelerated exceeds €25.0 million or its foreign currency equivalent;

(f) the Company or any Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law:

(i) commences a voluntary case;

(ii) consents to the entry of an order for relief against it in an involuntary case;

(iii) consents to the appointment of a Custodian of it or for any substantial part of its property; or

(iv) makes a general assignment for the benefit of its creditors or takes any comparable action under any foreign laws relating to insolvency;

(g) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i) is for relief against the Company or any Significant Subsidiary in an involuntary case;

(ii) appoints a Custodian of the Company or any Significant Subsidiary or for any substantial part of its property; or

(iii) orders the winding up or liquidation of the Company or any Significant Subsidiary;

or any similar relief is granted under any foreign laws and the order or decree remains unstayed and in effect for 60 days; or

(h) the Company or any Significant Subsidiary fails to pay final judgments aggregating in excess of €25.0 million or its foreign currency equivalent (net of any amounts which are covered by enforceable insurance policies issued by solvent carriers), which judgments are not discharged, waived or stayed for a period of 60 days following the entry thereof.

The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

The term "Bankruptcy Law" shall mean Title 11, United States Code, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law for the relief of debtors. The term "Custodian" shall mean any receiver, Administrative Agent, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

A Default under clauses (d), (e) or (h) above shall not constitute an Event of Default until the Administrative Agent notifies the Company or the Holders of Debt Instruments of at least 25% in principal amount of the outstanding Debt Instruments notify the Company and the Administrative Agent of the Default and, in the case of clause (d) above, the Company does not cure such Default within the time specified in clause (d) after receipt of such notice. Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default." The Company shall deliver to the Administrative Agent, within five (5) Business Days after the occurrence thereof, written notice in the form of an Officers' Certificate of any event which is, or with the giving of notice or the lapse of time or both would become, an Event of Default, its status and what action the Company is taking or proposes to take with respect thereto.

SECTION 4.02. Acceleration. If an Event of Default (other than an Event of Default specified in Section 4.01(f) or (g) with respect to the Company) occurs and is continuing, the Administrative Agent or the Holders of Debt Instruments of at least 25% in principal amount of outstanding Debt Instruments by notice to the Company may declare the principal of, premium, if any, and accrued but unpaid interest on all the Debt Instruments to be due and payable; *provided*, *however*, that so long as any Bank Indebtedness remains outstanding, no such acceleration shall be effective until the earlier of (1) five Business Days after the giving of written notice to the Company and the Representative under the CEVA Credit Agreement and (2) the day on which any Bank Indebtedness is accelerated. Upon such a declaration, such principal and interest shall be due and payable immediately. If an Event of Default specified in

Section 4.01(f) or (g) with respect to the Company occurs, the principal of, premium, if any, and interest on all the Debt Instruments shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Administrative Agent or any Holders of Debt Instruments.  The Holders of Debt Instruments of a majority in principal amount of the Debt Instruments by notice to the Administrative Agent may rescind an acceleration and its consequences.

In the event of any Event of Default specified in Section 4.01(e), such Event of Default and all consequences thereof (excluding, however, any resulting payment default) shall be annulled, waived and rescinded, automatically and without any action by the Administrative Agent or the Holders of Debt Instruments, if within 20 days after such Event of Default arose the Company delivers an Officers' Certificate to the Administrative Agent stating that (x) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Debt Instruments as described above be annulled, waived or rescinded upon the happening of any such events.

SECTION 4.03.  <u>Other Remedies.</u>  If an Event of Default occurs and is continuing, the Administrative Agent may pursue any available remedy at law or in equity to collect the payment of principal of or interest on the Debt Instruments or to enforce the performance of any provision of the Debt Instruments or this Agreement.

The Administrative Agent may maintain a proceeding even if it does not possess any of the Debt Instruments or does not produce any of them in the proceeding.  A delay or omission by the Administrative Agent or any Holder of Debt Instruments in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  To the extent required by law, all available remedies are cumulative.

SECTION 4.04.  <u>Waiver of Past Defaults.</u>  Provided the Debt Instruments are not then due and payable by reason of a declaration of acceleration, the Required Holders of Debt Instruments by written notice to the Administrative Agent may waive an existing Default and its consequences except (a) a Default in the payment of the principal of or interest on a Debt Instrument, (b) a Default arising from the failure to redeem or purchase any Debt Instrument when required pursuant to the terms of this Agreement or (c) a Default in respect of a provision that under Section 10.08 cannot be amended without the consent of the Holders of Debt Instruments of not less than 90% of the then outstanding aggregate principal amount of the Debt Instruments.  When a Default is waived, it is deemed cured and the Company, the Administrative Agent and the Holders of Debt Instruments will be restored to their former positions and rights under this Agreement, but no such waiver shall extend to any subsequent or other Default or impair any consequent right.

SECTION 4.05.  <u>Control by Majority.</u>  The Holders of Debt Instruments of a majority in principal amount of the Debt Instruments may direct the time, method and place of conducting any proceeding for any remedy available to the Administrative Agent or of

exercising any trust or power conferred on the Administrative Agent. However, the Administrative Agent may refuse to follow any direction that conflicts with law or this Agreement or, subject to terms of this Agreement, that the Administrative Agent determines is unduly prejudicial to the rights of any other Holder of Debt Instruments or that would involve the Administrative Agent in personal liability. Prior to taking any action under this Agreement, the Administrative Agent shall be entitled to indemnification or security satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

SECTION 4.06. <u>Limitation on Suits.</u> (a) Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no Holder of Debt Instruments may pursue any remedy with respect to this Agreement or the Debt Instruments unless:

(i) the Holder of Debt Instruments gives to the Administrative Agent written notice stating that an Event of Default is continuing;

(ii) the Holders of Debt Instruments of at least 25% in principal amount of the Debt Instruments make a written request to the Administrative Agent to pursue the remedy;

(iii) such Holder of Debt Instruments or Holders of Debt Instruments offer to the Administrative Agent reasonable security or indemnity satisfactory to it against any loss, liability or expense;

(iv) the Administrative Agent does not comply with the request within 60 days after receipt of the request and the offer of security or indemnity; and

(v) the Holders of Debt Instruments of a majority in principal amount of the Debt Instruments do not give the Administrative Agent a direction inconsistent with the request during such 60-day period.

(b) A Holder of Debt Instruments may not use this Agreement to prejudice the rights of another Holder of Debt Instruments or to obtain a preference or priority over another Holder of Debt Instruments.

SECTION 4.07. <u>Rights of the Holders of Debt Instruments to Receive Payment.</u> Notwithstanding any other provision of this Agreement, the right of any Holder of Debt Instruments to receive payment of principal of and interest on the Debt Instruments held by such Holder of Debt Instruments, on or after the respective due dates expressed or provided for in the Debt Instruments, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of the Holders of Debt Instruments of not less than 90% of the then outstanding aggregate principal amount of the Debt Instruments.

SECTION 4.08. <u>Collection Suit by Administrative Agent.</u> If an Event of Default specified in Section 4.01(a) or (b) occurs and is continuing, the Administrative Agent may recover judgment in its own name and as Administrative Agent of an express trust against the Company or any other obligor on the Debt Instruments for the whole amount then due and owing

(together with interest on overdue principal and (to the extent lawful) on any unpaid interest at the rate provided for in the Debt Instruments) and the amounts provided for in Section 4.07.

SECTION 4.09. Administrative Agent May File Proofs of Claim. The Administrative Agent may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Administrative Agent (including any claim for reasonable compensation, expenses disbursements and advances of the Administrative Agent (including counsel, accountants, experts or such other professionals as the Administrative Agent deems necessary, advisable or appropriate)) and the Holders of Debt Instruments allowed in any judicial proceedings relative to the Company, their creditors or their property, shall be entitled to participate as a member, voting or otherwise, of any official committee of creditors appointed in such matters and, unless prohibited by law or applicable regulations, may vote on behalf of the Holders of Debt Instruments in any election of a Administrative Agent in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each Holder of Debt Instruments to make payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Holders of Debt Instruments, to pay to the Administrative Agent any amount due it for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent, its agents and its counsel, and any other amounts due the Administrative Agent under Section 4.07. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel, and any other amounts due the Administrative Agent under Section 4.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders of Debt Instruments may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Holder of Debt Instruments any plan of reorganization, arrangement, adjustment or composition affecting the Debt Instruments or the rights of any Holder of Debt Instruments, or to authorize the Administrative Agent to vote in respect of the claim of any Holder of Debt Instruments in any such proceeding.

SECTION 4.10. Priorities. If the Administrative Agent collects any money or property pursuant to this Article 4, it shall pay out the money or property in the following order:

FIRST: to the Administrative Agent for amounts due under Section 8.07 of this Agreement;

SECOND: to the Holders of Debt Instruments for amounts due and unpaid on the Debt Instruments for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Debt Instruments for principal and interest, respectively; and

THIRD: to the Company.

SECTION 4.11. Undertaking for Costs. In any suit for the enforcement of any right or remedy under this Agreement or in any suit against the Administrative Agent for any

action taken or omitted by it as Administrative Agent, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section does not apply to a suit by the Administrative Agent, a suit by a Holder of Debt Instruments pursuant to Section 4.07 or a suit by Holders of Debt Instruments of more than 10% in principal amount of the Debt Instruments.

SECTION 4.12.  <u>Waiver of Stay or Extension Laws.</u>  The Company (to the extent it may lawfully do so) shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Agreement; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Administrative Agent, but shall suffer and permit the execution of every such power as though no such law had been enacted.

AMENDMENT AND WAIVER No. 1 dated as of January 31, 2012 (this "*Amendment*"), to the Debt Instrument Agreement dated as of February 15, 2007, and amended and restated as of June 2, 2008 (together with all exhibits, annexes and schedules thereto, the "*PIK Agreement*"), among CEVA INVESTMENTS LTD, a limited liability company organized under the laws of the Cayman Islands with tax residence in the United Kingdom (together with its successors, the "*Company*"), the HOLDERS OF DEBT INSTRUMENTS party thereto from time to time, and CREDIT SUISSE, as administrative agent (the "*Administrative Agent*") for the Holders of Debt Instruments.

A.    Pursuant to the PIK Agreement, the Holders of Debt Instruments have extended credit to the Company.

B.    The Company and the Required Holders of Debt Instruments (as defined in the PIK Agreement) have agreed to effectuate certain amendments and waivers to the PIK Agreement as set forth herein, and the Company and the Required Holders of Debt Instruments have agreed to such request on and subject to the terms and conditions of this Amendment.

C.    Capitalized terms used but not defined herein shall have the meanings assigned to them in the PIK Agreement.

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

SECTION 1.    *Amendments to the PIK Agreement.*

(a)    The Required Holders of Debt Instruments hereby permanently waive any non-compliance with any provisions that require sharing of, or acquisition of participations with, the proceeds from any assignment by a Holder of Debt Instruments of, or a granting of a participation in, its rights and obligations under the PIK Agreement to an Affiliate of the Company, whether already having occurred or occurring in the future.

(b)    Section 2.18(c) of the PIK Agreement is hereby amended by deleting the words ", other than to the Company or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph (c) shall apply)" from clause (ii) of the proviso therein.

SECTION 2.    *Conditions Precedent.*  This Amendment shall become effective as of the date set forth above on the date (the "*Amendment and Waiver No. 1 Effective Date*") the following conditions precedent are satisfied or waived: the Administrative Agent shall have received counterparts of this Amendment that, when taken together, bear the signatures of the Company, Administrative Agent and the Required Holders of Debt Instruments.

SECTION 3.  ***Effect of Amendment***.  Except as expressly set forth herein, this Amendment shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the Holders of Debt Instruments or the Administrative Agent under the PIK Agreement or any other Debt Instrument Document, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the PIK Agreement or any other Debt Instrument Document, all of which are ratified and affirmed in all respects and shall continue in full force and effect.  After the date hereof, any reference to the PIK Agreement shall mean the PIK Agreement, as modified hereby.  This Amendment shall constitute a "Debt Instrument Document" for all purposes of the PIK Agreement and the other Debt Instrument Documents.

SECTION 4.   ***Severability***.  In the event any one or more of the provisions contained in this Amendment should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.   ***Counterparts***.  This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same contract.  Delivery of an executed counterpart of a signature page of this Amendment by facsimile transmission, by electronic mail in "portable document format" (".pdf") form or by any other electronic means shall be as effective as delivery of a manually executed counterpart hereof.

SECTION 6.   ***Applicable Law***.  THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 7.   ***Headings***.  The headings of this Amendment are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their duly authorized officers, all as of the date and year first above written.

CEVA INVESTMENTS LTD

by: _____
Name: MARK BEITH
Title: DIRECTOR

CREDIT SUISSE, LONDON BRANCH, as
Administrative Agent and Holder of Debt
Instruments

by: _____
Name: Ian Croft
Title: Assistant Vice President

by: _____
Name: Russell J Wood
Title: Vice President
Operations

JPMORGAN CHASE BANK, N.A.

by: _____

Name: Florian Will
Title: Executive Director

AMENDMENT No. 2 dated as of January 31, 2012 (this "***Amendment***"), to the Debt Instrument Agreement dated as of February 15, 2007, and amended and restated as of June 2, 2008 (together with all exhibits, annexes and schedules thereto, the "***PIK Agreement***"), among CEVA INVESTMENTS LTD, a limited liability company organized under the laws of the Cayman Islands with tax residence in the United Kingdom (together with its successors, the "***Company***"), the HOLDERS OF DEBT INSTRUMENTS party thereto from time to time, and CREDIT SUISSE, as administrative agent (the "***Administrative Agent***") for the Holders of Debt Instruments.

A.     Pursuant to the PIK Agreement, the Holders of Debt Instruments have extended credit to the Company.

B.     The Company and the Required Holders of Debt Instruments (as defined in the PIK Agreement) have agreed to effectuate certain amendments and waivers to the PIK Agreement as set forth herein, and the Company and the Required Holders of Debt Instruments have agreed to such request on and subject to the terms and conditions of this Amendment.

C.     Capitalized terms used but not defined herein shall have the meanings assigned to them in the PIK Agreement.

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

SECTION 1.     ***Amendments to the PIK Agreement.***  Effective as of the Amendment No. 2 Effective Date (as defined below), the PIK Agreement is hereby amended as follows:

(a)     Section 2.13(b) of the PIK Agreement shall be amended in its entirety to read as follows:

"(b) Subject to clause (c) below, accrued interest on each Debt Instrument shall be capitalized as of and added to principal on (i) the last Business Day of each Interest Period, (ii) without duplication, on the date of any early redemption (on the amount redeemed), (iii) at maturity (whether by acceleration or otherwise) and (iv) after maturity, on the last Business Day of each month; provided that the Company may, at its election, pay any such accrued interest in cash.  The Company may make such election at the end of the Interest Period and shall deliver to the Administrative Agent, a written notice setting forth that such interest payment will be made in the form of cash."

(b)    The PIK Agreement shall be amended by deleting the following sections or clauses of the PIK Agreement and all references and definitions related thereto in their entirety:

> Section 2.11 (Mandatory Offer to Purchase)
> Section 2.02 of Annex A (Reports and Other Information);
> Section 2.03 of Annex A (Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock);
> Section 2.04 of Annex A (Limitation on Restricted Payments);
> Section 2.05 of Annex A (Dividend and Other Payment Restrictions Affecting Subsidiaries);
> Section 2.06 of Annex A (Asset Sales);
> Section 2.07 of Annex A (Transactions with Affiliates);
> Section 2.09 of Annex A (Compliance Certificate);
> Section 2.10 of Annex A (Further Instruments and Acts);
> Section 2.11 of Annex A (Future Guarantors);
> Section 2.12 of Annex A (Liens);
> Section 2.16 of Annex A (Suspension/Fall-Away of Covenants on Achievements of Investment Grade Status);
> Section 3.01 of Annex A (When Company may Merge or Transfer Assets);
> Clauses (c), (d), (e) and (h) of Section 4.01 of Annex A (Events of Default); and Section 10.17 (Platform; Company Materials).

SECTION 2.    *Waiver*.  The Required Holders of Debt Instruments hereby permanently waive any non-compliance with any provisions of the PIK Agreement, if any, on or prior to the date hereof.

SECTION 3.    *Conditions.*  This Amendment shall become effective on the date (the "*Amendment No. 2 Effective Date*") the following conditions are satisfied or waived: (i) the Administrative Agent shall have received counterparts of this Amendment that, when taken together, bear the signatures of the Company, Administrative Agent and the Required Holders of Debt Instruments and (ii) CEVA shall issue, substantially concurrently with the effectiveness of this Amendment, the Senior Secured Notes due 2017 and the Senior Notes due 2020, in each case, as described in the confidential offering circular dated January 27, 2012.

SECTION 4.    *Effect of Amendment*.  After the date hereof, any reference to the PIK Agreement shall mean the PIK Agreement, as modified hereby.  This Amendment shall constitute a "Debt Instrument Document" for all purposes of the PIK Agreement and the other Debt Instrument Documents.

SECTION 5.    *Severability*.  In the event any one or more of the provisions contained in this Amendment should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with

valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 6.  *Counterparts*.  This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same contract.  Delivery of an executed counterpart of a signature page of this Amendment by facsimile transmission, by electronic mail in "portable document format" (".pdf") form or by any other electronic means shall be as effective as delivery of a manually executed counterpart hereof.

SECTION 7.  *Applicable Law*.  THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 8.  *Headings*.  The headings of this Amendment are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their duly authorized officers, all as of the date and year first above written.

CEVA INVESTMENTS LTD

by: _Mark Beith_

Name: MARK BEITH

Title: DIRECTOR

CREDIT SUISSE, LONDON BRANCH, as Administrative Agent and Holder of Debt Instruments

by: _____
Name: ROBERT HETU
Title: MANAGING DIRECTOR

by: _____
Name: KEVIN BUDDHDEW
Title: ASSOCIATE

**APOLLO FUND VI BC, L.P.**

By: Apollo Advisors VI (EH), L.P.
     its general partner

By: Apollo Advisors VI (EH-GP), Ltd.
     its general partner

By: _____
     Name:
     Title: WENDY F. DULMAN
           VICE PRESIDENT

**AIF VI EURO HOLDINGS, L.P.**

By:  Apollo Advisors VI (EH), L.P.
     its general partner

By:  Apollo Advisors VI (EH-GP), Ltd.
     its general partner

By: _____
     Name:
     Title:    WENDY F. DULMAN
             VICE PRESIDENT

**AAA GUARANTOR – CO-INVEST VI, L.P.**

By: AAA MIP Limited,
    its general partner

By: Apollo Alternative Assets, L.P.,
    its investment manager under the services
    agreement

By: Apollo International Management, L.P.,
    its managing general partner

By: Apollo International Management GP, LLC
    its general partner

By: _____
    Name:
    Title:    WENDY F. DULMAN
              VICE PRESIDENT