Paul J. Ricotta
Kevin J. Walsh
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
Chrysler Center
666 Third Avenue
New York, NY 10017
Telephone: (212) 935-3000
Facsimile: (212) 983-3115

*Counsel for CIL Limited (by special appearance only)*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
| | | |
|---|---|---|
| In re : | : | Chapter 7 |
| | : | |
| CIL LIMITED, | : | |
| | : | Case No. 13-11272 (JMP) |
| Debtor. | : | |

------------------------------------------------------ x

**RESPONSE OF CIL LIMITED TO PETITIONING CREDITORS' MOTION FOR EXPEDITED DETERMINATION OF THE INVOLUNTARY PETITION OR, IN THE ALTERNATIVE, FOR APPOINTMENT OF AN INTERIM TRUSTEE**

CIL Limited ("**CIL**"), appearing specially and without consenting to the jurisdiction of this Court, hereby responds to the Petitioning Creditors' Motion for Expedited Determination of the Involuntary Petition or, in the Alternative, for Appointment of an Interim Trustee, dated April 23, 2013 [docket No. 6] (the "**Motion**") as follows:

1.  Since April 2, 2013, CIL has been in provisional liquidation proceedings in the Grand Court of the Cayman Islands Financial Services Division (the "**Cayman Court**") pursuant to which provisional liquidators (the "**Provisional Liquidators**") were appointed to assist in the implementation of the restructuring of CIL. *See* Order for Appointment of Provisional Liquidators, dated April 2, 2013, attached as Exhibit A to the

Declaration of Paul J. Ricotta, dated April 29, 2013, filed simultaneously herewith. All references to exhibits attached to such Declaration are hereinafter referred to as "Ricotta Decl. Ex. ____."

2. The appointment of Provisional Liquidators is the functional equivalent of a chapter 11 process and the appointment of a chapter 11 trustee; the Provisional Liquidators owe fiduciary duties to CIL's creditors.

3. On Friday, April 26, 2013, the Cayman Court issued an Order authorizing and directing CIL's counsel to prepare and file this Response with this Court. Attached as Exhibit B to the Ricotta Declaration is the form of Order that has been signed by all parties, including Cayman counsel for the Petitioning Creditors, agreeing as to the form of the Order. Because of the short timing, the clerk of the Cayman Court has not yet had a chance to provide a copy signed by the Court. This Response is filed on behalf of CIL and does not constitute any representation by the Provisional Liquidators. This Response is filed without waiving any rights to contest the purported jurisdiction of this Court over CIL.

**CIL**

4. Prior to the commencement of the Cayman Island proceedings, CIL was the direct and indirect owner of 100% of CEVA Group Plc, a Company incorporated in England & Wales, which is the parent company to dozens of operating entities ("**CEVA**") that comprise the fourth largest supply chain business and the second largest non-asset based supply chain management company in the world, with operations in more than 160 countries, employing approximately 50,000 people, and serving approximately 15,000 customers. CIL is merely a holding company and has no

operations or business of its own. CIL has two directors and currently has no employees. CIL does not own or lease any real estate or other tangible personal property and has no physical office from which it does any business. CIL does not generate any income from any business operations.

5. CIL's debt is almost entirely comprised of that certain Debt Instrument Agreement, dated as of February 15, 2007, as amended and restated, by which certain unsecured payment-in-kind notes ("**PIK Notes**") were issued. Credit Suisse acts as the administrative agent for the PIK Note holders. According to Credit Suisse, there are 15 PIK Note holders, owed an aggregate of €105,394,823.72. The Petitioning Creditors allegedly hold PIK Notes in the approximate amount of €41 million, meaning that they hold 39% of the PIK Notes. The Petitioning Creditors are apparently three investment funds managed by the same fund manager or advisor, Cyrus Capital Partners, a distressed debt fund manager. No other PIK Note holders have joined the involuntary petition.

### Jurisdiction

6. CIL was incorporated on August 15, 2006 as a Cayman Islands Company. At formation, its registered office in the Cayman Islands was Walkers Corporate Services Limited, Walker House, 87 Mary Street, KY1 9005, George Town, Grand Cayman, Cayman Islands. Its registered office has subsequently moved to Intertrust Cayman, 190 Elgin Avenue, George Town, KY1-09005, Grand Cayman, Cayman Islands. CIL is tax resident in the United Kingdom, is registered in England and Wales as an Overseas Company, and its registered agent is Intertrust (UK) Limited, a private company incorporated with limited liability under the laws of England and Wales, which has an office at 11 Old Jewry, London EC2R 8DU ("**Intertrust**").

7. Other than its shareholdings in CEVA and certain intercompany claims in the net amount of €12.6 million against CEVA that have been disputed and are described in the Cayman Island proceedings and in the Exchange Offer (as hereinafter defined), CIL is not aware of any other assets other than certain bank accounts with less than $20,000 cash balances located in the United Kingdom.

8. CIL's books and records do not indicate that it has ever maintained any assets in the United States.

9. As noted above, CIL has no active business operations and no employees. The only corporate activity of CIL consists of periodic meetings of the Board of Directors. Virtually all of such meetings have occurred in the United Kingdom. CIL has two directors. The chairman of meetings of the board of directors is typically Mr. Mark Beith, who is a citizen and resident of the United Kingdom. The other director is Mr. Gareth Turner who is a citizen of the United Kingdom and Canada. Although Mr. Turner currently maintains an office and residence in New York City, he conducts no business on behalf of CIL from that office or from any other locations. Mr. Turner is also a member of the board of directors of a number of other entities, all of which were fully disclosed in the Cayman Island proceedings. Mr. Turner travels extensively and typically attends board meetings of CIL, if he is not physically present in the United Kingdom, by telephone conference call from wherever he may be located around the world.

10. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("**Mintz Levin**"), CIL's counsel, does not act as custodian for any of CIL's corporate records, which are held by CIL's registered agent, Intertrust, in the United Kingdom. CIL's auditors are PwC, located in the United Kingdom. In the past, CIL has retained other law firms to

provide legal services, most of which have offices in the United States and many foreign countries.

11. CIL, CEVA Limited, and Apollo Management VI, L.P. (hereinafter, Apollo Management VI, L.P. and its affiliates are referred to as "**Apollo**") are parties to a Management Fee Agreement, dated as of November 4, 2006. CEVA Limited is not CIL. CEVA Limited is a separate entity that is a subsidiary of CEVA Group Plc. Under the Management Fee Agreement, CEVA Limited, not CIL, may request and obtain management services from Apollo in return for a fee. CIL's only involvement in the Management Fee Agreement is a provision by which CIL may make a written request for advisory services from Apollo concerning a merger, acquisition, recapitalization, financing or similar transaction in return for the payment of a fee, which has not occurred in connection with the current restructuring. The Management Fee Agreement does not authorize Apollo to manage the operations of CIL (of which there are none), nor does Apollo perform any management functions for or on behalf of CIL.

**Abstention**

12. On April 2, 2013, CIL commenced its provisional liquidation proceeding before the Cayman Court. The Provisional Liquidators, who are similar in function and hold similar powers to bankruptcy trustees, were appointed by the Cayman Court to oversee CIL, any and all of CIL's assets, any actions of the directors of CIL, and the Cayman Island proceedings of CIL. The Provisional Liquidators are officers of the Cayman Court, have retained independent legal counsel in the Cayman Islands, and have a fiduciary duty to safeguard the rights of CIL's creditors and to maximize the value of any return to creditors.

13. In pertinent part, the Order for Appointment of Provisional Liquidators (Ricotta Decl. Ex. A) provides, among other things:

> 4. For the avoidance of doubt, except as may be agreed by the Company's creditors in an exchange offer, and sanctioned by the Court pursuant to s.86 of the Law, no payment or other disposition of the Company's property shall be made or effected without the Provisional Liquidator's approval.

14. In its April 2, 2013 Order, the Cayman Court also directed that the CIL Directors and the Provisional Liquidators should agree upon a protocol under which the Directors would continue to administer CIL subject to the oversight of the Provisional Liquidators. Pursuant to this direction, a protocol was entered into between the CIL Directors and the Provisional Liquidators (Ricotta Decl. Ex. C) by which CIL cannot take any action out of the ordinary course of business without either the approval of the Provisional Liquidators or the Cayman Court.

15. Since the filing of the Cayman Island proceedings by CIL almost one month ago, the Provisional Liquidators have spent considerable time, effort and money becoming familiar with all aspects of CIL and its restructuring. CIL and its Cayman counsel have been in almost daily contact with the Provisional Liquidators to discuss any number of issues and to make numerous decisions. Except for the most routine decisions, CIL is not authorized to, and has not undertaken any action without the input and approval of the Provisional Liquidators.

16. In particular, immediately after their appointment and continuing through the present, the Provisional Liquidators have conducted due diligence and investigation into the existence and merits of intercompany claims between CIL and CEVA. Factual and financial data has been provided to the Provisional Liquidators by CIL, and interviews with the directors and CIL's advisors have occurred. CIL understands that the

Provisional Liquidators have made document requests to, and have received information from CEVA. CIL further understands that such due diligence is ongoing.

17. Given that the Petitioning Creditors hold 39% of the PIK Notes, they have the absolute right to block the approval of any scheme of arrangement by the Cayman Court. Therefore, it is likely that the Cayman Island proceedings of CIL will soon be converted into official liquidation, which is the functional equivalent of the chapter 7 relief sought by the Petitioning Creditors. Immediately thereafter, the Cayman Court will appoint official liquidators, which are the functional equivalent of a chapter 7 trustee. The Petitioning Creditors will be entitled to apply to the Cayman Court to have their own preferred official liquidators appointed, and given the size of their debt, that application is likely to carry significant weight.

**Alleged Need For Interim Trustee**

18. CEVA approached CIL in mid-February 2013 and initiated discussions with respect to a proposed restructuring plan by which it would offer to exchange €1.1 billion of its debt for equity in a new company to be formed for the purpose of owning restructured CEVA. An exchange offer as more fully described below was ultimately made on April 3, 2013 (the "**Exchange Offer**") and is currently set to expire on April 30, 2013. The facts set forth herein with respect to CEVA and the Exchange Offer are contained in a Report to Bondholders, dated April 4, 2013, which is attached as Exhibit A to the Declaration of Howard W. Schub, dated April 23, 2013 [docket # 7], the E&Y Report (Ricotta Decl. Ex. D), and the April 24 Press Release (Ricotta Decl. Ex. E).

19. In connection with the consideration of various alternatives for maximizing recovery for the PIK Note holders, CIL retained the law firm of Mintz Levin,

7

an international firm with offices in a number of jurisdictions throughout the United States and the United Kingdom. In addition, CIL retained the law firm of Appleby (Cayman) Ltd. to assist it with the proceedings before the Cayman Court. None of the professionals of CIL represent CEVA. CEVA is represented by its own legal and financial advisors, and Apollo is separately represented by its own legal advisors.

20. CIL also retained the Cayman Islands office of Ernst & Young Ltd ("**E&Y**"), an internationally recognized accounting and financial advisory firm to provide insolvency advice. In addition to its advisory role, E&Y rendered an expert opinion concerning the valuation of CIL's shareholdings in CEVA (Ricotta Decl. Ex. D). E&Y's expert opinion was included in the court filings in the Caymans Islands and, as more fully described below, concluded that the CEVA shares had no value.

21. As part of the negotiations with CEVA, in late February, 2013, CEVA presented a report to CIL prepared by Houlihan Lokey, which concluded that (1) CEVA was currently and would remain highly levered in the future if no reorganization and recapitalization or capital infusion occurred; (2) CEVA does not have sufficient liquidity to continue to operate its business, and likely already would have run out of cash if it had not received cash infusions from the recent sale of assets to third-parties and the recent sale of receivables to Apollo; (3) in light of CEVA's high level of debt, lack of liquidity and poor cash flow, it is unlikely that CEVA can continue operating its business even in the short term, and that, even if it were able to continue to operate in the near term, it would be unable to refinance its debt when it comes due; and (4) CEVA is both insolvent on a cash flow basis and, given its business model by which it owns relatively few

tangible assets, it is insolvent on a balance sheet basis after taking into consideration the fair saleable value of its assets.

22. CIL and its advisors, including E&Y, discussed the conclusions of the Houlihan Lokey report in detail with representatives of Houlihan Lokey who provided further support for their conclusions and considered the risk of further value degradation of CEVA to be very high if the level of debt of CEVA is not reduced given the fact that CEVA is an "asset light" company that relies on customer confidence in its ability to remain financially viable.

23. Additional financial information provided by CEVA indicated that, in the fourth quarter of 2012, CEVA's quarterly EBITDA declined 92% year-over-year from €63 million to €5 million. For the full year 2012, this resulted in annual EBITDA declining 29% year-over-year from €245 million to €173 million. CEVA generated negative net cash from operating and investing activities of approximately €(253) million in 2012.

24. E&Y independently analyzed the value of CIL's shareholding in CEVA by utilizing the facts and data set forth in the report of Houlihan Lokey as well as additional information. E&Y concluded that CEVA's value is between €2.3 billion and €2.6 billion, against total net liabilities, liquidity funding needs, and other expenses of €3.1 billion to €3.2 billion, before any value could be realized on account of CIL's shareholding in CEVA. E&Y also (1) consulted publicly available information to understand the nature and operations of the business, including historical financial performance, any existing business plans, future performance estimates or budgets for CEVA and the assumptions underlying these budget plans and the relevant risk factors; (2) obtained an understanding of the economic and competitive environments in which CEVA operates; (3) analyzed CEVA's earnings and capacity to pay

9

dividends; (4) analyzed prior M&A transactions of other similar companies; (5) analyzed the trading multiples of similar publicly traded companies; and (6) performed a valuation analysis of CEVA utilizing relevant customary and normal valuation approaches.

25. E&Y noted that (1) CEVA's cash flow forecasts indicate that it will have insufficient liquidity to pay its debts within the next three months; (2) CEVA has exhausted all options, short of a reorganization and recapitalization, to raise additional funds; (3) even in a consensual reorganization and recapitalization, CEVA would be unable to pay all of its debts and, therefore, there is no value in CIL's equity interest in CEVA; and (4) based on E&Y's assessment of the valuation of CEVA, the proceeds of a private sale or IPO of CEVA would result in no value for CIL's equity interest in CEVA.

26. E&Y also opined that CIL's only remaining known asset, the net €12.6 million intercompany claim, which is disputed by CEVA, would be of questionable collectability. In addition, given CIL's lack of any cash, the practical ability to pursue any claims would have been uncertain.

27. Given that (1) the CEVA shares held by CIL had no value according to E&Y, (2) irrespective of whether the disputed intercompany claim would be upheld it had questionable collectability given the financial condition of CEVA, (3) CIL had no other known material assets, (4) CIL had extremely limited cash and no third party sources of liquidity, and (5) the financial condition and financial resources of CEVA were rapidly deteriorating, CIL was advised that negotiating with CEVA to procure a purely voluntary option for the PIK Note holders either to participate in the Exchange Offer or retain any existing claims would not prejudice the rights of the PIK Note holders. Therefore, CIL did not believe that any dilution of its shareholding would constitute a transfer of any valuable asset of CIL; moreover, the failure to effectively

allow CEVA to make the Exchange Offer by blocking the issuance of new shares might force CEVA into liquidation thereby increasing the risk that the value of the PIK Notes would be impaired.

28. Although they are not creditors of CEVA, and CEVA asserted that the consent of the PIK Holders is not necessary to complete the Exchange Offer, CIL negotiated to have the Exchange Offer also made to the PIK Note holders, including the Petitioning Creditors, on the same basis as the holders of CEVA's senior unsecured and second lien secured debt.

29. CIL rejected the initial proposal made by CEVA with respect to the consideration being offered to the PIK Note holders. After a number of weeks of negotiation, CIL was successful in materially increasing the consideration being offered to the PIK Note holders in the Exchange Offer despite the fact the CEVA shares were estimated to be worthless by E&Y and that intercompany claims held by CIL against CEVA were being challenged by CEVA as to their validity. Ultimately, CIL negotiated an agreement with CEVA providing that the basis for the exchange of the PIK Notes would be a fixed value equal to the amount of the intercompany claims at the time of the commencement of the Exchange Offer as if they were valid and fully collectible, i.e., €12.6 million, all as more fully described in the Exchange Offer.

30. CEVA has a number of layers of debt in its capital structure which, in the aggregate, totaled approximately €2.758 billion as of December 31, 2012 (excluding pension liabilities and other debt-equivalent obligations in the amount of approximately €315 million), including first lien debt, asset-based loans, second lien debt, bridge loans, and senior unsecured debt, among others. Based upon realized EBITDA of €173 million for calendar year 2012,

11

CEVA was levered at 16x. On April 1, 2013, CEVA had an interest payment due in the aggregate amount of approximately €62 million on its second lien debt and its senior unsecured notes. CEVA informed CIL that, due to its decline in operating performance and its financial difficulties, including an imminent lack of cash to pay for debt service and day-to-day operating expenses, CEVA needed to restructure such debt before the expiration of the 30-day grace period under its second lien an senior unsecured debt documents, i.e., before April 30, 2013. A default under the €1.1 billion of second lien and senior unsecured debt could also result in the acceleration of €1.3 billion of first priority lien debt.

31. CEVA did not make the interest payment on April 1, 2013.

32. CIL is not a party to any agreement that requires CIL to give the Petitioning Creditors prior notice of a restructuring of CIL. CIL believed that disseminating notice of restructuring discussions to a wider group of creditors would have increased the risk that such information would become public before a restructuring could also be announced, thereby creating a greater risk that CEVA's business would be damaged by the loss of customers and employees and the tightening of credit terms by vendors, and also increasing the risk that the PIK Note holders would have received less or no value for their PIK Notes.

33. The Exchange Offer provides that, if the exchange fails and CEVA were forced to file for bankruptcy, the projected recoveries for the holders of CEVA's second lien debt and senior unsecured notes will be approximately 64% and 34%, respectively. The Exchange Offer appears to imply that if the exchange is consummated, those percentage recoveries will be 73% and 39%, respectively. In either case, the Exchange Offer does not predict that the senior unsecured debt holders or the second lien debt holders of CEVA will receive full recovery. Yet, based on CEVA's public

announcement on April 24, 2013 (Ricotta Decl. Ex. E), as of April 26, approximately 94% of second lien debt holders other than Apollo and approximately 82% of senior unsecured note holders other than Apollo have tendered their instruments and will accept the Exchange Offer.

34. Unless more than 75% of the PIK Note holders agree to the Exchange Offer made to CIL's creditors, CIL will go into liquidation in the Cayman Island proceedings. As holders of 39% of the PIK Notes, the Petitioning Creditors thus have the power to force CIL into liquidation in the Cayman Island proceedings at any time after April 30. The Exchange Offer provides that CIL will retain all rights to any claims against CEVA or any other person or entity. The restructuring contains no releases by CIL against any person or entity. CIL's creditors have the absolute right to forgo the Exchange Offer and instead retain their claims and pursue whatever rights they may have. The choice is entirely voluntary and is not a *fait accompli*.

35. Apollo is the controlling shareholder of CIL and is the third largest creditor of CEVA behind two sophisticated, institutional investment firms with billions of dollars under management. Apollo holds approximately $26 million of the $702 million second lien notes, all of a $113 million senior unsecured bridge loan, and $132 million of the $620 million of senior unsecured notes, or approximately 19% of the total of those three debt instruments, all of which debt is subject to being exchanged for equity in the Exchange Offer. Apollo and the aforementioned two largest creditors of CEVA are unrelated and independent and, in fact, frequently compete in the marketplace. The Exchange Offer provides that all exchanging creditors of a particular class, including Apollo, will receive the same treatment as any other exchanging creditor of that class.

Apollo's right to exchange is *pari passu* with all other similarly situated creditors, and the economic value of Apollo's equity interest in CEVA after the exchange will be based upon its *pro rata* holdings of debt prior to the exchange as compared to all other such exchanging creditors.

36. As part of the Exchange Offer, all second lien and senior unsecured debt holders as well as PIK Note holders who participate in the Exchange Offer, including Apollo, will have the opportunity to invest up to $215 million of new money into restructured CEVA in return for equity.

37. After the exchange and new money investment, CIL has been advised by CEVA that Apollo will own approximately 20% of the economic value of the equity of CEVA; in comparison, the two largest creditors will own approximately 27% and 26% respectively, and other shareholders will own approximately 27% of CEVA's equity value.

38. Because CEVA's first lien debt contains change of control provisions which, if breached, would trigger an event of default in the amount of €1.3 billion, the Exchange Offer provides that irrespective of its economic ownership, Apollo will continue to own 50.1% of the voting rights in restructured CEVA. However, as stated above, Apollo's actual economic interest in restructured CEVA will be consistent with its *pro rata* portion of its current debt holdings and, in addition, the first and second largest creditors will be granted veto rights with respect to significant shareholder decisions.

39. In addition to the exchange of all of Apollo's current debt holdings in CEVA for equity, in February of 2012, investment entities affiliated with Apollo, which at that time held CIL PIK Notes and various CEVA debt instruments, exchanged over €870 million of such debt

14

instruments for additional equity in CIL (junior to the PIK Notes) in order to assist in the partial deleveraging of CIL and CEVA.

40. If the Exchange Offer is consummated, Apollo will not receive any consideration for its existing equity in CIL (including the aforementioned incremental €870+ million investment made in February 2012). Apollo's sole remaining economic equity interest in CEVA will be the shares it receives through the Exchange Offer on a *pro rata* basis to its debt holdings along with the shares it receives on account of its new money investment.

41. Apollo's interaction with CIL with respect to CIL's restructuring was limited to a single act by which, as CIL's shareholder and proxy holder, it approved shareholder resolutions authorizing CIL to allow CEVA to issue additional shares that could be offered to exchanging creditors in order to make the Exchange Offer commercially and financially feasible, and to authorize CIL to commence the Cayman Island proceedings.

42. At its core, the restructuring provides the creditors of CIL with an opportunity to participate in the Exchange Offer or retain their existing rights to pursue any claims. CIL negotiated to make sure that no claims that it may have against CEVA or any other party were released as part of the restructuring, which preserves the ability of CIL's creditors to pursue their pre-restructuring rights. Given that all intrinsic and expert evidence demonstrated that CIL's shareholding in CEVA is valueless, the decision of CIL to agree to the dilution of CIL's shareholding in CEVA in order to permit the Exchange Offer to go forward does not prejudice or adversely affect CIL's creditors in any manner and, in fact, gives creditors an opportunity to obtain equity in restructured CEVA that they otherwise would not have been entitled to. If

15

Petitioning Creditors do not wish to participate in the Exchange Offer, they will retain all of their rights without prejudice in the official liquidation of CIL in the Cayman Island proceedings.

Dated: April 29, 2013
      New York, New York

By: /s/ Paul J. Ricotta_____
Paul J. Ricotta (pjricotta@mintz.com)
Kevin J. Walsh (kjwalsh@mintz.com)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
    AND POPEO, P.C.
Chrysler Center
666 Third Avenue
New York, NY 10017
Telephone: (212) 935-3000
Facsimile: (212) 983-3115

*Counsel for CIL Limited (by special appearance only)*