NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
                                                  :

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| CIL Limited, | : | Case No. 13-11272-JLG |
| | : | |
|                 Debtor. | : | |
| | : | |

------------------------------------------------------x

**AMENDED MEMORANDUM DECISION AND ORDER GRANTING MOTION**
**OF CHAPTER 7 TRUSTEE TO ENFORCE THE AUTOMATIC STAY\*\***

**A P P E A R A N C E S:**

JOHN D. WEBB, P.A.
10751 Deerwood Park Blvd., Ste. 105
Jacksonville, FL 32256
By:    Jack Webb, Esq.

*Counsel to Michael McEvoy*

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, New York 10036
By:    Scott M. Berman, Esq.
        Eric Seiler, Esq.
        Jeffrey C. Fourmaux, Esq.
        Alexander D. Levi, Esq.

*Attorneys for Defendants Gareth Turner and Mark Beith*

KASOWITZ, BENSON, TORRES LLP
1633 Broadway
New York, New York 10019
By:    Robert Novick, Esq.
        Howard W. Schub, Esq.
        David S. Rosner, Esq.

*Special Counsel to the Chapter 7 Trustee*

---

\*\*  This amended memorandum decision and order reflects the changes set forth in the Court's Order Granting
     Motion of Gareth Turner to Correct Certain Clerical Mistakes or Mistakes Arising From Oversight or Omission
     in the Memorandum Decision and Order Granting Motion to Enforce the Automatic Stay [ECF No. 216].

HON. JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE:

Salvatore LaMonica, as the court appointed chapter 7 trustee (the "**Trustee**") for the estate of CIL Limited, the debtor herein ("**CIL**" or the "**Debtor**"), has filed a Motion to Enforce the Automatic Stay and Award Damages for Willful Stay Violations by the Putative Class Action Plaintiff and His Counsel [ECF No. 172] (the "**Motion**") pursuant to sections 105 and 362 of the Bankruptcy Code.  He is seeking to enjoin Michael McEvoy ("**McEvoy**") and his professionals from prosecuting the lawsuit (the "**Class Action**") he commenced by filing a complaint (the "**Florida Complaint**") on August 3, 2017, in the United States District Court for the Middle District of Florida against defendants Gareth Turner ("**Turner**"), Mark Beith ("**Beith**," and together with Turner, the "**Directors**"), and Apollo Global Management, LLC ("**Apollo**," with the Directors, the "**Defendants**"), and declaring such action void.[1]  The Trustee maintains that McEvoy's continued prosecution of the Class Action violates section 362(a)(3) of the Bankruptcy Code because the claims at issue in that action belong to CIL, and continued pursuit of that action will interfere with his adversary proceeding in this Court against the Directors and others (the "**Adversary Proceeding**").[2]  Turner and Beith support the Motion.[3]  McEvoy opposes it.[4]  He asserts that the claims at issue in the Class Action are not estate property because

---

[1]   As filed, the Motion sought an award of actual damages, costs and attorneys' fees under section 362(k) of the Bankruptcy Code.  The Trustee subsequently withdrew, without prejudice, his request for an award of damages and costs.  *See* Reply in Further Support of Motion of Chapter 7 Trustee to Enforce the Automatic Stay [ECF No. 183] (the "**Trustee's Reply**") at 2, n.2.

[2]   *See* Adv. Proc. No. 14-02442.

[3]   *See* Response of Gareth Turner and Mark Beith to the Motion of Chapter 7 Trustee to Enforce the Automatic Stay and Award Damages for Willful Stay Violations by Putative Class Action Plaintiff and His Counsel [ECF No. 176].

[4]   *See* Response in Opposition to Motion of Chapter 7 Trustee to Enforce the Automatic Stay and Award Damages for Willful Stay Violations by the Putative Class Action Plaintiff and his Counsel [ECF No. 180] (the "**Opposition**").

they are direct claims against the Defendants that belong to him and the members of the putative

class of Employee Investors (defined below) that he represents.

As explained below, based upon a review of the Florida Complaint, the Court finds that

the claims alleged therein are derivative claims that constitute estate property.  As McEvoy is

prosecuting those claims in violation of the automatic stay, the Motion is granted.

## Jurisdiction

The Court has subject matter jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157

and 1334 and the amended standing order of reference for bankruptcy cases and related

proceedings for the United States District Court for the Southern District of New York.  *See* Am.

Standing Order of Reference, No. M10-468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012) (Preska,

C.J.).  This is a core proceeding.  *See* 28 U.S.C. § 157(b)(2)(G).

## Facts[5]

### Background

In the spring of 2013, the Debtor was a holding company known as CEVA Investments

Limited, that was controlled by several investment funds under the control of Apollo.  Its sole

asset was its direct and indirect ownership of nearly 100% of the equity of CEVA Group PLC

("**CEVA Group**"), itself a holding company for certain operating companies comprising one of

the world's largest non-asset-based freight management and supply chain logistics companies

(i.e., the "**CEVA Logistics**" operating entities).  Its creditors consisted of the holders of certain

payment-in-kind notes (the "**PIK Noteholders**").  In March 2013, CIL acquiesced to and

---

[5]    Unless otherwise indicated, the facts recited herein are intended to reflect allegations contained in the Florida
and/or the Amended Complaint.  The Court assumes the truth of these allegations solely for purposes of adjudicating
the Motion.  *See Goldin v. Primavera Familienstiftung, TAG Assocs., Ltd. (In re Granite Partners, L.P.)*, 194 B.R.
318, 326 (Bankr. S.D.N.Y. 1996).  The Court is not making any findings as to the truth of the allegations in the
Florida Complaint or the Amended Complaint in connection with the Motion.

participated in an out-of-court restructuring and recapitalization of CEVA Group (the "**CEVA Restructuring**").  In one step in that restructuring transaction, CIL authorized CEVA Group to issue new shares of its stock (the "**CEVA Equity Transfer**") to a newly created Apollo affiliate called CEVA Holdings, LLC ("**CEVA Holdings**").  Although CIL held the same number of CEVA Group shares before and after that stock transfer, a consequence of the transfer was that CIL's interest in CEVA Group was reduced from 100% to 00.01%.  The newly issued shares eventually were used to equitize a portion of CEVA Group's indebtedness, including unsecured debt held by Apollo, and at the end of that process, Apollo, which prior to the CEVA Restructuring owned (through CIL) almost 100% of CEVA Group, held a 21% ownership interest in recapitalized CEVA Group.

CIL is a Cayman Islands exempted company.  After the CEVA Equity Transfer, but before all steps in the CEVA Restructuring were completed, CEVA Investments Limited changed its name to "CIL Limited" (i.e., the Debtor) and filed a petition commencing liquidation proceedings in the Grand Court of the Cayman Islands.  Those proceedings are on-going.  A few weeks later, on April 22, 2013, three PIK Noteholders filed an involuntary petition under chapter 7 of the Bankruptcy Code against CIL in this Court.  On May 14, 2013, this Court (Peck, J.) entered an order for relief against CIL and, thereafter, entered an order appointing the Trustee.

**Bankruptcy Court Litigation**

On July 3, 2013, the Trustee sought and thereafter obtained leave of this Court to conduct Rule 2004 discovery.[6]  Thereafter, he undertook an extensive discovery process to investigate the conduct that would eventually form the basis for the Adversary Proceeding that has been pending

---

[6]    *See* Motion of the Chapter 7 Trustee for an Order Pursuant to Bankruptcy Rule 2004 Directing the Production of Documents and the Taking of Depositions [ECF No. 37]; Order Permitting the Chapter 7 Trustee to Conduct Rule 2004 Discovery [ECF No. 55].

herein since December 2014.  The Directors, CEVA Group and CEVA Logistics Finance B.V.

are among the defendants named in the Trustee's complaint (the "**Amended Complaint**").[7]

Apollo is not named in the complaint, although its affiliate CEVA Holdings is, and Apollo's role

in the CEVA Equity Transfer and CEVA Restructuring is alleged throughout the Amended

Complaint and goes to the heart of several of the Trustee's theories of recovery.

The gravamen of the Amended Complaint is that the CEVA Restructuring was a

fraudulent transaction that was orchestrated by Apollo, for its benefit and to the detriment of the

PIK Noteholders, pursuant to which CIL was stripped of its only valuable asset – its equity

interest in CEVA Group – for no consideration.  *See* Am. Compl. ¶¶ 2-3.  The Amended

Complaint alleges various causes of action arising from the CEVA Equity Transfer.  Among

them are claims against the Directors for breach of fiduciary duties, including duties of loyalty

and fidelity to CIL, the duty to act in the *bona fide* best interests of CIL, a duty to avoid

situations in which the Director had an interest that conflicts or that might conflict with the

Director's duties to CIL, a duty to exercise powers as a director only for the purposes for which

they were conferred and not for any improper or collateral purpose, a duty to disclose personal

interests in contracts and transactions involving CIL, and a duty not to misapply or cause to be

misapplied any assets or property of CIL.  *See* Am. Compl. ¶¶ 179-90, and generally *en passim*.

The Trustee also alleges claims against CEVA Group and CEVA Holdings for aiding and

abetting, and dishonestly assisting and procuring, the Directors' breaches of duties.  *Id*. ¶¶ 191-

97.  Further, the Amended Complaint includes fraudulent transfer claims against CEVA Group

and CEVA Holdings for carrying out and receiving the CEVA Equity Transfer.  These consist of

---

[7]    *See* Chapter 7 Trustee's Amended Complaint for Fraudulent Transfer of the Debtor's Interests in CEVA Group
PLC, Related Tortious Acts, And Turnover of Property of the Estate [Adv. Proc. No. 14-02442, ECF No. 21].

claims for actual fraud – a transfer made with actual intent to hinder, delay, or defraud under 11

U.S.C. § 548(a)(1)(A), and analogous provisions of the U.K. Insolvency Act of 1986, Cayman

Islands Companies Law, and the New York Debtor and Creditor Law made applicable by 11

U.S.C. § 544(b) – in addition to claims for constructive fraudulent transfer under 11 U.S.C. §

548(a)(1)(B) and other applicable statutes.  *See* Am. Compl.  ¶¶ 133-62.  Recently, this Court

granted in part motions filed by the defendants to dismiss certain causes of action alleged in the

Amended Complaint.  *See LaMonica v. CEVA Group PLC (In re CIL Limited)*, No. 13-11272,

2018 WL 329893 (Bankr. S.D.N.Y. Jan. 5, 2018).

### Class Action Litigation

The CEVA Logistics entities are the product of Apollo's 2007 acquisition and

combination of TNT Logistics ("**TNT**"), a global logistics company based in Hoopdorf,

Netherlands, and EGL, Inc. ("**Eagle**"), a global freight management company based in Houston,

Texas.  Florida Compl. ¶ 7.  Beginning in 2007, certain management-level employees of TNT,

and later, after the creation of CEVA Logistics, certain of their counterparts at Eagle

(collectively, the "**Employee Investors**"),[8] exercised the opportunity to purchase restricted

shares of stock (the "**CIL Class A Shares**") in the entity that would become CIL.  *Id*. ¶ 19.  At

all times relevant to the Florida Complaint, the Employee Investors held roughly 344,000 shares

of CIL's Class A Shares, which represented approximately 8.6% of CIL's Class-A equity.  *See

id.* ¶ 23.  McEvoy contends that Apollo induced the Employee Investors to invest in CEVA

Logistics by representing to them that they "would obviously participate in the management of

---

[8]    The putative class for which McEvoy seeks certification is defined as consisting of current and former
employees of CEVA Logistics who owned CIL Class A Shares on or before March 31, 2013, excluding the
Defendants, the officers and directors of CIL and CEVA Group and their immediate families, legal representatives,
heirs, successors and assigns.  Florida Compl. ¶ 13.

CEVA Logistics and that CEVA Logistics was to be operated as a 'partnership' based upon good

faith, mutual trust, and confidence." *Id*. ¶ 21.[9]  They held those shares at the time of the CEVA

Restructuring.  The Employee Investors acknowledge that the value of their investment in CIL is

derived from the value of CIL's ownership interest in the CEVA Group equity. *Id*. ¶ 55.  They

maintain that the CEVA Restructuring, generally, and the CEVA Equity Transfer, in particular,

destroyed the value of their interests in the CIL Class A Shares, because through that transfer,

"CIL agreed to allow CEVA Holdings to obtain all the equity in CEVA Global in exchange for

no consideration." *Id*. ¶ 37.  *See also id*. ¶ 15 ("[A]ll Employee Investors have been damaged by

Defendants, which caused members of the Employee Investors to lose the value of their

restricted stock through the [CEVA] Restructuring and the subsequent fraudulent valuation of the

Employee Investors' restricted stock.").

The allegations central to McEvoy's complaint essentially track the Trustee's allegations

in the Amended Complaint.  First, like the Trustee, McEvoy maintains that CIL's interest in

---

[9]    More specifically, McEvoy asserts that the following representations were made in a 2006 PowerPoint
presentation that Apollo allegedly distributed to the Employee Investors:

> a. "We are partners and we as sponsors commit ourselves personally and institutionally to the
> vision[;]"

> b. "Apollo is focused on creating value for all stakeholders (employees, customers and owners)
> [...;]"

> c. "The program is structured to reflect our philosophy that management and the Sponsors should be
> partners with aligned incentives to generate substantial equity value and share in gains[;]"

> d. "The combination of leverage provided to management through options as well as the equity
> returns on the deal will create significant investment returns. Apollo and management will create a
> 'business case' that all parties will 'own' and will be the basis for driving shareholder value[;]"

> e. "Bottom Line: Apollo and Management will be aligned to share in value creation[;]"

> f. "Fair Market Value is generally determined by the Board of Directors of the Company in good
> faith, utilizing a number of factors[.]"

Florida Compl. ¶ 20.

CEVA Group had value at the time of the CEVA Equity Transfer and that the Directors and

Apollo not only knew it, but that they tried to conceal it.  Thus, following the Trustee's lead, he

alleges that in September 2012, the Directors determined that CIL's Class A Shares were worth

€50/share (*see* Florida Compl. ¶¶ 23, 60), but that in January 2013, at the request of Stan Parker

of Apollo, Morgan Stanley produced a valuation report that showed that CEVA Group had little,

if any, value, and that at Beith's request, Ernst & Young produced a valuation report that

likewise showed that it had no value.  *See id.* ¶¶ 47, 50.  McEvoy also asserts, as does the

Trustee, that both reports are flawed and unreliable, and were produced in an effort to

misrepresent the value of the CIL Class A Shares.  *See id.* ¶¶ 49-50, 62.  McEvoy also alleges

that the CEVA Equity Transfer was not the product of an arm's length transfer, and that by

reason of that transfer, CIL was damaged, because it received nothing in consideration for the

loss of its ownership interest in CEVA Group.  *See id.* ¶¶ 31-32, 37, 64.  To that end, like the

Trustee, McEvoy lays the blame for CIL's losses at the feet of the Directors and Apollo and

asserts that (i) the Directors had disabling conflicts of interest because, at all times relevant to the

CEVA Equity Transfer, they were employed by Apollo and had interests in the Apollo funds in

control of CIL (*id.* ¶¶ 9-10, 43a.); (ii) the Directors took direction from Apollo and CEVA

Group, in complete disregard for their fiduciary duties to the Employee Investors (*id.* ¶¶ 27, 35);

and (iii) that the professionals the Directors retained to represent CIL in the CEVA Restructuring

Transaction acknowledged those conflicts and that actions were taken in complete disregard for

the Employee Investors' interest.  *See id.* ¶¶ 28-29.  McEvoy joins the Trustee in contending that

the CEVA Restructuring was not the product of an arm's length transaction between CIL and

CEVA Group.  *Id.* ¶ 44.  Likewise, he alleges that to effectuate the CEVA Restructuring and in

an effort to give it the appearance that it was an arm's length transaction, the Directors (a) caused

conflicted directors to resign from their positions in CIL and CEVA Group (*id.* ¶ 31); (b) created

the "illusion" that the Directors were independently evaluating the CEVA Restructuring

transaction by deeming an *ad hoc* telephone discussion among them as a board meeting during

which they evaluated the transaction (*id.* ¶ 32); and (c) gave presentations regarding the CEVA

Restructuring to certain of CEVA Group's creditors, but not to the Employee Investors.  *Id.* ¶ 33.

Further, he echoes the Trustee in asserting that the Directors tried to conceal the CEVA

Restructuring, and to ensure secrecy of the transaction, immediately after the CEVA Equity

Transfer, the Directors caused CIL to file for provisional liquidation in the Cayman Islands,

under an anonymous name of ABC Limited.  *Id.* ¶ 39.

The Florida Complaint identifies the common questions of law and fact that

"predominate" as:

> Whether the Defendants, in orchestrating and executing the [CEVA]
> Restructuring, perpetuated a fraud upon the Employee Investors which caused
> damages to the Employee Investors;
>
> Whether the Defendants, in orchestrating and executing the [CEVA]
> Restructuring, breached their respective fiduciary duties owed to the Employee
> Investors which caused damages to the Employee Investors; and
>
> To what extent the Employee Investors sustained damages and what is the proper
> measure of damages.

Florida Compl. ¶ 17.  The complaint asserts damage claims against the Defendants for fraud (*id.*

¶¶ 56-70) and breach of fiduciary duty (*id.* ¶¶ 71-85).  It seeks "to recover damages caused by

[their] fraudulent orchestration and implementation of a corporate restructuring in the Spring of

2013 . . . that resulted in the Employee Investors' individual monetary losses totaling in excess of

€14,000,000."  *Id.* ¶ 1.

Following the commencement of the Class Action, during August and September 2017,
representatives of the CIL estate contacted McEvoy's counsel to advise him that prosecution of
the Class Action violated the automatic stay and to request that he cease pursuing it. *See* Motion
¶ 19. When McEvoy continued to prosecute the action, the Trustee sent a letter formally
demanding that McEvoy withdraw and dismiss it. *See id.* ¶ 20; *see also* Kasowitz Letter dated
9/20/17 (Motion, Ex. E). As of the date hereof, the Class Action has been "stayed until further
Order" and administratively closed. *See* Endorsed Order Granting Joint Unopposed Motion to
Stay Case [Case No. 3:17-cv-00891-TJC-MCR, ECF No. 25]; *see also* Opp'n at n.1
("undersigned counsel and counsel for Defendants in the Florida Action have mutually agreed to
stay the Florida Complaint.").

## Discussion

Section 362(a)(3) of the Bankruptcy Code stays "any act to obtain possession of property
of the estate or of property from the estate or to exercise control over property of the estate." 11
U.S.C. § 362(a)(3). Section 541(a)(1) of the Bankruptcy Code broadly defines property of the
estate to include "all legal or equitable interests of the debtor in property" wherever located and
by whomever held. 11 U.S.C. § 541(a)(1). *See also Chartschla v. Nationwide Mut. Ins. Co.*, 538
F.3d 116, 122 (2d Cir. 2008) ("[E]very conceivable interest of the debtor, future, nonpossessory,
contingent, speculative, and derivative, is within the reach of § 541.") (citations omitted). That
includes causes of action that belong to the estate. *In re Soundview Elite Ltd.*, 565 B.R. 534, 543
(Bankr. S.D.N.Y. 2017) (citations omitted). *See also Grubin v. Rattet (In re Food Mgmt. Grp.,
LLC)*, 380 B.R. 677, 690 (Bankr. S.D.N.Y. 2008) ("Upon the commencement of a bankruptcy
case, the trustee succeeds to a debtor's rights, including the ability to sue and be sued."). The
trustee has the exclusive standing to prosecute estate causes of action; the automatic stay bars all

other parties in interest from doing so. *See McHale v. Alvarez (In re The 1031 Tax. Grp. LLC)*,

397 B.R. 670, 679 (Bankr. S.D.N.Y. 2008) ("When the trustee has standing to sue, the automatic

stay prevents creditors or shareholders for asserting the claim notwithstanding that outside of

bankruptcy, they have a right to do so.") (internal citations and quotations omitted). Estate

causes of action include claims that could have been asserted by the debtor against third parties

as of the petition date. *See In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) (explaining that

causes of action "are considered property of the bankruptcy estate 'if the claim existed at the

commencement of the filing and the debtor could have asserted the claim on his own behalf

under state law.'" (citing *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown,

Inc.*, 296 F.3d 164, 169, n.5 (3d Cir. 2002)); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff

Inv. Sec. LLC*, 568 B.R. 203, 209 (Bankr. S.D.N.Y. 2017) ("The principal question is whether the

PTAC asserts claims that are derivative or duplicative of the claims that the Trustee asserted or

could have asserted against the Picower Parties, or instead, asserts direct claims that belong to

the Fox Parties."). In contrast, estate property does not include "a cause of action that belongs

solely to a debtor's creditors or shareholders." *In re Lehr Construction Corp.*, No. 11-10723,

2015 WL 5174467, at *5 (Bankr. S.D.N.Y. Sept. 2, 2015). *See also Goldin v. Primavera

Familienstiftung, TAG Assocs., Ltd. (In re Granite Partners, L.P.)*, 194 B.R. 318, 323-24 (Bankr.

S.D.N.Y. 1996) (noting that "[i]f the cause of action belongs to the estate, the trustee has the

exclusive standing to assert it; conversely, if the cause of action belongs solely to the

shareholders or creditors, the trustee has no standing to assert it.") (citing *Schertz-Cibolo-

Universal City, Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Trust)*, 25 F.3d 1281,

1284 (5th Cir. 1994)).

"Property interests in bankruptcy are created and defined by state law, unless federal law requires a different result." *In re Cabrini Med. Ctr.,* 489 B.R. 7, 19 (S.D.N.Y. 2012) (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)). *See also Hirsch v. Arthur Andersen & Co*., 72 F.3d 1085, 1093 (2d Cir. 1995) ("Whether the rights belong to the debtor or the individual creditors is a question of state law.") (internal citations and quotations omitted). CIL is incorporated in the Cayman Islands. Under New York law, the internal affairs doctrine "generally requires that questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 191 (S.D.N.Y. 2006) (internal quotation omitted). Cayman Islands law generally bars shareholders from asserting derivative claims. *Varga v. McGraw Hill Financial Inc*., 147 A.D. 3d 480, 481 (1st Dep't 2017); *see also Shenwick v. HM Realty Fund*, 108 A.D. 3d 638, 639 (1st Dep't 2013) (noting that Cayman Islands law "prohibits shareholder derivative actions."). In assessing whether a claim is derivative, Cayman Islands law "looks to whether the shareholder's loss is merely 'a reflection of the loss suffered by the company' and 'would be made good if the company enforced its full rights against the party responsible.'" *Davis v. Scottish Re Grp. Ltd.,* 138 A.D.3d 230, 234 (1st Dep't 2016) (quoting *Johnson v. Gore Wood & Co*., [2002] 2A.C. 1, 36) *rev'd on other grounds* 30 N.Y.3d 247 (2017). Accordingly,

> "[u]nder Cayman law, shareholders may not recover 'reflective losses,' which are losses that the company itself could recover if it chose to initiate legal action. The Cayman courts have held that [w]here a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss by the company ... there is no discretion involved. A shareholder cannot sue in a personal capacity for a loss unless that loss is distinct from that of the company, and this rule applies regardless of whether the company itself intends to sue."

*Id.* (internal quotations and citations omitted).[10]   That mirrors the law in this circuit.   "If a claim

is a general one, with no particularized injury arising from it, and if that claim could be brought

by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors

are bound by the outcome of the trustee's action."   *St. Paul Fire & Marine Ins. Co. v. PepsiCo,*

*Inc.* ("***St. Paul Fire & Marine***"), 884 F.2d 688, 701 (2d Cir. 1989).   A "derivative claim" is a

kind of general claim that only a trustee has standing to pursue.   *In re Soundview Elite Ltd.*, 565

B.R. 534, 544 (Bankr. S.D.N.Y. 2017) (citations omitted).   For these purposes, those are claims

that "arise[] from the harm done to the estate" and that "seek[] relief against the third parties that

pushed the debtor into bankruptcy[.]"   *Picard v. JP Morgan Chase & Co. (In re Bernard L.*

*Madoff Inv. Sec. LLC)*, 721 F.3d 54, 70 (2d Cir. 2013).   *See also Tronox Inc. v. Kerr-McGee*

*Worldwide Corp. (In re Tronox Inc.)*, 855 F.3d 84, 100 (2d Cir. 2017) (noting that "so-called

'derivative claims' [are] claims 'based on rights "derivative" of, or "derived" from, the

debtor's[.]'" (quoting *Marshall/Madoff*, 740 F.3d at 88)).   Claims based upon breach of fiduciary

duty belong to the corporation.   *See Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844,

851 (Bankr. S.D.N.Y. 1994).   However, upon the commencement of a bankruptcy case, the

trustee "is the only person with standing to bring those claims, and absent their abandonment or

relief from the automatic stay, the creditors are barred from asserting them."   *Id.*   The parties

agree, and the Court finds, that as there are no substantive differences between U.S. and Cayman

Islands law on whether a shareholder has standing to assert derivative claims against third parties

in a bankruptcy case, the Court will apply U.S. law in resolving the Motion.

---

[10]   The Appellate Division affirmed the Supreme Court's decision to dismiss the plaintiff's derivative actions in part because he had not first sought leave of court to commence such derivative action, as required under Rule 12A of the Rules of the Grand Court of the Cayman Islands.   On appeal, the New York Court of Appeals reversed, finding that Rule 12A was a procedural rule rather than a substantive one and that it had no applicability to New York courts.   *See Davis v. Scottish Re Grp. Ltd.*, 30 N.Y.3d 247, 254-56 (2017).

McEvoy's claims against Apollo and the Directors are predicated on the same bad acts alleged against them by the Trustee in the Amended Complaint.  Alone, that does not bar him from prosecuting the Florida Complaint as "it is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct."  *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 585 (5th Cir. 2008).  Indeed, sometimes "the same factual allegations may give rise to both derivative and independent claims[.]"  *Fox v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 531 B.R. 345, 351 (S.D.N.Y. 2015) (citations omitted).  McEvoy contends that is the case here.  He agrees that "as a question of law," derivative claims belong solely to the bankruptcy estate.  Opp'n at 4.  However, he says that the claims he is asserting in the Florida Complaint are direct claims against the Directors and Apollo because: (i) Cayman Islands law recognizes a specific species of "quasi-partnerships" that provide for direct actions against directors and majority shareholders; (ii) Apollo made representations to the Employee Investors that bring it within the "province of the direct action by the Employee Investors under substantive Cayman Islands law;" and (iii) the nature of the fraudulent equity transfer to an Apollo-affiliate (i.e., the CEVA Equity Transfer to CEVA Holdings) coupled with the post-petition implementation of a so-called "Restructuring Agreement" in which the Employee Investors were not permitted to participate, establishes a direct breach of the respective fiduciary duties of both Apollo and the Directors to McEvoy and the Employee Investors asserted in the Florida Complaint under Cayman Islands substantive law.  *Id*. at 4-6.  McEvoy also alleges that the damages that he and the Employee Investors suffered

"are personal and distinct from any damages allegedly suffered by CIL, to the extent that CIL

suffered any damages at all." *Id.* at 7.[11]

----

[11]    McEvoy makes three additional, albeit secondary, arguments in opposition to the Motion. They are discussed below.

First, he contends that the Trustee is asserting that the claims at issue in the Florida Complaint are property of the estate, but that McEvoy, as an "implied creditor" has not filed a proof of claim. He says that the Trustee is taking that position even though he (i) failed to provide notice of the bankruptcy litigation to McEvoy or any of the other Employee Investors; (ii) failed to convene a meeting of equity security holders as required by sections 341(b) and (d) of the Bankruptcy Code; and (iii) failed to find any potential claims of the Employee Investors to be worthy of action under sections 507(a)(4) and (a)(5) of the Bankruptcy Code. *See* Opp'n at 9. The Court finds no merit to those contentions. As an initial matter, the Court understands the Trustee to be asserting that the Employee Investors are violating the automatic stay because they are asserting claims that belong to the estate, not because they have failed to file claims in this case. The case docket reflects that the section 341(a) meeting has been continued from time to time, and the record of this Motion reflects that the Trustee has communicated "[f]or years" with a group of employee investors represented by the Seattle law firm of Hills Clark Martin & Peterson. *See* Trustee's Reply at 12, n.5. To that end, the Trustee contends that his counsel "consistently and promptly responded to [the group's] requests for information and listened to its comments." *Id.* Further, the Trustee explains that he did not communicate with counsel for McEvoy and the Employee Investors until this past summer because counsel was not known to the Trustee until then. Finally, sections 507(a)(4) and (5) have no bearing on claims that the Trustee (or anyone else) can or should bring against third parties. Instead, those provisions establish the relative priority for payment of claims against a debtor by employees on account of unpaid prepetition wages and benefits and for contribution to employee benefit plans, respectively.

Next, McEvoy contends that "while asserting that [his] claims are property of the estate, the Trustee inexplicably failed to . . . assert claims and request relief uniquely available to the Employee Investors." Opp'n at 9. He maintains that Cayman Islands substantive law allows for equitable orders requiring that majority shareholders buyout minority shareholders and U.S. courts should apply that substantive law in the context of an equitable claim. *Id.* at 9-10. The Court finds no merit to those assertions because it is well settled that bankruptcy trustees lack authority and standing to assert claims that belong to minority shareholders. *See Caplin v. Marine Midland Grace Tr. Co. of N.Y.*, 406 U.S. 416 (1972) (stating that a trustee is not empowered to bring suit "for the benefit of a specific class of creditors"); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 116, 118 (2d Cir. 1991) ("a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself.") (citations omitted).

Finally, citing *Gage v. Rosenbaum (In re Rosenbaum)*, No. 08-43029, 2010 WL 1856344 (Bankr. E.D. Tex. May 10, 2010), McEvoy contends that bankruptcy courts can fashion equitable remedies for minority shareholders seeking damages for breach of fiduciary duties and fraud where there are no adequate remedies at law due to defunct companies in liquidation. Opp'n at 10. In *Rosenbaum*, the plaintiff, Gage, a minority shareholder in a closely held company that he owned with the majority shareholders—James and Sandra Rosenbaum—had a lawsuit against the Rosenbaums pending in Texas state court when the Rosenbaums filed their chapter 7 bankruptcy case. 2010 WL 1856344, at *6. In their bankruptcy petition and schedules, the Rosenbaums listed Gage's claim at $375,000; however, Gage's filed proof of claim asserted a claim for $1,159,852.41, plus attorney's fees. *See id.* The Rosenbaums objected to Gage's claim, and Gage filed an adversary proceeding against them, seeking to liquidate his claims for minority shareholder oppression, breach of fiduciary duty, common law fraud, statutory fraud, and theft. Gage's adversary complaint also sought a determination that his claim was not dischargeable by the Rosenbaums' chapter 7 bankruptcy. *See id.* at *1. *Rosenbaum* has no relevance factually or legally to the Motion. In *Rosenbaum*, the plaintiff sued individual debtors to liquidate his claim and determine the dischargeability of this claim. In contrast, here, McEvoy is suing non-debtor third parties and the matter before the Court is whether in doing so, McEvoy is violating the automatic stay. Moreover, *Rosenbaum* does not stand for the proposition that a bankruptcy court can fashion equitable remedies for minority shareholders where there are no adequate remedies at law for defunct companies because the Rosenbaums were individual bankrupts and the remedy granted by the

In assessing whether McEvoy is asserting direct, and not derivative claims, the Court "look[s] to the nature of the wrongs alleged in the [Florida Complaint] without regard to [McEvoy's] designation." *In re Granite Partners*, 194 B.R. at 325 (citations omitted). A cause of action "belongs to a specific creditor . . . if the alleged injury is 'primary,' 'particularized,' 'special,' 'direct,' 'personal,' 'distinct,' or 'individualized' to [that] creditor []." *In re Lehr Construction Corp.*, No. 11-10723, 2015 WL 5174467, at *5 (Bankr. S.D.N.Y. Sept. 2, 2015) (citations omitted). Thus, the Court must "inquire into the factual origins of the injury and, more importantly, the nature of the legal claims asserted." *Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)* ("**Madoff/Marshall**"), 740 F.3d 81, 89 (2d Cir. 2014) (citation omitted). In doing so, the Court will not assess the legal sufficiency of the Florida Complaint. *See, e.g.*, *McHale v. Alvarez (In re The 1031 Tax Grp., LLC)*, 397 B.R. 670, 679 (Bankr. S.D.N.Y. 2014) (noting that in determining whether plaintiff is asserting derivative or direct claims, the court "does not pass on the legal sufficiency of the claims."). However, the Court will consider whether the particularized factual allegations in the Florida Complaint assert direct claims against the Defendants, or merely derivative claims that belong to the estate. *See, e.g.*, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284, 299 (Bankr. S.D.N.Y. 2016) (in assessing whether creditor's cause of action violated court's permanent injunction order barring litigation against the estate, bankruptcy court had to "determine whether the particularized factual allegations in the Complaint assert a claim that is derivative or duplicative of the Trustee's fraudulent transfer claims against the [defendants] . . . .") *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 565 B.R. 510 (S.D.N.Y. 2017).

---

*Rosenbaum* Court was a liquidated damage claim in the amount of $324,400, plus interest, which was determined to be non-dischargeable. *Id.* at 13.

McEvoy has failed to allege direct or particular damage claims in favor of the Employee Investors against the Defendants. In his complaint, McEvoy acknowledges that the value of the Employee Investors' investment in CIL is derived from the value of CIL's ownership interest in the CEVA Group equity. Florida Compl. ¶ 55. His grievance is that CIL's agreement to allow CEVA Holdings to obtain the new equity issued by CEVA Group for no consideration "caused members of the Employee Investors to lose the value of their restricted stock[.]" *Id.* ¶ 15. *See also id.* ¶ 1 ("The class is seeking to recover damages caused by Defendants' fraudulent orchestration and implementation of [the CEVA Restructuring] that resulted in the Employee Investors individual monetary losses totaling in excess of €14,000,000."). In support of both counts alleged in the complaint, McEvoy attributes that loss solely and directly to the reduction of CIL's interest in CEVA Group from 100% to 00.01%, by reason of the CEVA Equity Transfer.[12] Indeed, McEvoy does not dispute that the Employee Investors' relative equity interests in CIL and their rights under the CIL Class A Shares and as employees of CEVA Logistics were unchanged by either the CEVA Equity Transfer, or the subsequent conversion of CEVA Group debt to CEVA Holdings equity. *Cf. Sobchack v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs)*, 17 F.3d 600, 605 (2d Cir. 1994) ("Where the wrong committed by a third party consists of injury inflicted on stockholders' rights rather than upon the corporation, the stockholders' action seeks relief awarded directly in their favor against the third party."). McEvoy has not pled independent, direct claims against the Defendants because he has not alleged injuries "particularized" to the Employee Investors that can be traced to the Defendants'

---

[12]    In support of the fraud claim, McEvoy alleges that "beginning in October 2012 [the Defendants], knowingly and willingly, began to plan an unlawful scheme that would damage the Employee Investors by extinguishing the value of their restricted shares in CIL, while retaining equity value in and majority control in CEVA Holdings for themselves." Florida Compl. ¶ 61. He alleges that in furtherance of that scheme, the "Defendants knowingly and willingly transferred all equity in CEVA Group to CEVA Holdings for no consideration, and gave improper value and consideration to the Employee Investors." *Id.* ¶ 64. He makes identical allegations in support of the breach of fiduciary duty claim. *Id.* ¶¶ 78, 81.

actions. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995) ("when

creditors . . . have a claim for injury that is particularized as to them, they are exclusively entitled

to pursue that claim, and the bankruptcy trustee is precluded from doing so."). He has failed to

do so because he has not, and cannot, assert that the injury can be directly traced to the

Defendants' conduct. *See Madoff/Marshall*, 740 F.3d at 89 ("[A]n injury is said to be

'particularized' when it can be 'directly traced to [the third party's] conduct.'" (quoting *St. Paul

Fire & Marine*, 884 F.2d 688, 704 (2d Cir. 1989)). The loss McEvoy complains of is not distinct

from, but rather, is derivative of, the loss suffered by the CIL estate when CIL's interest in

CEVA Group was all but eliminated after the CEVA Equity Transfer. *See id.* ("[A] derivative

injury is based upon a 'secondary effect from harm done to [the debtor][.]'") (quoting *St. Paul

Fire & Marine*, 884 F.2d at 704)).

      The Court finds no merit to McEvoy's assertions to the contrary. First, McEvoy alleges

that the damages that he and the other Employee Investors suffered "are personal and distinct

from any damages allegedly suffered by CIL, to the extent that CIL suffered any damages at all."

Opp'n at 7. But, as demonstrated above, that is just not so. Moreover, McEvoy concedes as

much as he acknowledges that the "two discrete groups" that were harmed by the CEVA Equity

Transfer were the PIK Noteholders and the Employee Investors. *Id.* at 8. McEvoy also denies

that the CEVA Equity Transfer harmed CIL or CEVA Logistics' business in any "non-illusory"

way. *Id.* However, as previously noted, CIL's interest in the CEVA Group was directly and

adversely impacted by the CEVA Equity Transfer, since it fell from 100% to 00.01%.

Moreover, the impact of that transfer on CEVA Logistics' business is irrelevant to whether

McEvoy can plead that the Employee Investors suffered personal and direct injuries. Finally,

McEvoy asserts that (i) in the CEVA Restructuring, after the CEVA Equity Transfer, Apollo

exchanged $295 million of CEVA Group debt for CEVA Holdings stock; (ii) it is likely that

Apollo acquired the debt at a deep discount; and (iii) it might be easily assumed that Apollo

made a significant amount of money when it exchanged its debt for stock and that it did so at the

expense of the minority shareholders. *Id.* 7-8. However, Apollo's alleged "profit" on its

exchange of its CIL debt does not impact the Employee Investors' standing to assert the claims

in the Florida Complaint because the harm they complain of is the loss in value of their CIL

Class A Shares. That harm was caused by the CEVA Equity Transfer, not Apollo's exchange of

its debt for CEVA Holdings equity, and McEvoy does not allege anything to the contrary.

The case law that McEvoy relies on is not to the contrary and does not support his

assertion that the Employee Investors have suffered direct injuries. *See* Opp'n at 6-7 (citing

*Gentile v. Rossette*, 906 A.2d 91 (Del. 2006), *F5 Capital v. Pappas*, 856 F.3d 61 (2d Cir. 2017),

and *Abbey v. Modern Africa One, LLC*, 305 B.R. 594 (D.D.C. 2004)). *Gentile* stands for the

proposition that under Delaware law, a public shareholder will have a direct claim for breach of

fiduciary duties (even as the company can assert a derivative claim) where (i) a shareholder

having majority or effective control causes the corporation to issue "excessive" shares of its

stock in exchange for assets of the controlling shareholder that have a lesser value; and (ii) the

exchange causes an increase in the percentage of the outstanding shares owned by the controlling

shareholder, and a corresponding decrease in the share percentage owned by the public

shareholders, even if the public shareholders held only a minority interest in the stock at the time

of the challenged transaction. 906 A.2d at 101-02.[13] But that is not what happened here. The

---

[13]    In *Gentile*, SinglePoint Financial Inc.'s largest shareholder, Rosette ("**Rossette**"), was also its largest creditor, with a claim of approximately $3 million. Rossette determined that he would convert approximately $2 million of that indebtedness into SinglePoint stock. At that time, the contractual conversion rate of $0.50 of debt per share of stock was in effect. Nonetheless, the SinglePoint board (of which Rossette was one of two directors) resolved that SinglePoint would convert Rossette's debt into equity at a rate of $0.05 per share. As a result of that conversion, Rossette's equity interest in SinglePoint rose from 61.19% to 93.49%. The minority shareholders' interest was reduced correspondingly from 38.81% to 6.51%. After the debt conversion, Singlepoint merged with Cofiniti, and

CEVA Equity Transfer did not impact the relative economic and voting interests of McEvoy, the Employee Investors or any other CIL shareholder; those shareholder rights remained unchanged after the transfer. Instead, the CEVA Equity Transfer adversely impacted CIL's interest in CEVA Group by diluting its shares by almost 100%. That gives rise to a derivative claim belonging to CIL, not a direct claim of the shareholders.

In *F5 Capital v. Pappas,* 856 F.3d 61 (2d Cir. 2017), the Second Circuit affirmed the lower court's dismissal of the plaintiff-minority shareholder's wrongful equity dilution claim as a derivative claim under Delaware law, explaining that although a separate, direct claim by a minority shareholder can be asserted if the requirements set forth in *Gentile* are met, F5 Capital's dilution claim did "not fall into the small group of direct dilution claims that *Gentile* describes" because it could not establish the requisite control by the majority shareholder defendants, and the transaction at issue did not dilute F5 Capital's minority interests.[14] Thus, *F5 Capital v.*

---

approximately, 18 months later, Cofiniti filed for bankruptcy and was liquidated. Eventually, a number of minority shareholders sued Rossette and others, for damages occasioned by their alleged breach of fiduciary duty contending, among other things, that the debt conversion was an improper extraction of the economic value and voting power from their minority interest. At that time, it was settled under Delaware law that a company held a derivative claim and shareholders held a direct claim for damages where (i) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling shareholder that have a lesser value; and (ii) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling shareholder, and a corresponding decrease in the share percentage owned by the minority shareholders. The courts reasoned that because the means used to achieve that result is an overpayment (or over-issuance) of shares to the controlling shareholder, the corporation was harmed and had a claim to compel the restoration of the value of the overpayment. *Id.* "That claim, by definition, is derivative." *Id.* They also found that the minority shareholders had a separate, and direct claim, arising out of that transaction. "Because the shares representing the 'overpayment' embody both economic value and voting power, the end result is that this type of transaction is an improper transfer - or expropriation - of economic value and voting power from the public shareholders to the majority or controlling stockholder[.]" *Id.* The Delaware Court of Chancery dismissed the claim on the grounds that to give rise to a direct claim, the dilution must result in a "material decrease" in voting power. *See Gentile v. Rossette,* No. CIV.A. 20213-NC, 2005 WL 2810683, at *4-5 (Del. Ch. Oct. 20, 2005), rev'd, 906 A.2d 91 (Del. 2006). That court held that there was no "material" decrease in voting power because the plaintiffs were minority shareholders of SinglePoint both before and after the debt conversion. *See id.* On appeal, the sole issue before the Delaware Supreme Court was whether the reduction in the voting power of the public shareholders had to be from majority to minority shareholder status for the public shareholders to have standing to assert a direct claim against the fiduciaries responsible. 906 A.2d at 93. The Delaware Supreme Court held that the answer is "no" and reversed the Delaware Chancery Court's dismissal of the claim and remanded the matter to that court. *Id.* at 103.

[14]    In *F5 Capital v. Pappas*, the plaintiff, a minority shareholder of a Marshall Islands shipping company, Star Bulk, asserted four causes of action—three of which were derivative, and one purportedly direct, for wrongful

*Pappas* merely supports the holding in *Gentile*, which, as discussed above, do not apply to the facts here.

Finally, in *Abbey v. Modern Africa One, LLC*, 305 B.R. 594 (D.D.C. 2004), the district court dismissed the putative claims of certain minority shareholders of a chapter 7 debtor, Warsun, against the majority shareholders for interference with their economic advantage of their interests in a wholly owned subsidiary of Warsun and mismanagement of Warsun, on the grounds that they were derivative claims that belonged to the debtor. The claims that survived as direct claims (subject to further proceedings) were a claim that the majority shareholders converted the minority shareholders' interests in the debtor and a breach of fiduciary duty claim based upon injuries allegedly inflicted by the majority shareholders on the minority shareholders, but not the debtor. *Id*. at 606-07.[15] That is the opposite of what transpired here. That case is

---

equity dilution—against individual board members and affiliates of Star Bulk relating to three separate, and allegedly self-dealing transactions. 856 F.3d at 69. The District Court found that plaintiff's wrongful equity claim was derivative, not direct, and dismissed F5 Capital's complaint because it had not made the requisite pre-suit demand and had failed to plead demand futility under Fed. R. Civ. P. 23.1(b)(3)(B). In affirming the lower court decision, the Second Circuit held, *inter alia*, that F5 Capital's wrongful dilution claim was properly derivative. In so holding, the Second Circuit explained that under Delaware law, which the parties agreed was applicable, a wrongful equity dilution claim is "not normally regarded as direct" because "the alleged injury is to the corporation" and it "falls upon all shareholders equally and falls only upon the individual shareholder in relation to his proportionate share of stock as a result of the direct injury being done to the corporation." *Id.* at 72 (citing *Feldman v. Cutaia*, 951 A.2d 727, 732 (Del. 2008). Notwithstanding this general rule, the Second Circuit noted that under Gentile v. Rossette, 906 F.2d 91 (Del. 2006), a direct claim may lie only where: (1) a stockholder having majority or effective control causes the company to issue excessive stock in exchange for assets of the controlling stockholder with a lesser value, and (2) such exchange causes an increase in ownership by the controlling shareholder and a decrease in ownership by the minority shareholder. *See id.* The Second Circuit went on to conclude, however, that F5 Capital did not meet these two requirements in that it did not sufficiently allege that the three groups of defendants constituted a single control group, and in any event, the transactions complained of resulted in ownership decreases (as opposed to increases) for the defendants. *See id.* at 74-75. Thus, in *F5 Capital v. Pappas*, the Second Circuit actually affirmed the rule that equity dilution claims are derivative, and that under the facts there, the narrow exception to the rule did not apply.

[15]   In *Abbey*, the plaintiffs were minority shareholders of Warsun International Communications Inc. ("**Warsun**"), a company that was being liquidated under chapter 7 of the Bankruptcy Code. Outside of the bankruptcy case, the plaintiffs sued various individuals and an entity (collectively, "**Modern Africa**"), as Warsun's majority shareholders, in federal district court to recover compensatory and punitive damages, attorneys' fees and costs and injunctive relief in connection with Modern Africa's alleged interference with plaintiffs' ownership interest in Warsun's Nigerian subsidiary ("**Warsun Nigeria**"). 305 B.R. at 597. After Warsun commenced its bankruptcy case, but before the plaintiffs commenced the adversary proceeding against Modern Africa, the bankruptcy court authorized Warsun to sell all of its assets to Modern Africa pursuant to section 363 of the Bankruptcy Code, "free

irrelevant because McEvoy has not alleged a claim against Apollo or the Directors based upon the alleged interference with the Employee Investors' ownership interests in CIL, and he cannot do so. As noted previously, their interests in CIL were not altered by the CEVA Equity Transfer. Thus, the Court finds that the Florida Complaint does not allege direct, particularized claims against Apollo or the Directors.

McEvoy has also failed to allege the non-damage elements of a direct cause of action against them. Under Cayman Islands law, directors only owe fiduciary duties to the company for which they serve, not to its investors or shareholders. *See Wimbledon Fin. Master Fund, Ltd. v. Weston Capital Mgmt. LLC*, 2017 N.Y. Misc. LEXIS 2725, at *49-50 (N.Y. Sup. Ct. July 17, 2017) (citations omitted); *Davis v. Scottish Re Grp., Ltd.*, 28 N.Y.S.3d 18 (1st Dep't 2016) ("Under Cayman Islands law, a director does not owe any fiduciary duties to minority shareholders solely based on his or her relationship to the company.") (citation omitted).

---

and clear" of all interests, liens and encumbrances (the "**363 Order**"). Among the assets sold were 6 million shares of common stock of Warsun Nigeria representing all of the shares of common stock held by Warsun in Warsun Nigeria. *Id.* at 599. The damage claims that the plaintiffs asserted against Modern Africa in the district court complaint included claims for (i) breach of fiduciary duty to plaintiffs as minority shareholders of Warsun; (ii) conversion of the plaintiffs' interests in Warsun; and (iii) a conspiracy claim. *Id.* at 600. Modern Africa moved the district court for an order either transferring the adversary proceeding to the bankruptcy court (pursuant to 28 U.S.C. §§ 1404(a) and 1412) or dismissing the complaint (pursuant to Fed. R. Civ. P. 12(b)(6)). The district court denied the motion to transfer the action in part because the breach of fiduciary duty claim did not fall within the subject matter of the bankruptcy court because the plaintiffs did not seek monetary damages from Warsun and Warsun would not ultimately be responsible for any damages awarded to the plaintiffs. *Id.* at 602-03 ("[B]ecause plaintiffs' claims (with the exception to their claim of ownership of Warsun Nigeria) in this case are not predominantly related to the bankruptcy action, the Bankruptcy Court would lack subject matter jurisdiction under 28 U.S.C. § 1334(b), and therefore, this case cannot be transferred."). In considering whether to dismiss the claims, the district court focused on whether the claims were barred by the 363 Order, as having been transferred to Modern Africa. *Id.* at 606. The district court noted that "whether the plaintiffs' claims are legal interests that belong to the bankruptcy estate [and thus covered by the 363 Order] turns on whether plaintiffs' claims belong to the corporation, and as such must be brought as a derivative suit." *Id.* at 607. The court held that, as alleged in the complaint, the plaintiffs' breach of fiduciary claim against Modern Africa was a direct claim of the minority shareholders, not a derivative claim of Warsun. That is because in the complaint the plaintiffs alleged that Modern Africa, as majority shareholder, owed a fiduciary duty to them, and in breaching it, damaged them, but not Warsun. *Id.* The court declined to dismiss the conversion and conspiracy claims because the complaint did not allege which specific allegations were directed at Warsun and which related to special harms inflicted on the plaintiffs in their distinct status as minority shareholders. As such, the court could not conclude that they should be dismissed as barred by the 363 Order. *Id.*

Likewise, majority shareholders do not owe any fiduciary duties to minority shareholders. *See Feiner Family Trust v. VBI Corp.*, 2007 U.S. Dist. LEXIS 66916, at *22 (S.D.N.Y. Sept. 10, 2007) (citing *Phillips v. Mfr.'s Secs. Ltd.*, [1917] 116 L.T. 290, 296). Thus, a claim for breach of fiduciary duties is a derivative action and generally prohibited under Cayman Islands law. *See id.* at *17 (noting that under Cayman Islands law, "shareholders cannot ordinarily bring derivative actions for wrongs to the company since the company itself would be the proper plaintiff").

However, McEvoy asserts that Cayman Islands law recognizes an exception to this general rule under the "quasi-partnership" doctrine, which, according to McEvoy, provides for "direct actions against directors and majority shareholders." Opp'n at 5 (citing *Hayat v. Al-Mazeedi*, 2011 Mass. Super. LEXIS 73 (Mass. Super. Ct. Jan. 20, 2011)). In *Hayat*, the plaintiff was one of three shareholders of BTU Holdings (a Cayman Islands corporation), owning a 44% interest, with the remaining 56% held by the other two shareholders Al-Mazeedi and his wife Oishi. 2011 Mass. Super. LEXIS 73, at *3. Under his agreement with the majority shareholders, Hayat was promised a seat on the board as a director, the right to participate in all major management decisions, and a salary of $20,000 per month, with annual 5% increases. *See id.* After Hayat refused to approve a $1 million payment by BTU Holdings to a related company, Al-Mazeedi and Oishi stopped providing him with information on the company and its operations, stopped paying him his monthly stipend, and at a board meeting in which Hayat was not present, voted to remove Hayat from the board. *Id.* at *5. Hayat sued the majority shareholders for damages predicated on, among other things, their alleged breach of fiduciary duties to him. The defendants moved to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Massachusetts Rules of Civil Procedure. *Id.* at 1-2.

22

In analyzing the breach of fiduciary duty claim against Al-Mazeedi and Oishi, in their dual capacities as directors and majority shareholders of BTU Holdings, the *Hayat* court explained that, as a general rule, under Cayman Islands law, a director's fiduciary duties run to the corporation, but that in "special circumstances," fiduciary duties will run from a director to a shareholder, where the breach of such a duty has caused loss directly to the shareholder.  *Hayat* at *8 (quoting *Peskin v Anderson*, [2001] BCC 874, 1 BCLC 372, 379, 2000 WL 1841707 (English Court of Appeal, Civil Division)).  The court found that the imposition of fiduciary duties is "dependent on establishing a special factual relationship between the directors and the shareholders in the particular case[,]" and that "[e]vents may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary duty obligations[.]"  *Id.* at 8-9.  Among the examples of "special circumstances" cited by the court included instances where the directors make "direct approaches to, and [deals] with, the shareholders in relation to a specific transaction and holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of insider information in the context of negotiations for a take-over of the company's business; or supplying them specific information and advice on which they have relied."  *Id.* at 9-10.  The court found that the plaintiff had sufficiently alleged that his fellow directors had "once courted and received his trust and confidence but has since frozen him out of corporate affairs and profit participation" to survive a motion to dismiss.  *Id.* at 10-11.

The *Hayat* court next analyzed the fiduciary duties owed by the defendants, as majority shareholders, to Hayat, as the minority shareholder, under Cayman Islands law.  The court noted that the Cayman Islands courts have recognized a species of business corporations for "quasi-

23

partnerships" where "the principals enjoy a relationship of trust and confidence similar to that

obtaining between partners[.]"  *Id.* at 11.  The court found that "[t]he typical characteristics of

such a company are that there should be (i) a business association formed or continued on the

basis of a personal relationship of mutual trust and confidence; (ii) an understanding or

agreement that all or some of the shareholders should participate in the management of the

business; and (iii) restrictions on the transfer of shares so that a member cannot realize his stake

if he is excluded from the business."  *Id.* at 11-12 (quoting *CVC/Opportunity Equity Partners

Ltd. v. DeMarco*, 2002 CILR 77, 88)).  This doctrine is meant to relax "corporate formalities and

contractual obligations, where necessary to honor the understandings and expectations of

principals who formerly enjoyed a relationship of trust and confidence."  *Id.* at 13 (citing

*Donahue v. Rodd Electrotype Co. of New England Inc.*, 367 Mass. 578 (1975); *Samia v. Central

Oil of Worcester, Inc.*, 339 Mass. 101, 109 (1959)).  The *Hayat* court noted, however, that the

quasi-partnership doctrine has been restricted in its application to a Cayman Islands statutory

winding-up of a solvent company, brought on the "just and equitable" ground, and therefore, has

been deployed "only in cases in which the aggrieved shareholder seeks, at least nominally, a

winding-up of the company."  *Id.* at 15.  Nevertheless, the court found that a Cayman Islands

court in a winding up proceeding could grant at least some of the relief sought by the plaintiff as

an alternative to a winding-up order, and that it could similarly order such relief.  The *Hayat*

court thus allowed the breach of fiduciary duties claim to proceed as a civil action and concluded

that the plaintiff had stated a claim for breach of fiduciary duties under Count 1.  *Id.* at 17-19.

McEvoy's reliance on *Hayat* is misplaced.  The communications that McEvoy says that

gave rise to a fiduciary relationship between the Employee Investors and the Directors/Apollo

are those contained in a PowerPoint allegedly distributed to the Employee Investors in 2006.  *See*

Opp'n Ex. 2; *see also* Florida Compl. ¶ 20 (quoting portions of the PowerPoint).  Even

assuming, *arguendo,* that the distribution of the PowerPoint could constitute "close contact" with

the "greater than 300" Employee Investors who are "geographically diverse across the United

States and the world" (*id*. ¶ 14), McEvoy does not allege that either Turner or Beith had any

involvement in the creation or distribution of that document.  Paragraph 73 contains the only

allegation in the Florida Complaint that there was a fiduciary relationship among the Directors

and the Employee Investors.  It states that "Turner and Beith, by virtue of their respective roles

as directors of CIL and employees of Apollo . . . owed a special duty of care to the minority

Employee Investor shareholders."  *Id.* ¶ 73.  However, as noted previously, Cayman Islands law

is clear that directors do not owe fiduciary duties to minority shareholders based solely on the

directors' relationship with the company.  *Wimbledon*, 2017 N.Y. Misc. LEXIS 2725, at *50-51;

*Feiner Family Trust v. VBI Corp.*, 2007 U.S. Dist. LEXIS 66916, at *25-26. McEvoy has failed

to state a breach of fiduciary duty claim against the Directors.

Nor has he done so with respect to Apollo.  First, as noted, *Hayat* is clear that the "quasi

partnership company" doctrine applies only in regards to the winding up of a solvent company.

*Hayat* at *13.  Here, there is no dispute that CIL is insolvent.  Next, while *Hayat* involved a close

corporation with three shareholders, McEvoy "believes that the number of Employee Investors is

greater than 300[,]" and, in any event, that "[t]he members of the Employee Investors are

numerous and geographically diverse across the United States and the world so that joinder is

impractical." Florida Compl. ¶ 14.  Although McEvoy alleges that CIL was a closely held

corporation in May 2012 (*id.* ¶ 23), that is plainly not the case.  *See, e.g.*, Del. Gen. Corp. L. §

342(a)(1) (defining a close corporation as being held by no more than 30 shareholders); *Donahue*

*v. Rodd Electrotype Co.*, 367 Mass. at 586 (describing a close corporation as one with "a small

number of stockholders.").  McEvoy cannot plausibly allege that those 300 Employee Investors

formerly enjoyed a "relationship of trust and confidence" with Apollo.  Finally, *Hayat* is

inapplicable because McEvoy has not alleged, nor can he, that there was an agreement that the

Employee Investors participated in CIL's corporate management.  McEvoy asserts that "the

Employee Investors purchased the restricted shares in CIL based on Apollo's representations to

the Employee Investors that the Employee Investors would obviously participate in the

management of CEVA Logistics[,]" (Florida Compl. ¶ 21) and that "Apollo [] exercised

complete dominion and control over CIL by and through its employees, Turner and Beith, CIL's

directors." *Id.* ¶ 74.  There are no facts pled anywhere that the Employee Investors played a role,

or otherwise participated, in any management decisions made at CIL.  McEvoy has failed to

assert direct claims against for breach of fiduciary duty against Apollo because he has failed to

meet his burden of alleging facts demonstrating a "special relationship" giving rise to a

shareholder-to-shareholder fiduciary duty.  *See Wimbledon*, 2017 N.Y. Misc. LEXIS 2725, at

*51 (finding that plaintiff's mere averment that a shareholder owed fiduciary duties to another

shareholder under Cayman Islands law was insufficient to survive dismissal "because no

explanation was provided as to why a 'special relationship' exists in this case.").

　　　McEvoy likewise has failed to allege direct fraud claims against Apollo or either

Director.  The elements of a fraud claim are: (1) a misrepresentation of an existing material fact;

(2) knowingly or recklessly made by one party to another; (3) with the intent to deceive, or

scienter; (4) which misrepresentation is justifiably relied upon; (5) to the detriment of the party

relying on it.  *See In re Acrex, Inc.*, No. 13-13133 (ALG), 2014 WL 3586533, at *3 (Bankr.

S.D.N.Y. July 21, 2014) (citations omitted).  As previously discussed, McEvoy has not alleged

any direct, particularized damages to the Employee Investors.  Moreover, he has failed to allege

material false representations to the shareholders, other than those associated with the

PowerPoint presentation in 2006, and has not alleged that the shareholders took any action with

regard to the 2013 transactions that are the subject of the Florida Complaint, in reliance on any of

those representations.  In essence, the fraud claims merely repackage the estate's fraudulent

transfer claims relating to the CEVA Equity Transfer.  Upon the commencement of CIL's

chapter 7 case, those claims vested in the Trustee.  *See M.Y.G. Tex Ltd. v. Tie Cargo Corp*, 96

CIV. 5226 KMW HBP, 1997 WL 777372, at *3 (S.D.N.Y. Dec. 17, 1997) (fraudulent

conveyance claims are property of the trustee alone and a stakeholder may not "push its way to

the front of the line of creditors" by asserting disguised fraudulent transfer claims); *see also BRS

Assocs. L.P. v. Dansker*, 246 B.R. 755, 774 (S.D.N.Y. 2000) (dismissing suit by debtor's

investors and creditors for claims of breach of fiduciary duty and fraudulent conveyance that

were identical to claims previously settled by trustee).

## Conclusion

The Motion is granted.  Based upon the foregoing, the Court finds that the claims at issue

in the Florida Complaint are derivative claims that are assets of the CIL estate, not direct claims

belonging to McEvoy and the Employee Investors.  In prosecuting the Class Action, McEvoy

and his counsel are violating the automatic stay.  *See* 11 U.S.C. § 362(a)(3); *see also Sec. Inv'r

Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 443 B.R. 295, 318 (Bankr. S.D.N.Y. 2011)

(concluding that "the Third Party Actions as against the Madoff Defendants are directly violative

of the extant stays, specifically the automatic stay under section 362(a) and at least one of the

District Court Stay Orders, and are therefore void *ab initio* as against these defendants" and

enjoining the Third Party Plaintiffs, under 11 U.S.C. § 105(a), from proceeding with the Third

Party Actions).  The Class Action is null and void *ab initio* as to the Defendants and McEvoy

and his professional are enjoined from prosecuting that action.  *See id.*


      IT IS SO ORDERED.

    Dated: New York, New York

        April 24, 2018

                                      /s/ *James L. Garrity, Jr.*
                                      Honorable James L. Garrity, Jr.
                                      United States Bankruptcy Judge